**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------

ASSOCIATION OF CONTRACTING
PLUMBERS OF THE CITY OF NEW YORK,
INC.; PLUMBING-HEATING-COOLING
CONTRACTORS—NATIONAL
ASSOCIATION; PLUMBERS LOCAL UNION
NO. 1, UNITED ASSOCIATION OF
JOURNEYMEN AND APPRENTICES OF THE
PLUMBING AND PIPEFITTING INDUSTRY
OF THE UNITED STATES AND CANADA;
NEW YORK STATE ENERGY COALITION,
INC.; THE PLUMBING FOUNDATION CITY
OF NEW YORK, INC.; LICENSED
PLUMBING ASSOCIATION OF NEW YORK
CITY, INC., d/b/a MASTER PLUMBERS
COUNCIL OF THE CITY OF NEW YORK; and
BUILDING INDUSTRY ASSOCIATION OF
NEW YORK CITY, INC.,

                     Plaintiffs,

      v.

CITY OF NEW YORK,

                     Defendant.

---------------------------------------------------------------------

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**Civil Action No. 1:23-cv-11292**

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiffs Association of Contracting Plumbers of the City of New York, Inc.; Plumbing-Heating-Cooling Contractors—National Association; Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; New York State Energy Coalition, Inc.; The Plumbing Foundation City of New York, Inc.; Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York; and Building Industry Association of New York City, Inc., seek declaratory and injunctive relief under federal law against enforcement of the City of New York's ordinance that bans combustion appliances (the "ban" or "gas ban") that are subject to regulation under the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422.

2.      The City of New York's effective ban on gas or oil equipment in new buildings is preempted by EPCA and therefore unenforceable.  As the only federal appellate court to have addressed this issue recognized, EPCA preempts state and local laws relating to the use of energy, such as gas or heating oil, by covered appliances and equipment.  The City's ban prohibits any combustion equipment with carbon dioxide emissions levels over a certain threshold, as determined by the Energy Information Administration's emissions factors; by design, the City set that level so low as to ban all gas and oil appliances.  The City's gas ban thus prohibits all fuel gas appliances, violating federal law.  EPCA reflects Congress's decision that the nation's energy policy cannot be dictated by state and local governments; such a patchwork approach would be the antithesis of a national energy policy.

3.      Further, millions of New York City residents use fuel gas (including natural gas and heating oil) for home heating, cooking, and hot water, and the decision to outright prohibit the use of all fuel gas in new buildings is at odds with citizens' and businesses' need for reliable,

resilient, and affordable energy.  Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice, exacerbates the problem of housing affordability, and will shift energy demand onto already overburdened electric grids.  Plaintiffs support achieving the City's (and State's) climate goals, but with the majority of New York's electric generating capacity coming from gas-fired power plants, banning gas in homes will do little if anything to advance those goals—and in all events, the City must comply with federal law.

4.      Plaintiffs are trade associations and a union whose members rely on the availability of gas and oil appliances and systems for their livelihoods.  Plaintiffs and their members work in various industries such as construction, delivery, and servicing related to fuel gas and fuel gas appliances.  New York City's ban, which is set to go into effect on January 1, 2024, is already chilling and undermining the livelihoods of Plaintiffs' members, decreasing job opportunities and construction project work, disrupting long-term business strategy and asset planning, and jeopardizing jobs and hiring and training programs.  Ultimately, the ban will compel Plaintiffs' members to exit some or all of their work, businesses, or jobs—all despite the ban's express preemption under federal law.  The ban presents a significant threat for businesses in New York City that sell, install, and service gas plumbing and infrastructure, and already it is causing irreparable harm to Plaintiffs and their members.

5.      The federal energy policy reflected in EPCA was born out of the oil crisis of the 1970s and reflects concerns with energy independence, domestic supply, and national security.  The federal regulatory scheme requires a practical approach to energy regulation, maintaining neutrality on energy sources and recognizing the need for a diverse energy supply.  This is for good reason: A patchwork approach is unworkable, undercuts a coordinated national energy

policy, overlooks the public's need for reliable and resilient energy, and denies consumers choice.

