UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING-COOLING CONTRACTORS—NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., d/b/a MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC.,

Case No.: 1:23-cv-11292 (RA)

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

-----------------------------------------------------------------------x

**<u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED</u>**

**SYLVIA O. HINDS-RADIX**
Corporation Counsel of the City of New York
Attorney for Respondent – the City of New York
100 Church Street
New York, NY 10007

Of Counsel:
    Alice R. Baker
    Christian C. Harned

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

**A.**   **The City's Need to Address Building Emissions** ................................................. 2

**B.**   **Local Law 154** ........................................................................................................ 2

**C.**   **The Energy Policy and Conservation Act** ........................................................... 3

STANDARD OF REVIEW .................................................................................................... 5

ARGUMENT ....................................................................................................................... 5

**A.**   **EPCA Creates Federal Regimes Regulating Appliance Energy Consumption and Preempts State or Local Regulations Doing the Same.** ................................................. 8

   *i.*   *EPCA Creates a Nationwide Regulatory Framework to Reduce the Energy Consumption of Certain Appliances.* ............................................................................ 9

   *ii.*   *EPCA's Narrow Preemption Provision Prohibits State and Local Regulations Addressing Appliance Energy Consumption.* ................................................................ 11

   *iii.*   *Local Law 154 Does Not Regulate Appliance Energy Consumption.* ........................ 14

**B.**   **Plaintiffs' Interpretation of EPCA is Fatally Defective.** ..................................... 15

   *i.*   *Plaintiffs Misunderstand the Meaning of "Point of Use" Within the Definition of "Energy Use," Rendering Its Incongruent With the Structure and Text of EPCA.* ................. 16

   *ii.*   *Plaintiffs' Interpretation of "Energy Use" Impermissibly Renders Other Clauses in EPCA Meaningless.* ......................................................................................................... 19

   *iii.*   *Plaintiffs' Interpretation of "Energy Use" Would Necessarily Result in Inconsistent Meanings of "Energy Use" Applied Across EPCA.* ......................................................... 20

   *iv.*   *The Word "Concerning" in EPCA's Preemption Provision Does Not Extend Its Effect to the Furthest Stretch of Indeterminacy.* ...................................................................... 22

**CONCLUSION** ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,*
   410 F.3d 492 (9th Cir. 2005) ........................................................................3, 4, 13, 23, 24

*Almendarez-Torres v. United States,*
   523 U.S. 224 (1998) ...........................................................................................................12

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................................5, 8, 15

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................................5, 6, 9, 11, 15, 18

*Bostock v. Clayton Cty.,*
   140 S. Ct. 1731 (2020) .........................................................................................................7

*Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council,*
   683 F.3d 1144 (2013) .............................................................................12, 13, 14, 15, 18

*Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.,*
   519 U.S. 316 (2010) ...........................................................................................................14

*Cal. Rest. Ass'n v. City of Berkeley,*
   65 F.4th 1045 (9th Cir. 2023) .................................................................................6, 12, 16

*Cal. Rest. Ass'n v. City of Berkeley,*
   89 F.4th 1094 (9th Cir. 2024) ........................................................................................13, 16

*Caro v. Weintraub,*
   618 F.3d 94 (2d Cir. 2010) ..................................................................................................5

*Cipollone v. Liggett Group,*
   505 U.S. 504 (1992) ..............................................................................................................6

*Commerce of United States of America v. Whiting,*
   563 U.S. 582 (2011) ..............................................................................................................6

*Dan's City Used Cars, Inc. v. Pelkey,*
   569 U.S. 251 (2013) .......................................................................................................22, 23

*Davis v. Mich. Dep't of the Treasury,*
   489 U.S. 803 (1989) ........................................................................................................7, 18

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*,
    938 F.3d 246 (5th Cir. 2019) ............................................................6

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)............................................................5

*Dubin v. United States*,
    599 S. Ct. 1557 (2023)...............................................................23

*Duncan v. Walker*,
    533 U.S. 167 (2001) ............................................................19, 20

*Egelhoff v. Egelhoff*,
    532 U.S. 141 (2001) ............................................................23, 24

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) ..............................................................7

*Marentette v. Abbot Labs, Inc.*,
    866 F.3d 112 (2d Cir. 2018) ........................................................7

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)..............................................................6, 15

*Metro. Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010)........................................................7, 14

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)...............................................................23

*NRDC v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985) ....................................................3

*N.Y. Pet Welfare Ass'n v. City of New York*,
    850 F.3d 79 (2d Cir. 2017).........................................................7

*Papasan v. Allain*,
    478 U.S. 265 (1986)................................................................5

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
    579 U.S. 115 (2016)..............................................................6, 23

*Roberts v. Sea-Land Servs.*,
    566 U.S. 93 (2012)................................................................7

*Sullivan v. Stroop*,
    496 U.S. 478 (1990)............................................................................................20, 22

*Troll Co. v. Uneeda Doll Co.*,
    483 F.3d 150 (2d Cir. 2007)..............................................................................21

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021)........................................................................................7

*United States v. Dauray*,
    215 F.3d 257 (2d Cir. 2000)..............................................................................21

*United States v. Menasche*,
    348 U.S. 528 (1955)...........................................................................................19

*Yates v. United States*,
    574 U.S. 528 (2015)...........................................................................................12

**Statutes**

Pub. L. No. 95-619.......................................................................................................4

Pub. L. No. 100-12.......................................................................................................4

Pub. L. No. 102-486.....................................................................................................5

92 Stat. 3206...............................................................................................................4

42 U.S.C. § 6201.....................................................................................................3, 5, 9

42 U.S.C. § 6291...................................................................6, 8, 9, 10, 11, 17, 19

42 U.S.C. § 6293.............................................................9, 10, 18, 19, 20, 21, 22

42 U.S.C. § 6295.................................................................................9, 10, 17

42 U.S.C. § 6296.............................................................................................9

42 U.S.C. § 6297..............................................11, 12, 13, 14, 17, 18, 20, 21, 22

42 U.S.C. § 6311...................................................................6, 8, 9, 10, 11, 17, 19

42 U.S.C. § 6312.............................................................................................9

42 U.S.C. § 6313.................................................................................9, 17, 18

42 U.S.C. § 6314....................................................................10, 18, 19, 20, 21

42 U.S.C. § 6316.................................................................................9, 12, 14

iv

Administrative Code of the City of New York § 24-177.1.............................................................2