6.     EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances.  The thrust of EPCA is that nationally uniform energy use and energy efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply, and that those standards should use consumption objectives that do not favor one type of energy or appliance over another.  EPCA thus expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which EPCA sets energy conservation standards, leaving only narrow room for concurrent state and local regulations that meet certain stringent statutory conditions.  EPCA's default rule is federal preemption; Congress intended for national policy to control.  *See, e.g.*, 42 U.S.C. § 6297(c); S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

7.     Indeed, the United States Court of Appeals for the Ninth Circuit recently invalidated the City of Berkeley's prohibition on gas piping in new buildings, holding that it was preempted by EPCA.  *See Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *petition for reh'g en banc filed*, No. 21-16278 (9th Cir. May 31, 2023).  The unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings," and that Berkeley could not do indirectly (by prohibiting gas piping) what it could not do directly.  *Id.* at 1056.  New York City's ban on combustion emissions in new buildings prohibits use of gas appliances and thus does exactly what the Ninth Circuit concluded was preempted.  No statutory exemption to preemption applies to New York City's ban.

8.     In short, New York City's gas ban is already causing substantial adverse consequences for Plaintiffs and the public.  New York City's effort to bypass federal law to

implement its own energy policy violates EPCA, is contrary to the public interest, and causes irreparable harm to Plaintiffs and their members.  Plaintiffs accordingly bring this action seeking a declaration that New York City's gas ban is preempted by EPCA and therefore unenforceable, as well as an injunction preventing its enforcement.

## JURISDICTION

9.      This Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

## VENUE

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant New York City is the sole defendant and resides in this District within the meaning of § 1391(c)(2). Venue is also proper under § 1391(b)(2) because a substantial part of the acts and events giving rise to the claim occurred in this District, including because the local law at issue will be enforced here.

## PARTIES

11.      Plaintiff Association of Contracting Plumbers of the City of New York, Inc. is a nonprofit trade association organized under the laws of New York with its principal office in New York City.  The Association of Contracting Plumbers represents union-affiliated licensed master plumbers in the City of New York.  Its 63 member firms employ several thousand plumbing technicians, including union journeymen and apprentices of the UA Plumbers Local 1, and are responsible for a large variety of new construction work in New York City, including large high-rise residential and commercial buildings,  as well as industrial work and repair work.  Among the Association of Contracting Plumbers' purposes are to improve public health through the proper

and adequate installation of sanitary systems, to support good relations with the public and the building construction industry, and to ensure its members' ability to provide quality plumbing contracting services for all New York City consumers and builders.

12. The impending gas ban is causing current and imminent harm to the Association of Contracting Plumbers' members. One or more members are suffering, or are imminently facing, harm to profits and operations from the gas ban. At least one member has already lost business opportunities because long-term residential construction projects are being designed or are being re-designed to proceed without gas infrastructure plans in preparation for compliance with the gas ban. With the gas plumbing work eliminated from many building projects, the projects will involve roughly 18% to 25% less plumbing work overall and therefore will employ fewer plumbers. Members are having to consider changes in their long-term asset investments and planning and will likely face decisions on the number of technicians to employ, hire, or train for installation as well as for service visits.

13. The Plumbing-Heating-Cooling Contractors—National Association ("PHCC") is a nonprofit 501(c)(6) trade association that represents the interests of plumbing and heating, ventilation, and air conditioning (HVAC) contractors across the United States. PHCC is organized under the laws of Delaware with its principal office in Falls Church, Virginia. PHCC is dedicated to the advancement of the plumbing and HVAC trades through education, training, and the promotion of industry safety and best practices.

14. PHCC estimates that its approximately 3,200 U.S.-based plumbing and HVAC contractor members employ over 64,000 plumbing and HVAC professionals across the United States, many of which sell, install, and service gas combustion plumbing and HVAC equipment, parts, controls, and supplies on both a residential and commercial scale. In the State of New York,

there are approximately 212 plumbing and HVAC contractors who are PHCC members via its state affiliate, the New York State Plumbing-Heating-Cooling Contractors, and its regional affiliate, the Association of Contracting Plumbers of the City of New York, Inc. All members of the regional affiliate and many members of the state affiliate have plumbing and/or HVAC contracting businesses domiciled in New York City or are otherwise licensed to perform plumbing and/or HVAC services in New York City and its surrounding metropolitan areas.

15. PHCC and its New York affiliates are harmed or will imminently be harmed by the impact of New York City's gas ban in new construction as it will render obsolete a critical skillset of the plumbing and HVAC trades. The elimination and/or phaseout of gas connections in construction contracts will force plumbing and HVAC professionals out of work and reduce the need for their services. Residential and commercial plumbing and HVAC customers will have fewer and arguably less reliable choices in how heat and comfort are provided in their dwellings.