Administrative Code of the City of New York § 28-506.1.........................................................3, 8

**Rules**
Fed. R. Civ. P. 12(b)(6)..................................................................................................................5

**Other Authorities**
S. Rep. No. 100-6 (1987)........................................................................................................4, 13, 24

H.R. Rep. 94-340 (1978)...............................................................................................................3

H. Rep. No. 100-11 (1987) ......................................................................................................13, 24

133 Cong. Rec. H881-01 (1987)..................................................................................................4

133 Cong. Rec. 3070 (1987).......................................................................................................24

Antonin Scalia and Bryan A. Garner,
     Reading Law: The Interpretation of Legal Texts (2012) .............................7, 18, 19, 20, 22

Defendant, the City of New York ("City"), submits this Memorandum of Law in support of its Motion to Dismiss the Complaint for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiffs challenge a local law that will reduce buildings' emission of greenhouse gases to mitigate the impacts of climate change and curtail the emission of other air pollutants to address local air quality concerns. Plaintiffs allege that the law is preempted by a federal statute, the Energy Policy Conservation Act of 1975 ("EPCA"). However, Plaintiffs misread that statute, erroneously concluding that EPCA is concerned with ensuring that consumers may actually use their choice of covered product. Plaintiffs' reading is fatally defective. It ignores the broader regulatory regime EPCA creates and ignores the technical meaning of terms within EPCA.

EPCA establishes a comprehensive federal regime regulating the energy consumption of a variety of appliances. EPCA does this by imposing obligations on manufacturers to comply with energy conservation standards. In order to ensure that manufacturers are subject to only one appliance energy conservation standard for a given covered product, EPCA preempts state or local regulations that "concern" the energy consumption of products that are subject to a federal standard.

The City's local law is unrelated to the regulatory regime created by EPCA. Local Law 154 of 2021 ("Local Law 154") addresses emissions from the combustion of fossil fuels in new construction and prohibits the City's Department of Buildings ("DOB") from authorizing the construction of a new building that does not comply with the combustion limits. It is unrelated to the domain expressly preempted by EPCA.

Plaintiffs' theory ignores the text and structure of EPCA's appliance regulatory regime, renders key statutory terms superfluous, and results in statutory terms having inconsistent

meanings based upon the provision they appear in. Plaintiffs' theory is without merit. As Plaintiffs' preemption claim fails as a matter of law, the Complaint fails to state a claim and must be dismissed.

## STATEMENT OF FACTS

### A.  The City's Need to Address Building Emissions

Global man-made carbon and other greenhouse gas emissions are causing increasing rates of sea level rise, frequency of extreme weather events, and rising temperatures. New Yorkers are already too familiar with the serious consequences of extreme weather, having experienced both Tropical Storm Henri and Hurricane Ida in 2021. Compl. Ex. A, ECF No. 1-1. The same fossil fuels used to heat, cool, and power buildings are responsible for nearly 70% of greenhouse gas emissions in the City and the source of significant air pollution that harms the health of New Yorkers. *Id*. In 2021, the City conducted a study, *Pathways to Carbon Neutral NYC*, that found that electrifying heating and domestic hot water systems can provide immediate emissions reduction benefits in buildings. *Id.* These emissions benefits would be realized even though electricity generation serving the City relies on the combustion of fossil fuels, and, importantly, such benefits would increase as electricity generation serving the City continues its transition to low- or no-emissions resources. *Id.* Against this backdrop, the City has taken action to reduce emissions and control local air pollution, including enacting Local Law 154.

### B.  Local Law 154

Local Law 154 amends the Administrative Code of the City of New York ("Ad. Code") to address emissions from the combustion of fossil fuels in new construction. It states that, with limited exceptions: "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy…" within new construction. Ad. Code § 24-177.1(b). This prohibition will be phased in over time. *See* Ad. Code

§ 28-506.1. With limited exception, buildings less than seven stories are currently subject to Local Law 154; most buildings seven stories or more will be subject to Local Law 154 on July 1, 2027; and buildings of all sizes will be subject to Local Law 154's emissions limit on January 1, 2028. *See Id.* Buildings used for manufacturing or operation of a laboratory, laundromat, hospital, crematorium, or commercial kitchen, among others, are exempt from Local Law 154's combustion limit. *Id.* DOB enforces Local Law 154's requirement through building permit applications and approvals. *See* Ad. Code § 28-506.1. Through this phased-in approach, Local Law 154 will effectively require new construction to be electric.

### C.  The Energy Policy and Conservation Act

Congress enacted EPCA to reduce demand for energy through energy conservation plans and improved appliance efficiency. *See generally* 42 U.S.C. § 6201; *see also* H.R. Rep. 94-340, pt. V, at 94 (1978) (noting to what degree residential energy use, and specifically residential appliances, contributed to overall domestic energy use); *NRDC v. Herrington*, 768 F.2d 1355, 1365 (D.C. Cir. 1985) (describing program). The purpose of enacting EPCA in 1975 was to, among other things, "reduce domestic energy consumption through…energy conservation programs." 42 U.S.C. § 6201(4). As related to major home appliances, EPCA required manufacturers measure the energy consumption of their products in accordance with test procedures prescribed by the Federal Energy Administration[1] and label their products with such measure of energy consumption. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,* 410 F.3d 492, 499 (9th Cir. 2005) ("*ACRI*"). "Congress believed that better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards

---

[1] The agency originally responsible for the implementation of EPCA. After the creation of the Department of Energy in 1977, it became the agency responsible for the portions of EPCA relevant here.

unnecessary." *Id.*

However, rather than waiting in hopes that manufacturers would voluntarily reach efficiency targets, Congress undertook a "complete overhaul" of national energy policy only three years later when it passed the National Energy Conservation Policy Act ("NECPA"). *See* Pub. L. No. 95-619, 92 Stat. 3206. NECPA amended EPCA to create a national conservation program for consumer appliances and required that the Department of Energy ("DOE") establish mandatory efficiency standards for covered home appliances that would achieve the maximum technologically feasible and economically justified improvement in appliance efficiency. *See* Pub. L. No. 95-619 §§ 422, 325(a) & (c).