16. Plaintiff Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("Local 1") is a labor union with its principal office in New York City. It represents the employees of New York City licensed plumbing contractors and has approximately 6,000 members who work in all five boroughs of New York City in the industrial, commercial, institutional, and residential sectors of the construction industry. Its members provide sophisticated piping systems and their work spans from underground installations to final connections of fixtures and equipment. Local 1 spends millions of dollars annually in training and educating its members in code, theory, and certification of all installations. Local 1's mission is to educate and train highly skilled journeymen and apprentices, to support the working conditions and environment of its members, and to protect the health of New York City residents through providing quality plumbing services.

17.     The impending gas ban is causing current and imminent harm to Local 1 and its members.  The loss of work on gas infrastructure as a result of the ban will cost some of its members their jobs, result in lower hours worked by members, or lead to hiring freezes.

18.     Plaintiff New York State Energy Coalition, Inc. (the "Coalition") is a nonprofit trade association organized under the laws of New York with its principal office in Hauppauge, New York.  Its members include retail heating oil providers, wholesale and terminal operators supplying those retailers with heating oil, independent transporters and associate members who are affiliated in one way or another with the heating oil industry.  Its members have businesses and work in the five boroughs of New York City, Long Island, and Westchester.  Its mission is to provide representation, education, and constructive ideas on industry issues for its members including representing its interests to other branches of industry and to government.  The Coalition safeguards the interests of its members in conducting their business in economic freedom and the integrity of the industry it represents to ensure public acceptance of its products.

19.     The impending gas ban is causing current and imminent harm to the Coalition's members who do business in New York City.  At least one member has already suffered or will imminently suffer harm to its business in the loss of potential customers, reduced business opportunities, and reduced sales.  Its members are also impacted in terms of planning for long-term investments, such as transport or service vehicles, and for hiring and training employees.

20.     Plaintiff The Plumbing Foundation City of New York, Inc. is a nonprofit trade association of licensed contracting firms, engineering associations, manufacturers, and suppliers and is organized under the laws of New York with its principal office in New York City.  Its members comprise approximately 195 union and non-union New York City licensed master plumbers, who employ thousands of technicians in the City, as well as approximately 15 associate

members including engineering firms, manufacturers, and supply houses. Its Gas Operator Qualification Membership Program has approximately 800 New York City licensed plumbing companies and 2,000 technicians. The Plumbing Foundation also has reciprocal memberships with associations like the International Association of Plumbing & Mechanical Officials and NYS American Society of Plumbing Engineers. Its mission is to ensure the public health through the enactment and enforcement of safe plumbing codes and to educate the plumbing industry and the general public on issues relating to plumbing.

21.     The impending gas ban is causing current and imminent harm to The Plumbing Foundation's members who do business in New York City. Gas plumbing constitutes anywhere from about 20% to a substantial majority of the work of member master plumbers, and members have already experienced or will imminently experience adverse economic impacts from the New York City ban. At least one member, which has roughly 20% to 25% of its work come from gas plumbing, has already seen a reduction in business, as builders are designing or redesigning projects to eliminate gas. The member is already having to assess the impact on long-term investments for its business, such as the number of service vans that will be needed. Another member has already experienced a roughly 30% drop in sales of plumbing supplies, such as piping and fittings.

22.     Plaintiff Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York ("Master Plumbers Council") is a nonprofit corporation organized under the laws of New York with its principal office in Queens County, New York. The Master Plumbers Council is a professional trade association whose membership comprises licensed master plumbers and their affiliates in the City of New York. It has more than 300 members, including nearly 250 licensed plumbers in New York City, along with associated

businesses.  The Master Plumbers Council strives to promote the licensed plumbing industry and the benefits of hiring a licensed and insured firm, as well as providing education and clarification on a wide assortment of code issues.

23.     One or more members of the Master Plumbers Council are suffering, or are imminently facing, lost business as a result of the gas ban.  For example, building renovations planned with gas piping have been changed to use all-electric systems, resulting in members' contracts being downsized or canceled; eliminating gas piping reduces the amount of plumbing work a project requires.  At least one member has also experienced an overall reduction in business hours.