DOE largely did not implement this mandate and, instead, authorized states to establish their own appliance energy conservation standards, resulting in a patchwork of state and local appliance standards. *ACRI*, 410 F.3d at 499; S. Rep. No. 100-6, at 4 (1987). In the face of the proliferation of separate and sometimes conflicting state and local standards that complicated the design, production, and marketing of appliances, industry trade groups negotiated with consumer groups concerned with improving appliance efficiency to establish uniform national standards that would ease the burden on manufacturers while promoting appliance energy conservation. *ACRI*, 410 F.3d at 500; S. Rep. No. 100-6, at 4. To provide uniformity and predictability to manufacturers, Congress adopted the standards negotiated between industry and consumer groups when it passed the National Appliance Energy Conservation Act of 1987 ("NAECA"). *See* S. Rep. No. 100-6, at 3-4 (1987), *see also* Pub. L. No. 100-12. In addition to adopting the negotiated standards, NAECA amended EPCA's preemption provision. *ACRI*, 410 F.3d at 500. Manufacturers agreed to comply with strict standards in order to secure stability via the preemption mechanism at issue here. *See, e.g.*, 133 Cong. Rec. H881-01 at 27 (1987) (statement of Rep. Moorehead) ("manufacturers agreed

to comply with stringent efficiency standards in order to secure stability via a strong preemption mechanism"). However, the purpose of EPCA remains "to conserve energy supplies through energy conservation programs…" 42 U.S.C. § 6201(4). The central tenet of EPCA is conceptually simple: the more efficient the appliance, the less energy it consumes. *See* 42 U.S.C. § 6201(5).[2]

## STANDARD OF REVIEW

On a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of a plaintiff. *See Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010). "When deciding such a motion, a court may consider the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A complaint will only survive a 12(b)(6) motion where it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, a court is not required to accept a plaintiff's legal conclusions as true. *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265 (1986)).

## ARGUMENT

### POINT I

### LOCAL LAW 154 IS PLAINLY NOT PREEMPTED BY EPCA

Plaintiffs ask this Court to find that Local Law 154 is expressly preempted by a

---

[2] Congress expanded EPCA's appliance efficiency regime to commercial and industrial products via the Energy Policy Act of 1992. *See* Pub. L. No. 102-486.

statute that obligates manufacturers to reduce the energy consumed by their appliances in accordance with federal performance standards or design requirements and, in exchange, frees them from state and local regulations affecting appliance energy consumption. Local Law 154 does not create any appliance performance standard or design requirement, *see* 42 U.S.C. §§ 6291(6), 6311(18), nor does it regulate appliance energy consumption at all. Thus it is not preempted by EPCA. Plaintiffs' theory must be rejected and the Complaint dismissed. *See Twombly*, 550 U.S. at 555 (courts need not accept a plaintiff's legal conclusions on a motion to dismiss).

Where "a federal law contains an express preemption clause, [courts] focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Com. of U.S. of Am. v. Whiting*, 563 U.S. 582, 594 (2011).[3] However, courts must "identify the domain expressly pre-empted" by an express preemption provision because "interpretation of the statutory language does not occur in a contextual vacuum." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992). "[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case," as "any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose." *Medtronic*, 518 U.S. at 485-486 (internal quotations omitted) (noting Congressional intent is discerned from "the language of the pre-emption statute and the statutory framework surrounding it" as well as the "structure and purpose of the statute as a whole."). When the preempted subject matter is essential to a challenged law's operation, it is preempted by an express

---

[3] It is unclear if a presumption against preemption applies where a statute contains an express preemption clause. *See Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (courts "do not invoke any presumption against preemption), *cf. Cal. Rest. Ass'n. v. City of Berkeley*, 65 F.4th 1045, 1056-57 (9th Cir. 2023) (O'Scannlain, J., concurring) ("the court did not mention—much less overrule—the decades of cases" applying the presumption against preemption); *see also Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (collecting circuit split).

preemption provision. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). The burden of establishing preemption rests with the party asserting such claim. *See*, *e.g.*, *Marentette v. Abbot Labs, Inc.*, 866 F.3d 112, 117 (2d Cir. 2018); *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017).

Understanding the domain expressly preempted by EPCA requires statutory interpretation guided by well-established principles. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989); *see also Roberts v. Sea-Land Servs.*, 566 U.S. 93, 101 (2012); Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). Generally, courts must interpret a statute in accord with the ordinary meaning of its terms at the time of enactment. *See*, *e.g.*, *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020); *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). However, it is well-established that when addressing scientific or technical subject, technical meanings apply. Scalia and Garner, Reading Law at 73; *see*, *e.g.*, *Van Buren v. U.S.*, 141 S. Ct. 1648, 1658 n.7 (2021) (citing Scalia and Garner, Reading Law at 73).

As discussed below, applying the well-established principles of statutory interpretation reveals that EPCA's comprehensive structure regulates appliance energy consumption, of which preemption is one piece. Plaintiffs, however, ignore these bedrock principles and misinterpret key statutory terms to reach their desired—and incorrect—conclusion. As EPCA does not preempt local regulations unrelated to appliance energy consumption, the

Complaint fails to state a claim and must be dismissed.