24.     Plaintiff Building Industry Association of New York City, Inc. is a not-for-profit corporation organized and existing pursuant to the laws of the state of New York with its principal office in Staten Island.  The Building Industry Association's members generally comprise builders, developers, architects, and related trades engaged primarily in the construction of one- and two-family houses and similar buildings in New York City; of 89 members, roughly 30 are builders or developers.  The Building Industry Association's stated purpose is to promote cooperation "with all branches of the home building industry including, but not limited to homebuilders, contractors, sub-contractors, manufacturers, dealers, suppliers, tradesmen, mechanics and financial institutions within the City of New York, principally in the boroughs of Staten Island and Brooklyn, for the purpose of mutual advantage and for the benefit of the industry as a whole."

25.     The impending gas ban is causing current and imminent harm to the Building Industry Association's members.  One or more members are suffering, or are imminently facing, harm to profits and operations from the gas ban.  The specific manner by which its members will suffer harm includes an inability to market and sell new construction to prospective purchasers

who prefer gas appliances and heat because the ban prevents members from making gas appliances available in new construction; the likelihood that prospective home purchasers will purchase new construction outside of New York City due to their inability to have gas appliances, resulting in lost business; and the inability of its members to develop and sell new construction with gas appliances if electric infrastructure becomes unable to support such construction.  Further, the cost associated with the installation of electric appliances will increase the expense associated with such construction and make new homes less marketable.  Members are having to consider changes in their long-term investments and planning and will likely face decisions on the number and type of employees to hire or train.

26.     Accordingly, Plaintiffs and their members are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the impending gas ban.  For example, a member of one Plaintiff has already seen its business drop by 30%, and members of other Plaintiffs have seen construction projects and contracts modified to remove gas plumbing, which can constitute from 18% to 25% of the plumbing work in new buildings.  Other Plaintiffs' members have suffered or will imminently suffer reduced work hours, impacts on long-term planning and investment, and diminished company values.

27.     Plaintiffs each have standing to bring this action because the interests they seek to address through this action are germane to their fundamental purposes; each Plaintiff has one or more members that are or will be injured as a result of the ban and would independently have standing; and the claims asserted seek only declaratory and injunctive relief and therefore do not require participation of individual members.

28.     Defendant City of New York is a municipal corporation existing under the laws of the State of New York.

29.     An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of New York City's gas ban.  Plaintiffs contend that the gas ban is preempted by EPCA.  Plaintiffs are informed and believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and asserts that its gas ban is lawful and enforceable.

30.     Enforcement of the gas ban will injure Plaintiffs or their members.  Those injuries will likely be redressed by a favorable ruling from this Court.

31.     Plaintiffs challenge the facial validity of certain provisions of the New York City gas ban.  There is no set of circumstances under which New York City's gas ban would be valid under federal law.

## ALLEGATIONS

### The New York City Gas Ban

32.     On December 15, 2021, the New York City Council passed Local Law No. 154 of 2021.  The Mayor of New York City approved the law on December 22, 2021.  *See* N.Y.C. Local Law No. 154 (2021) (codified at N.Y.C. Admin. Code §§ 24-177.1, 28-506.1).

33.     The law's intent and effect is to ban gas and fuel oil appliances in new buildings.

34.     The law amended the New York City Administrative Code to add section 24-177.1, "Prohibited emissions," which states:

a.     Buildings shall be subject to the emission limits set forth in this section in accordance with section 28-506.1.

b.     No person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within such building.

c.    Notwithstanding the prohibition in subdivision b, combustion of a substance that emits 25 kilograms of carbon dioxide per million British thermal units of energy or more shall be permitted for use within such a building where the combustion of such substance occurs in connection with a device that contains no connection to a building's gas supply line or fuel oil piping system, is used on an intermittent basis, and is not used to supply a building with heat or hot water.

d.    This section may be enforced by the department or the department of buildings.

35.    The law also created section 28-506.1 of the Administrative Code, which provides that section 24-177.1's ban applies to "[n]ew buildings."   N.Y.C. Admin. Code § 28-506.1. Specifically, section 28-506.1 provides:

New buildings shall be subject to the emissions limits set forth in section 24-177.1. The commissioner shall not approve an application for the approval of construction documents, nor issue any permit in connection therewith, for a new building that does not comply with section 24-177.1.