**A.** **EPCA Creates Federal Regimes Regulating Appliance Energy Consumption and Preempts State or Local Regulations Doing the Same.**

EPCA creates federal regulatory regimes aimed at reducing the energy consumption of certain consumer and industrial appliances over time.[4] These two regimes provide that, when a manufacturer designs appliances in compliance with DOE's energy conservation mandates, the manufacturer may market and sell the appliances within the United States. The appliances subject to EPCA's regulatory framework are known as "covered products," which include "any article…of a type—(A) which in operation consumes, or is designed to consume, energy… and (B) which, to any significant extent, is distributed in commerce for personal use or consumption[.]" 42 U.S.C. §§ 6291(1), 6921(2).[5] In concert with these regimes, EPCA preempts any state or local regulation that addresses a covered product's energy consumption once DOE establishes a federal energy conservation standard for that product. Local Law 154 does not address the energy consumption of any appliance. Instead, it prohibits the combustion of high emission fuels in new construction. Ad. Code § 28-506.1. Though Local Law 154 will ultimately prevent the actual use of an appliance relying on a prohibited fuel source, neither EPCA's regulatory regimes nor its preemption provisions guarantee consumers' the ability to actually use covered products. As the Complaint relies on EPCA providing such guarantee, it fails to state a claim and must be dismissed. *See Iqbal*, 556 U.S. at 678 (a complaint must create a reasonable inference that a defendant is liable in order to survive dismissal); *Twombly*, 550 U.S. at 555 (courts

---

[4] EPCA regulates consumer products, *see* 42 U.S.C. §§ 6291-6299, and industrial equipment, 42 U.S.C. §§ 6311-6317, in the same manner. The City addresses these two frameworks concurrently throughout the brief, providing citations to the relevant provisions in both the consumer product and industrial equipment sections of EPCA. Where meaningful textual differences exist between the provisions, the City notes such distinctions.

[5] In the industrial context, EPCA regulates "industrial equipment," or various categories of equipment "of a type—(i) which in operation consumes, or is designed to consume, energy; (ii) which, to any significant extent, is distributed in commerce for industrial…use; and (iii) which is not a "covered product" as defined in [Section 6291][.]" 42 U.S.C. § 6311(2)(b).

need not accept a plaintiff's legal conclusions on a motion to dismiss).

  *i.* *EPCA Creates a Nationwide Regulatory Framework to Reduce the Energy Consumption of Certain Appliances.*

   EPCA creates a nationwide regulatory framework requiring that covered products, both consumer and industrial, consume less energy, defined as "electricity [or] fossil fuels," 42 U.S.C. §§ 6291(3), 6311(7), over time. This framework requires the establishment of energy conservation standards—"a performance standard which prescribes a minimum level of *energy efficiency* or a maximum quantity of *energy use"* or a "design requirement" for enumerated products like dishwashers, clothes washers and dryers, and kitchen ranges. 42 U.S.C. § 6291(6) (emphasis added); *see also* 42 U.S.C. § 6311(18). Manufacturers must produce covered products compliant with energy conservation standards, among other substantive obligations imposed by this framework, before they may market covered products.[6] *See*, *e.g.*, 42 U.S.C. §§ 6293 (subjecting products covered by an energy conservation standard to mandatory test procedures), 6295 (subjecting manufacture of covered products to energy conservation standards); *see also* 42 U.S.C. §§ 6313, 6316(c), (e)(5)(A).

   Broadly, both "energy efficiency" and "energy use"—the two types of energy consumption limitations imposed by an energy conservation standard—are technical measures used to address different aspects of EPCA's overarching goal, which is reducing energy consumption of certain appliances. *See* 42 U.S.C. §§ 6201(4), 6291(6)(A), 6311(18), 6312. Indeed, EPCA makes this abundantly clear by defining "measure of energy consumption" as "energy use [or] energy efficiency." 42 U.S.C. § 6291(8). In contrast to the truncated definition Plaintiffs provide, *see* Compl. ¶¶ 61, 63, "energy use" is the "quantity of energy directly consumed by [a

---

[6] In addition to constraining manufacturers, EPCA also imposes pre-marketing obligations on distributors and retailers of covered products. *See* 42 U.S.C. §§ 6291(13)-(14), 6293(c), 6296.

consumer product or an article of industrial equipment] at point of use, determined in accordance with test procedures under [Section 6293 or Section 6314]." 42 U.S.C. §§ 6291(4), 6311(4). "Energy use" is the appropriate technical measure of energy consumption for products, like refrigerators, that operate constantly. 42 U.S.C. § 6295(b)(1). "Energy efficiency" is the "ratio of the useful output of services from [a consumer product or an article of industrial equipment] to the energy use of such product, determined in accordance with test procedures under [Section 6293 or Section 6314]." 42 U.S.C. §§ 6291(5), 6311(3). "Energy efficiency" is the appropriate technical measure of energy consumption for products, like air conditioners or heat pumps, which operate intermittently and only when needed. *See* 42 U.S.C. §§ 6295(c)(1), (d)(1). Both technical measures inform the same goal—reducing the energy consumption of a covered product. *See* 42 U.S.C. §§ 6291(6)(A), 6311(18).

    "Energy use" and "energy efficiency" provide instructions regarding how an energy conservation standard must measure, and subsequently limit, a covered product's energy consumption. For both technical measures of energy consumption—energy use and energy efficiency—consumption must be measured "in accordance with test procedures under [Section 6293]." *See* 42 U.S.C. §§ 6291(4), 6291(5); *see also* 42 U.S.C. § 6311(3)-(4) (requiring consumption be measured "in accordance with test procedures under [Section 6314]"). And the test procedures used must be designed to measure a covered product's energy consumption "during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3); *see also* 42 U.S.C. § 6314(a)(2) ("during a representative average use cycle"). Further, "energy use" contains the instruction that, when measuring the energy consumption of covered products, such consumption must be measured at "point of use." 42 U.S.C. §§ 6191(4), 6311(4). A "point of use" measurement instructs that the energy consumption of a covered product should be measured where it would

typically be used. When read together, these instructions require that a covered product's energy consumption be measured based on its typical operating conditions and its typical operating location. These instructions make sense in light of EPCA's overarching goal, as an energy conservation standard that did not account for an appliance's typical use conditions would have little chance of reducing appliance energy consumption over time.

Critically, EPCA's federal regulatory framework is not concerned with a consumer's actual use of a covered product, as Plaintiffs advance. Compl. ¶ 67; *infra* at I.B; *see Twombly*, 550 U.S. at 555 (courts need not accept a plaintiffs legal conclusions on a motion to dismiss). Instead, the technical measures of energy consumption—energy efficiency and energy use—are used to craft energy conservation standards that apply to manufacturers *before* a consumer product is marketed, as they are "performance standards" or "design requirements." *See* 42 U.S.C. §§ 6291(6), 6311(18). A product purchased by a consumer cannot be retroactively designed to comply with an energy conservation standard. The same is true for a performance standard.[7] Rather than contemplating actual use of a covered product, EPCA clearly contemplates requiring manufacturers to design more energy efficient products.