36.    Section 28-506.1 provides that the ban takes effect for new buildings "less than seven stories" beginning January 1, 2024, and for new buildings "seven stories or more" beginning July 2, 2027.  N.Y.C. Admin. Code § 24-177.1(1) to -(2).  Buildings for which "an application for the approval of construction documents" is submitted before the effective date are not subject to the ban.  *Id.*

37.    Section 28-506.1 also grants exceptions to various buildings, including where combustion equipment "is necessary for a manufacturing use or purpose, or for the operation of a laboratory, laundromat, hospital, crematorium, commercial kitchen as defined in section 602 of the New York city fire code, or where used for emergency or standby power, or other use allowed by rule of the department, to the extent necessary for, and in the space occupied by such use or purpose."  N.Y.C. Admin. Code § 24-177.1(9).

38.    The United States Energy Information Administration determines emissions of kilograms of carbon dioxide per million British thermal units of energy for various substances.

13

The right-hand column of the following chart shows those determinations as of September 2023:

**Carbon Dioxide Emissions Coefficients by Fuel**

| Carbon Dioxide (CO₂) Factors: | Pounds CO₂ Per Unit of Volume or Mass | Kilograms CO₂ Per Unit of Volume or Mass | Pounds CO₂ Per Million Btu | Kilograms CO₂ Per Million Btu |
|---|---|---|---|---|
| **For homes and businesses** | | | | |
| Propane | 12.68 gallon | 5.75 gallon | 138.63 | 62.88 |
| Diesel and Home Heating Fuel (Distillate Fuel Oil) | 22.45 gallon | 10.19 gallon | 163.45 | 74.14 |
| Kerosene | 21.78 gallon | 9.88 gallon | 161.35 | 73.19 |
| Coal (All types) | 3,890.78 short ton | 1,764.83 short ton | 211.47 | 95.92 |
| Natural Gas | 120.96 thousand cubic feet | 54.87 thousand cubic feet | 116.65 | 52.91 |
| Finished Motor Gasoline[a] | 17.86 gallon | 8.10 gallon | 148.57 | 67.39 |
| Motor Gasoline | 19.37 gallon | 8.78 gallon | 155.77 | 70.66 |
| Residual Heating Fuel (Businesses only) | 24.78 gallon | 11.24 gallon | 165.55 | 75.09 |

*Carbon Dioxide Emissions Coefficients*, U.S. Energy Info. Admin. (Sept. 7, 2023), https://www.eia.gov/environment/emissions/co2_vol_mass.php.

39.     As can be seen in the Energy Information Administration's chart, all listed fuel gases for homes and businesses are well over the New York City law's 25 kg $CO_2$/MBtu limit, and even the lowest emissions factor, for natural gas, is still more than twice the City's limit.

40.     Accordingly, as a practical matter, the City's emissions standard functions to ban all use of fuel gas appliances in new buildings.

41.     That was the point.  The Mayor's Office provided testimony in support of the ban, making clear that the law's purpose and effect is to require all-electric buildings and to eliminate the use of all gas appliances:

> The next generation of buildings is electric.  Setting ambitious targets for new buildings to be built without reliance on fossil fuels presents an opportunity for us to shape the future of our city and lead the world in developing the high-efficiency, electric buildings of the future.

> To meet our carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener, it is time for new buildings to be built without on-site combustion of fossil fuels.  Gas or oil heating systems lock buildings into fossil fuel infrastructure for years to come and those are years that we do not have to waste.

Testimony of the Mayor's Office Before the New York City Council Committee on Environmental Protection, Nov. 17, 2021 (addressing the proposed ban, Intro. 2317 A) (attached as Exhibit A).

42.     The New York City Council Committee on Environmental Protection, in voting on the bill, described it as a "Bill that will ban the use of natural gas in new buildings." Transcript of the Minutes of the Committee on Environmental Protection, New York City Council, Dec. 14, 2021, at 3 (Committee Chair James F. Genarro) (attached as Exhibit B).

43.     Likewise, during the debate on the bill, City Council members referred to it as the "gas ban bill." *See, e.g.*, Transcript of the Minutes of the City Council of New York Stated Meeting, Dec. 15, 2021, at 67, 88 (excerpts attached as Exhibit C); *see also id.* at 23 (Speaker Johnson: "Among the Bills is one to ban the use of gas in new buildings, helping us transition to a greener future."); *id.* at 47-48, 59.

44.     The New York City Department of Buildings published a "What You Need to Know" sheet that described Local Law 154 as the "NYC Building Electrification Law." It explained:

> The City is phasing out the usage of natural gas and fuel oil in buildings for cooking, heating and service hot water (Service HW). This impacts appliances such as cooking ranges and clothes dryers.