    *ii.*    *EPCA's Narrow Preemption Provision Prohibits State and Local Regulations Addressing Appliance Energy Consumption.*

EPCA's preemption provision provides that, "on the effective date of an energy conservation standard established…for any covered product, no State regulation concerning the energy efficiency [or] energy use…of such covered product shall be effective with respect to such product[.]"[8] 42 U.S.C. 6297(c); *see also* 42 U.S.C. § 6316(b)(2)(A) (an energy conservation

---

[7] Importantly, EPCA makes clear that the "energy use" of an appliance under the statute is a different quantity than may result during actual use. 42 U.S.C. § 6297(g).

[8] "State regulation" includes "a law, regulation, or other requirement of a State or its political subdivisions." 42 U.S.C. § 6297(a)(2)(A).

standard established for covered industrial equipment preempts "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed").[9] EPCA's preemption provision is limited in scope, as demonstrated by its section headings, use of technical terms found in EPCA's substantive provisions, and confirmed by EPCA's legislative history.

The preemption provision does not contemplate preempting every regulation that might prevent the actual use of any covered product. The heading of a section is a tool available to clarify doubt about the meaning of a statute. *Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998); *see also Yates v. U.S.*, 574 U.S. 528, 540 (2015) ("[w]hile these headings aren't commanding, they supply clues" as to Congressional intent). Here, the heading of the preemption provision clarifies the limited scope of the statutes' preemption. EPCA's preemption provision is under the heading "General Rule of Preemption for *Energy Conservation Standards* When Federal Standard Becomes Effective for Product." 42 U.S.C. § 6297(c) (emphasis added). The heading clearly indicates that preemption applies for "energy conservation standards."

The domain expressly preempted by EPCA is state or local regulations which directly or indirectly establish energy conservation standards—that is, performance standards or design requirements addressing the "energy efficiency" or "energy use" of covered products. *See Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1145 (9th Cir. 2012) (EPCA "expressly preempts state standards requiring greater efficiency than the federal standards"), *cf. Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1050 (9th Cir. 2023), *amended and superseded on denial of rehearing en banc* by *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). Nothing in the provision indicates, as Plaintiffs' theory would establish, that EPCA's

---

[9] EPCA contains nine exemptions to this general rule of preemption; however, none of these exemptions are at issue here because EPCA's preemption provision does not reach regulations like Local Law 154.

preemption provision sought to protect the *actual use* of a covered product.[10]

Such a reading is confirmed by a review of EPCA's legislative history. EPCA's mandatory nationwide appliance efficiency regime was not created until the 1978 NECPA. *See ACRI*, 410 F.3d at 499. However, instead of establishing efficiency regulations, DOE largely allowed the creation of a patchwork of state standards regulating appliance energy consumption. *Id*. Manufacturers, frustrated by the lack of uniformity in appliance efficiency standards, and consumer groups, frustrated by the lack of progress in improving appliance efficiency, engaged in a compromise which became enshrined in the 1987 NAECA and established the preemption provision applicable to consumer products. *Id*., 499-500. Under this compromise, manufacturers accepted stringent and ever-evolving appliance efficiency standards and, in exchange, they would be subject to a single, federal appliance efficiency standard. *Id.* at 500. "The reason for the broader preemption standards was to counteract the systems of separate state appliance standards…which caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Id.*; S. Rep. No. 100-6 at 4; *see also* H. Rep. No. 100-11 at 23-24 (1987) (EPCA's preemption provision provides for "the basic concept of preempting *State energy efficiency standards* and allowing waivers of preemption under certain circumstances") (emphasis added); *Bldg. Indus. Ass'n*, 683 F.3d at 1145.

Simply put, the compromise reached in 1987 exists today. Manufacturers are subject to mandatory federal regulations governing the energy consumption—"energy efficiency" or "energy use"—of covered products, and DOE may promulgate more stringent standards over time. However, states and local governments may not establish regulations regarding those

---

[10] In fact, Section 6297(g) expressly contemplates that "energy use" is a different value than energy consumed during actual use. *See* 42 U.S.C. 6297(g).

product's energy consumption where the federal government has already done so. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A); *see also Bldg. Indus. Ass'n*, 683 F.3d at 1145. This compromise was not intended to, nor does it, guarantee consumers the *actual use* of covered products, as Plaintiffs maintain EPCA's preemption provision does. *See* Compl. ¶¶ 62, 64.

     *iii.*    *Local Law 154 Does Not Regulate Appliance Energy Consumption.*

Local Law 154 is not preempted by EPCA's consumer product or industrial equipment frameworks because it does not regulate the energy consumption of any regulated product. Local Law 154 does not reference energy conservation standards, nor are energy conservation standards essential to the operation of Local Law 154. *See Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 324-25 (2010) (stating that a law is preempted when preempted subject matter is referenced or essential to the law's operation); *Metro Taxicab Bd. of Trade*, 615 F.3d at 157 (same). Local Law 154 clearly does not directly regulate the energy consumption of a covered product by establishing a performance standard or design requirement setting a minimum level of energy efficiency or maximum level of energy use. Local Law 154 also does not indirectly regulate the energy consumption of a regulated product by preventing the purchase of a product because of its energy consumption that is otherwise compliant with a federal standard established under EPCA. *Cf. Metro Taxicab Bd. of Trade*, 615 F.3d at 157 (discussing a local regulation within a domain of preemption). Therefore, Local Law 154 cannot be preempted by EPCA.

Local Law 154 *does* regulate the combustion of certain fuels that exceed the reasonable emissions limit imposed by the City. Such a regulation is permissible and fundamentally not a concern of EPCA. Though true that Local Law 154 will ultimately prevent the *actual use* of some regulated products, it does not do so because of their energy consumption—

the domain expressly preempted by EPCA. *See Medtronic, Inc.*, 518 U.S. at 485; *Bldg. Indus. Ass'n*, 683 F.3d at 1145. Furthermore, EPCA does not provide a consumer a right to actually use a covered product. As Local Law 154 does not infringe on the preempted domain, it is not preempted under EPCA. The Complaint must therefore be dismissed for failing to state a claim.