N.Y.C. Dep't of Buildings, LL154 of 2021: NYC Building Electrification Law, https://www.nyc.gov/assets/buildings/pdf/ll154.pdf (last accessed December 27, 2023) (attached as Exhibit D).

**Federal Energy Policy and Regulation**

45.     Born out of the oil crisis the United States faced in the early 1970s, the Energy Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422, establishes a "comprehensive energy policy" designed to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning &*

*Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004).  Among other topics, EPCA regulates the energy efficiency and energy use of covered appliances and equipment.

46.     Congress has amended EPCA several times since it was first enacted in 1975, and has progressively moved away from a laissez faire approach to appliance efficiency, which relied on consumers to choose more efficient appliances, and toward binding federal standards.  Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and energy efficiency itself and further limited state and local government authority in this area.

47.     In its original form, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency.  Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499; *Nat. Res. Def. Council*, 355 F.3d at 185.  The legislative history memorializes Congress's intent at the time: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation."  H. Rep. No. 94-340, at 95 (1975).

48.     In that early form, EPCA permitted significant state involvement, allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

49.     In 1977, President Carter created the federal Department of Energy to coordinate a federal response to the nation's energy problems.  And the next year, Congress passed a range of statutes known as the National Energy Act, which gave the federal government broader authority over energy policy and sought to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth.

50.     As part of that 1978 effort, Congress amended EPCA.  Rather than relying exclusively on labeling, the new approach "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain products.  *Air Conditioning*, 410 F.3d at 499; *see also Nat. Res. Def. Council*, 355 F.3d at 186.  The amendment also strengthened EPCA's preemption, allowing state regulations "*only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Air Conditioning*, 410 F.3d at 499.

51.     Despite these new requirements, the Department of Energy did not adopt federal minimum energy standards.  Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption.  As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

52.     Congress responded in 1987 by again amending EPCA.  Among other changes, Congress added the preemption provision at issue here.  *See* National Appliance Energy

Conservation Act of 1987, Pub. L. No. 10012, § 7, 101 Stat. 103, 117-22.

53.     The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances."  S. Rep. No. 100-6 at 2.  As Congress recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans."  *Id*. at 4 (alteration incorporated); *see also* H.R. Rep. No. 100-11, at 24 (1987) ("Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements.").

54.     The amended statute broadly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, but then it allows certain exceptions for state and local governments to regulate, so long as they comply with the statutory terms.  States can still seek permission under the amended statute to establish their own standards, but "achieving the waiver is difficult."  S. Rep. No. 100-6 at 2.  It requires showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators."  *Id.*  Moreover, Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met."  *Id.* at 10-11.  To avoid preemption, a state or local building code provision must, among other requirements, "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency."  *Id.* at 11.

55.     In 1992, Congress again amended EPCA, expanding its federal appliance program to include commercial and industrial appliances.

56.     Congress has made a handful of minor amendments to EPCA's preemption provisions since 1987, none of which are relevant here.

**EPCA's Express Preemption Provisions**

57.     EPCA expressly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, subject to a few narrow exceptions.  The statute sets out specific requirements that must be met to qualify for those exceptions.  That structure reflects Congress's choice to preempt all regulations concerning energy use and energy efficiency by covered appliances, subject to detailed conditions that must be met for state or local laws in this area to avoid preemption.

58.     EPCA regulates the energy efficiency and energy use of a variety of consumer and industrial products, which the statute calls "covered products."  Its standards for "consumer product[s]" cover a range of appliances, including water heaters, furnaces, dishwashers, and stoves.  42 U.S.C. §§ 6291(1)-(2), 6292(a).  It also contains standards for "industrial equipment," including furnaces and water heaters.  *Id.* § 6311(2)(A).  Those definitions are not tied to who is using the product.  A product qualifying as a "consumer product" but used in a commercial enterprise is still a "consumer product."  *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).

59.     The express preemption provision in EPCA's consumer product regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

60.    "State regulation" is defined to include "a law, regulation, or other requirement of a State or its political subdivisions."  42 U.S.C. § 6297(a)(2)(A).

61.    "[E]nergy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use."  42 U.S.C. § 6291(4).  "[E]nergy" is defined as "electricity, or fossil fuels."  *Id.* § 6291(3).