**B.   Plaintiffs' Interpretation of EPCA is Fatally Defective.**

Plaintiffs ignore the clear structure and intent of EPCA when asserting that it preempts Local Law 154. Plaintiffs' entire theory rests on a truncated reading of two statutory provisions—a portion of EPCA's preemption provision and the words "point of use" in the definition of "energy use." *See* Compl. ¶¶ 59, 62-64. Based on their reading of these two statutory fragments, Plaintiffs argue that EPCA preempts state or local regulations which prevent actual use of a covered product. Plaintiffs' theory is untenable and must be rejected. First, Plaintiffs misunderstand Congress' intent in including "point of use" in the definition of "energy use" and, in doing so, render its use incongruent with the structure and text of EPCA. Second, by emphasizing the phrase "point of use," Plaintiffs' interpretation of "energy use" impermissibly renders portions of that term's definition superfluous. Third, by misunderstanding the meaning of "point of use," Plaintiffs give "energy use" a different meaning in the preemption provisions than it holds in other provisions of EPCA, an outcome that principles of statutory interpretation urge should be avoided. Fourth, the use of the word "concerning" in EPCA's preemption provisions cannot be read as broadly as Plaintiffs desire to reach regulations which are entirely unrelated to appliance energy consumption. As Plaintiffs' claim fails as a matter of law, they fail to state a claim. *See Iqbal*, 556 U.S. at 678 (a complaint must create a reasonable inference that a defendant is liable in order to survive dismissal); *Twombly*, 550 U.S. at 555 (courts need not accept a plaintiff's legal conclusions as true on a motion to dismiss).

     i.   *Plaintiffs Misunderstand the Meaning of "Point of Use" Within the Definition of "Energy Use," Rendering Its Incongruent With the Structure and Text of EPCA.*

Plaintiffs allege that Local Law 154 is preempted because "EPCA preempts regulations relating to 'the quantity of [fossil fuel] directly consumed by' covered consumer appliances at the place where those appliances are used." Compl. ¶ 62; *see also id*. ¶ 64. To redefine the statute's text "point of use," to mean "the place where [covered appliances] are used," Plaintiffs rely on a recent opinion from the Ninth Circuit that applied the ordinary meaning of "point of use," or the "place where [covered products] are used." *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1050 (9th Cir. 2023).[11] On that basis, the Ninth Circuit concluded that, "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Id*. at 1052. Plaintiffs follow this rationale to allege that "EPCA …preempts regulations relating to…the place where those appliances are used." *See* Compl. ¶¶ 62, 64. The reliance on the ordinary meaning of "point of use," by itself, is misplaced, as it fails to apply the technical meaning of terms in EPCA and fails to read "energy use" in the context of EPCA and with a view to EPCA's overall statutory scheme. *See Cal. Rest. Ass'n*, 89 F.4th at 1119-1120 (Friedland, J., dissenting) (advising future courts interpreting the scope of EPCA's preemption against "misinterpret[ing] the statute's key terms to have colloquial meanings instead of the technical meanings required by established canons of statutory interpretation").

     Contrary to Plaintiffs' interpretation of "point of use," related provisions of the statute make clear that EPCA is unconcerned with the actual use of a covered product. For example, the definitions of both consumer products and industrial equipment—the subjects of

---

[11] Importantly, the Federal Government submitted an amicus brief advocating against a finding of preemption where a local regulation prohibits access to a fuel source, rather than establishing an appliance efficiency standard. *See Brief of the United States*, *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045.

EPCA's appliance regulatory regimes—make clear that Congress contemplated that EPCA did not *require* the actual use or even distribution of a regulated product. Congress defined "consumer product"[12] to be "without regard to whether such [product] is in fact distributed in commerce for personal use or consumption." 42 U.S.C. § 6291(1); *see also* 42 U.S.C. § 6311(2)(A) (defining industrial equipment to be "without regard to whether such article is in fact distributed in commerce for industrial or commercial use"). Though Congress defined regulated products and the parties subject to EPCA regulations, Congress never defined "consumer." *See*, *e.g.*, 42 U.S.C. §§ 6291(12)-(15), 6311(5). Similarly, EPCA's substantive provisions, which govern energy conservation standards, also do not contemplate a covered product's actual use, but rather focus on a covered product's manufacture and design. *See* 42 U.S.C. §§ 6211(6), 6295, 6313; *see also supra*, Section I.A.i. Energy conservation standards simply require manufacturers meet energy consumption performance standards *or* design requirements and ensure that, over time, those products consume less energy. 42 U.S.C. §§ 6295, 6313. These substantive provisions contemplate that when a manufacturer develops covered products in compliance with EPCA's energy conservation standards, the manufacturer may offer such product for sale, though such offering is "without regard to whether such [product] is in fact distributed in commerce." 42 U.S.C. §§ 6291(1), 6295, 6311(2)(A), 6313. And, EPCA protects manufacturers from claims where their products do not achieve the statutory measure of "energy use" under conditions of actual use. *See* 42 U.S.C. § 6297(g). In fact, no provision of EPCA expressly contemplates the right to actually use a covered product, as Plaintiffs maintain.

When reading "energy use" in the context and structure of EPCA's definitions, substantive obligations, and preemption provisions, it is clear that EPCA contemplates protecting

---

[12] A "covered product" includes consumer products covered under 42 U.S.C. § 6292.

manufacturers from compliance with a competing state or local energy conservation standard. 42 U.S.C. §§ 6297(c), 6313(b)(2)(A); *see also Bldg. Indus. Ass'n*, 683 F.3d at 1145. Such a reading is supported by EPCA's legislative history. *Supra*, Section I.A.ii. Plaintiffs' interpretation, however, ignores all of this to allege that EPCA's preemption provision is intended to protect a non-existent consumer right to actually use a covered product. *See* Compl. ¶¶ 62, 64, 81. Such a reading creates consumer rights that only spring into effect when a state or local regulation triggers the preemption provision and which are not otherwise contemplated anywhere in the statute. Plaintiffs' theory ignores EPCA's context and the place of "energy use" in EPCA's overall structure and must be rejected. S*ee Davis*, 489 U.S. at 809 ("the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"); *Twombly*, 550 U.S. at 555 (courts need not accept a plaintiff's legal conclusions as true on a motion to dismiss).