62.    Putting these definitions together, EPCA preempts regulations relating to "the quantity of [fossil fuel] directly consumed by" covered consumer appliances at the place where those appliances are used.  42 U.S.C. §§ 6291(3)-(4), 6297(c).

63.    Similarly, EPCA's industrial equipment provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute.  42 U.S.C. § 6316(b)(2)(A).  In the industrial product standards, "energy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use."  *Id.* § 6311(4).  And "energy" is defined in the same way as for the consumer product standards.  *Id.* §§ 6311(7), 6291(3).

64.    EPCA thus preempts regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the place where those appliances are used.  42 U.S.C. § 6311(4), (7); *id.* § 6291(3).

**New York City's Gas Ban Is Preempted by EPCA**

65.    New York City's gas ban is preempted by EPCA's express preemption provisions. The gas ban is a regulation concerning the energy use or energy efficiency of appliances covered by EPCA in that it "prevent[s] such appliances from using" fossil fuels, such as propane or natural gas.  *Cal. Rest.*, 65 F.4th at 1048 (emphasis omitted).  The gas ban therefore is preempted by federal law.

66.     The Ninth Circuit—the only federal court of appeals to have addressed the scope of preemption under § 6297(c)—recently held in *California Restaurant Association v. City of Berkeley*, *supra*, that "[b]y its plain text and structure," § 6297(c)'s preemption provision "encompasses building codes that regulate natural gas use by covered products," including those that "prevent[] such appliances from using natural gas."  65 F.4th at 1048 (emphasis omitted). That case involved a Berkeley, California ordinance that, rather than "directly banning those appliances in new buildings," banned fuel gas piping in new construction, "rendering the gas appliances useless."  *Id.*

67.     The unanimous Ninth Circuit panel explained that "EPCA preempts regulations that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used."  *Cal. Rest.*, 65 F.4th at 1050-51.  "[A] regulation that prohibits consumers from using appliances necessarily impacts the 'quantity of energy directly consumed by [the appliances] at point of use.'"  *Id.* at 1051.  Berkeley's gas ban thus was preempted by EPCA "because it prohibits the installation of necessary natural gas infrastructure on premises where covered natural gas appliances are used."  *Id.*

68.     New York City's gas ban is functionally indistinguishable from Berkeley's preempted ordinance.  New York City, rather than banning gas piping, banned the use in new buildings of any combustion materials that have emissions of kg of $CO_2$ per unit of energy (MBtu) over a level that the City set with the intent and effect of banning the use of any fuel gas.  Indeed, there is not a single substance for which the Energy Information Administration reports a $CO_2$ coefficient that can satisfy New York City's law.  *See Carbon Dioxide Emissions Coefficients*, *supra* ¶ 38.  So although the local law nominally contemplates that buildings may still have a "gas supply line or fuel oil piping system," *see* N.Y.C., N.Y., Admin. Code § 24-177.1(c), it prohibits

any appliance connected to such a system from using the energy it could provide.  Simply put, under New York City's ban, fuel gas appliances—including those covered by EPCA—cannot be used in new buildings.

69.     The gas ban does not qualify for any of EPCA's narrow exceptions to preemption.

70.     On information and belief, neither New York City nor the State of New York has applied for a waiver from the Secretary of Energy, as would be required for § 6297(d)'s exception. Nor could either lawfully obtain such a waiver.  The Secretary is authorized to grant waivers only where the "regulation is needed to meet unusual and compelling State or local energy . . . interests."  42 U.S.C. § 6297(d)(1)(B); *see id.* § 6297(d)(1)(C)(i) (interests must be "substantially different in nature or magnitude than those prevailing in the United States generally").  And EPCA prohibits the Secretary from granting waivers that would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," *id.* § 6297(d)(3), or where "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver, *id.* § 6297(d)(4).

71.     Nor can the gas ban satisfy the exception for certain building code requirements. 42 U.S.C. § 6297(f)(3).  That exception requires a regulation to meet seven specific requirements that, taken together, are intended to allow only codes that use consumption objectives and give builders choice about how to increase overall efficiency, ensuring an evenhanded policy that does not force builders to choose one type of appliance over another.  *See* S. Rep. 100-6 at 10-11 (1987).

72.     The gas ban is not included in a building code, but rather in Title 24 of New York City's Administrative Code, which addresses "Environmental Protection and Utilities."