Instead, as noted above, "point of use" is a technical instruction to DOE advising that energy conservation standards need not only measure a covered product's energy consumption during a typical use cycle, *see* Sections 6293(b)(3) and 6314(a)(2), but must also measure that consumption where the product would typically be used. *See* Scalia and Garner, Reading Law at 73; *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate.'"). This reading is in line with EPCA's overall statutory scheme, which is to reduce the energy consumption of appliances by obligating manufacturers to comply with "performance standards" or "design requirements" for covered products. *Supra*, Section I.A.i. As Plaintiffs' reliance on the application of the ordinary meaning of "point of use" is incongruent with the text and structure of EPCA, their Complaint fails to state a claim and must be dismissed.

ii.   *Plaintiffs' Interpretation of "Energy Use" Impermissibly Renders Other Clauses in EPCA Meaningless.*

Plaintiffs' interpretation of "energy use," which under their reading establishes a right to actually use a covered product, would render meaningless an essential element of that very term. Such an interpretation cannot be what Congress intended. It is a court's "duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *U.S. v. Menasche*, 348 U.S. 528, 538-539 (1955). "The provisions of a text should be interpreted in a way that renders them compatible, not contradictory…[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." Scalia and Garner, Reading Law at 180.

Plaintiffs allege that "energy use" means "'the quantity of [fossil fuel] directly consumed by' covered [consumer appliances or industrial equipment] at the place where those appliances are used." Compl. ¶¶ 62, 64. Plaintiffs' reading, however, impermissibly ignores the remainder of the definition, which is that energy consumption must be "determined in accordance with test procedures under [Sections 6293 or 6314]." 42 U.S.C. §§ 6291(4), 6311(4). Indeed, Plaintiffs make no mention or reference to the required test procedures in the Complaint. *See generally* Compl.

Unlike Plaintiffs, this Court cannot ignore the complete definition of "energy use." Instead, this Court must "give effect, if possible, to every clause and word" of the definition. *See Duncan*, 533 U.S. at 174. There is no need to strain to find a definition of "energy use" that gives effect to every clause or word in its definition. As detailed *supra*, the definition of "energy use" contains two related instructions—"point of use" and "in accordance with test procedures." "Point of use" advises that energy consumption be measured only at a location indicative of where the product would typically be used. Similarly, "in accordance with test procedures" directs that

energy consumption be measured in a manner that is designed to reflect the energy consumption "during a representative average use cycle." 42 U.S.C. §§ 6293(b)(3), 6314(a)(2). Together, these instructions ensure that an energy conservation standard measures a covered product's energy consumption only where a product would typically be used *and* how such product would typically be used. Such a reading "give[s] effect…to every clause and word" of the definition of "energy use." *See Duncan*, 533 U.S. at 174.

In contrast, Plaintiffs' definition is fundamentally incompatible with this obligation. It is functionally impossible for product manufacturers to measure energy consumption both where a product is actually used by every end user and during a representative average use cycle.[13] For this reason also, the Complaint fail to state a claim and must be dismissed.

iii.   *Plaintiffs' Interpretation of "Energy Use" Would Necessarily Result in Inconsistent Meanings of "Energy Use" Applied Across EPCA.*

Again counter to the principles of statutory interpretation, application of Plaintiffs' limited interpretation of the meaning of "energy use" results in a different meaning of "energy use" in the preemption provision than it has in other sections of EPCA. In statutory construction, a word or phrase is presumed to bear the same meaning throughout a text. *See* Scalia and Garner, Reading Law, at 170; *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("identical words used in different parts of the same act are intended to have the same meaning").

The folly of Plaintiffs' interpretation of "energy use" is made clear when applying it to EPCA's labeling provisions. Section 6294 requires certain covered products be labeled to inform consumers about a products energy consumption. 42 U.S.C. § 6294; *see also* 42 U.S.C. § 6315. Section 6294(a)(2)(I) requires that some electronic devices, like televisions or personal

---

[13] And, as noted previously, EPCA contemplates that "energy use" under EPCA may be a different quantity of consumption than would occur during "actual use." 42 U.S.C. § 6297(g).

computers, be labelled to disclose the product's "energy use." 42 U.S.C. § 6294(a)(2)(I); *see also* 42 U.S.C. §§ 6315(b)-(c). Plaintiffs' definition of "energy use" is incompatible with the obligations imposed by Section 6294(a)(2)(I). If "energy use" is a measure of the energy consumed where a product is *actually* used, as Plaintiffs contend, then Section 6294(a)(2)(I) requires manufacturers to label a product with its *actual* energy consumption once an end user begins using it—something manufacturers plainly could not do. In contrast, applying the meaning of "energy use" articulated above results in the straightforward application of labeling obligations under Section 6294. *Supra* Section I.A.i. A manufacturer tests the product's energy consumption in a manner that captures where and how it would typically be used, and affixes a label containing the fixed measure of energy consumption on the product to inform the consumer of that product's energy consumption.[14]

This inconsistency arises again under Section 6293(b)(3), which requires that any test procedure applicable to a covered product be designed to produce test results "which measure…energy use…during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3); *see also* 42 U.S.C. § 6314(b). Applying Plaintiffs' meaning of "energy use," EPCA's test procedures would require a test designed to measure a consumer's actual energy use during *that consumer's* typical period of use. Such a procedure is necessarily not "representative," and again creates an unworkable system for manufacturers. Plaintiffs' interpretation would result in an absurd application of Section 6294—something that must be avoided. *See*, *e.g.*, *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007) ("it is an elemental principle of statutory construction that an ambiguous statute must be construed to avoid absurd results"); *U.S. v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd

---

[14] Though, again, EPCA does not contemplate that the value of "energy use" contained on a label will reflect the energy consumed under conditions of actual use. *See* 42 U.S.C. § 6297(g).