Regardless, the ban fails several of the requirements for exemption.  It does not "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective," 42 U.S.C. § 6297(f)(3)(A).  Rather, without regard to any consumption target—or even whether the result of applying the ban makes a building use more or less energy—the ban prevents builders from selecting any appliances that use fuel gas.  Nor does it provide credits "for installing covered products having energy efficiencies exceeding" federal standards "on a one-for-one equivalent energy use or equivalent cost basis," *id.* § 6297(f)(3)(C).  No matter how far they exceed federal standards, fuel gas appliances get no credit at all because they cannot be installed.  And the gas ban does not "specif[y]" any "energy consumption or conservation objective," let alone do so "in terms of an estimated total consumption of energy" calculated in the manner prescribed by statute, *id.* § 6297(f)(3)(F).

73.    Similar to the consumer product provisions, EPCA contains only limited exceptions to the default rule of preemption of state or local regulations concerning the energy use of industrial appliances.  42 U.S.C. § 6316(2)(B).

74.    To avoid preemption for industrial appliances, a state or local regulation in a building code must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1."  42 U.S.C. § 6316(2)(B)(i).

75.    New York City's gas ban does not qualify for that exception because it is not in a building code and, in any event, it bans all gas appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

## CAUSE OF ACTION:
## FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

76.    Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

77.     New York City's gas ban is preempted by EPCA.

78.     The gas ban concerns the energy use of all gas appliances, including appliances covered by EPCA, in newly constructed buildings included within the statute.

79.     The gas ban does not qualify for any of EPCA's exemptions from preemption because:

       a.  The gas ban has not received—and is not eligible for—a waiver of preemption;

       b.  It is not in a building code;

       c.  It does not set objectives in terms of total consumption of energy;

       d.  It does not permit builders to select items otherwise acceptable under federal regulations whose combined energy efficiencies meet an objective for total energy consumption, but rather requires a particular category of items (electric appliances) while it precludes other categories of items (gas appliances);

       e.  It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards because it gives no credit for (and indeed bans) gas appliances no matter their efficiency; and

       f.  It bans all gas appliances, even when those appliances meet the federal standards.

80.     Plaintiffs and their members will be irreparably harmed if the gas ban becomes effective and is enforced.  Plaintiffs and their members have already experienced and will continue to face economic injuries, including lost sales, lost customers, lost work hours, and ultimately the demise of certain businesses or lines of business or certain jobs; their business planning, investments, and hiring decisions are and will be affected; and they face compliance burdens associated with the gas ban.

81.     Plaintiffs and their members have no adequate remedy at law for these irreparable harms.  Unless New York City is enjoined from effectuating the gas ban, Plaintiffs and their members will continue to be denied their legal rights.

82.     There will be no significant harm to New York City from an injunction because the City has no legitimate interest in enforcing an invalid law.  The balance of harms thus favors injunctive relief.

83.     An injunction is also in the public interest.  The public interest is not served by enforcing invalid laws.  Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, ensuring energy security, and protecting consumer choice, all of which is undermined by conflicting local regulation of these matters, exemplified by the City's gas ban.

84.     Plaintiffs therefore request that the Court (i) declare that the gas ban is preempted by EPCA and (ii) enjoin New York City from enforcing the gas ban.

## REQUESTED RELIEF

85.     Plaintiffs therefore request that the Court award the following relief:

a.   a declaratory judgment under 28 U.S.C. § 2201(a) that the gas ban, New York City Administrative Code §§ 24-177.1, 28-506.1, is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

b.   a permanent injunction enjoining Defendant from enforcing or attempting to enforce the gas ban, New York City Administrative Code §§ 24-177.1, 28-506.1;

    c.   costs of this suit, including reasonable attorneys' fees; and

    d.   such other and further relief as the Court may deem just and proper.


Dated:  December 29, 2023           Respectfully submitted,

*/s/ Caroline M. Walters*
Caroline M. Walters (NY Bar No. 5780739)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
400 Madison Ave., Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
Facsimile: (650) 560-3501
cwalters@reichmanjorgensen.com

Sarah O. Jorgensen (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Telephone: (650) 623-1403
Facsimile: (650) 560-3501
sjorgensen@reichmanjorgensen.com

Courtland L. Reichman (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 560-3501
creichman@reichmanjorgensen.com

Brian C. Baran (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K St. NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501
bbaran@reichmanjorgensen.com

*Attorneys for Plaintiffs*