results"). Under Plaintiffs' interpretation of "energy use," both Sections 6294(a)(2)(I) and 6293(b)(3) would place obligations on a manufacturer before it could sell a product while simultaneously requiring that the manufacturers know how much energy a consumer might use after the sale of a product. For example, manufacturers, before sale of an appliance such as a personal computer, would need to label that computer with the energy use of each specific customer, even though a manufacturer would not know of the customer's energy use until after the computer had been sold and actually used by those customers. This position is untenable.[15]

In positing their definition of "energy use," Plaintiffs ask this Court to find that the meaning of "energy use," though only defined once, varies based on its location in the statute. Such an interpretation runs afoul of textualist principles of statutory interpretation. *See* Scalia and Garner, Reading Law, at 170; *Sullivan*, 496 U.S. at 484. For this reason also, the Complaint fails to state a claim and must be dismissed.

iv. *The Word "Concerning" in EPCA's Preemption Provision Does Not Extend Its Effect to the Furthest Stretch of Indeterminacy.*

Though EPCA's preemption provision includes the modifier, "concerning," it is not unlimited. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). The modifier "concerning" does not stretch the scope of EPCA's preemption so far as to include any regulation that might prevent the use of covered products. Instead, "concerning" ensures that EPCA preempts both direct and indirect regulations of covered product energy consumption. *See Dan's City Used Cars, Inc.*, 569 U.S. at 260 ("the breadth of the words 'related to' does not mean the sky is the limit").

"Concerning" means the same thing as "relating to" or "with respect to." *See*, *e.g.*,

---

[15] And, as noted previously, EPCA expressly provides that the "energy use" contemplated by EPCA is a different level of consumption than may occur under conditions of actual use. 42 U.S.C. § 6297(g).

*Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018); *ACRI*, 410 F.3d at 502. However, such terms must not be read too broadly. "If relate to were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as [r]eally, universally, relations stop nowhere." *Dubin v. U.S.*, 599 S. Ct. 1557, 1566 (2023) (cleaned up) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). Though such terms "refer[] to a relationship or nexus of some kind," they must be read in the context of the statute like all other statutory terms. *Id.*; *see also Puerto Rico*, 579 U.S. at 137. Failing to read such terms in the context of the statute may result in uncritical literalism that would make preemption turn on infinite connections. *See Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) (quoting *Travelers Ins. Co.*, 415 U.S. at 656).

Here, "concerning" does not expand the scope of EPCA's preemption provision from protecting manufacturers from state or local energy conservation standards to protecting a non-existent right of consumers to actually use covered products. When read in the context of the statute, a regulation concerns the "energy use" of a covered product when it burdens manufacturers such that they must modify their appliance in order to meet the regulation's requirements. Such regulation need not be a direct regulation (e.g., a performance standard), but may be an indirect regulation (e.g., a regulation that requires consumers to purchase or use more efficient appliances than allowed under a federal standard). *Dan's City Used Cars, Inc.*, 569 U.S. at 260. Local Law 154 does neither.

This reading is consistent with prior interpretations of EPCA. For example, the Ninth Circuit found that EPCA's preemption of state labeling regulations did not reach a California regulation requiring that covered products display a manufacturer name, model number, and date of manufacture. *See ACRI,* 410 F.3d at 502. The court reasoned that the preemption provision

23

concerns the labeling of covered products with their measure of energy consumption; California's regulations were too "indirect, tenuous, and remote" to relate that concern and thus were not preempted. *Id.*.

The legislative history of the relevant preemption provisions further supports such a limiting principle. Congress used broad language—"concerning"—to clarify that regulations relating to appliance energy consumption would be preempted even though they were not presented as an energy conservation standard. *See, e.g.*, S. Rep. No. 95-1294, at 118 (1978) (Conf. Rep.) (providing an example of a state prohibition on gas pilot lights which, though not directly an energy efficiency standard, would require products to consume less energy). Indeed, the legislative record makes clear that Congress sought to prohibit state or local efficiency standards. *See, e.g.*, S. Rep. No. 100-6, at 4; 133 Cong. Rec. 3070 (1987) (statement of Sen. Johnson) (describing NAECA as having "two basic principles": "to establish efficiency standards" and "to preempt State efficiency standards"); H. Rep. No. 100-11, at 23-24 (1987) (NAECA "also continues the basic concept of preempting State energy efficiency standards and allowing waivers of preemption under certain circumstances"). The use of "concerning" in the preemption provisions does not sweep in any state or local regulation that may impact a consumer's ability to actually use a covered product. To find otherwise is to engage in "uncritical literalism." *Egelhoff*, 532 U.S. at 147.

Here, the fundamental concern of EPCA's appliance conservation regime is to reduce the amount of energy a covered product is able to consume. Local Law 154 plainly does not "concern" the energy consumption of any covered product. As in *ACRI*, Local Law 154 is unrelated to that regime; it has no impact on the amount of energy any appliance is design to consume. It is unrelated to appliance energy consumption at all and, instead, regulates emissions

from fuel combustion. For this reason also, the Complaint fails to state a claim and must be dismissed.

## CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court dismiss the Complaint with prejudice and grant such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            March 1, 2024

**SYLVIA O. HINDS-RADIX**
Corporation Counsel of the City of New York

By: _____
    Christian C. Harned (NY Bar No. 5684543)
    Assistant Corporation Counsel
    chharned@law.nyc.gov
    Alice R. Baker (NY Bar No. 5023916)
    Assistant Corporation Counsel
    albaker@law.nyc.gov
    100 Church Street
    New York, New York 10007
    (212) 356-1676

    *Attorneys for the City of New York*

## CERTIFICATE OF SERVICE

Case: *Association of Contracting Plumbers of the City of New York, Inc., et al. v City of New York.* No. 1:23-cv-11292 (RA)

I hereby certify that on March 1, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**NOTICE OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED – FED. R. CIV. P. 12(b)(6)**

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED – FED. R. CIV. P. 12(b)(6)**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of New York and the United States of America the foregoing is true and correct and that this declaration was executed on March 1, 2024, at New York, New York.

Christian C. Harned

Declarant                                                                 Signature

26