UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING COOLING CONTRACTORS–NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDTATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION NEW YORK CITY, INC., d/b/a/ MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC., | CIVIL ACTION NO. 1:23-cv-11292-RA |
| Plaintiffs, | |
| v. | |
| CITY OF NEW YORK, | |
| Defendant. | |

**[PROPOSED] INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF DISMISSAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ...................................................................................................................1

I.        LOCAL LAW 154 ....................................................................................................1

II.       THE ENERGY POLICY AND CONSERVATION ACT ("EPCA")................................2

III.      THIS LAWSUIT .......................................................................................................5

LEGAL STANDARD............................................................................................................5

ARGUMENT .........................................................................................................................6

I.        EPCA PREEMPTS ONLY LAWS CONCERNING APPLIANCES'
EXCESSIVE OR INEFFICIENT ENERGY USE. ............................................................6

         A.     The statute's text, context, and history demonstrate that only state and
local regulations prescribing energy conservation standards are preempted............6

         B.     Plaintiffs' expansive preemption theory is based on a misreading of
EPCA. ...................................................................................................................13

II.       LOCAL LAW 154 CONCERNS HEALTH AND WELFARE, NOT THE
ENERGY USE OF COVERED APPLIANCES....................................................................16

         A.     Local Law 154 addresses the health and safety effects of indoor fossil fuel
combustion.............................................................................................................16

         B.     Local Law 154 addresses the urgent need to reduce carbon emissions and
accelerates the city's green transition. ...................................................................19

         C.     Local Law 154 does not regulate "energy use" within the meaning of
EPCA. ...................................................................................................................20

III.      PLAINTIFFS' READING OF EPCA'S PREEMPTION CLAUSE PRODUCES
ABSURD RESULTS. ......................................................................................................22

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

**Page number(s)**

*Ace Auto Body & Towing, Ltd. v. City of New York*,
171 F.3d 765 (2d Cir. 1999)..................................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................5

*Beauvoir v. Israel*,
794 F.3d 244 (2d Cir. 2015)...................................................................................5

*Bragdon v. Abbott*,
524 U.S. 624 (1998).............................................................................................10

*Buono v. Tyco Fire Prods., LP*,
78 F.4th 490 (2d Cir. 2023)...................................................................................7

*Cal. Rest. Ass'n v. City of Berkeley*,
65 F.4th 1045 (9th Cir. 2023) .............................................................................13

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ...................................................................... *passim*

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011)...............................................................................................7

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013).............................................................................................23

*Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*,
9 F.4th 91 (2d Cir. 2021) ......................................................................................5

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...............................................................................................9

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
508 F. Supp. 2d 295 (D. Vt. 2007)......................................................................23

*Hines v. Davidowitz*,
312 U.S. 52 (1941)...............................................................................................11

*Huron Portland Cement Co. v. City of Detroit*,
362 U.S. 440 (1960).............................................................................................25

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007)...................................................................................5

*Metro. Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152 (2d Cir. 2010)...........................................................................21, 22

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995).............................................................................................10

*New York v. Nat'l Highway Traffic Safety Admin.*,
974 F.3d 87 (2d Cir. 2020).............................................................................10, 12

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004).............................................................................3, 4, 12

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
894 F.3d 95 (2d Cir. 2018).....................................................................................2

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019)..............................................................15

*Queenside Hills Realty Co., Inc. v. Saxl*,
    328 U.S. 80 (1946)........................................................................................25

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)........................................................................................7

*Univ. Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)......................................................................................23

*Wyeth v. Levine*,
    555 U.S. 555 (2009)......................................................................................11

*Yates v. United States*,
    574 U.S. 528 (2015)........................................................................................8

## STATUTES

42 U.S.C. § 6201(5) .......................................................................................................2

42 U.S.C. § 6291(4) ................................................................................................14, 15

42 U.S.C. § 6291(6) ...................................................................................................7, 8

42 U.S.C. § 6292(a) .......................................................................................................3

42 U.S.C. § 6292(a)(9) .................................................................................................23

42 U.S.C. § 6293(b)(3) .................................................................................................15

42 U.S.C. § 6295 ...............................................................................................8, 16, 20

42 U.S.C. § 6295(b)(1) .................................................................................................16

42 U.S.C. § 6295(e)(1) .................................................................................................21

42 U.S.C. § 6297(a)(2) ...........................................................................................10, 11

42 U.S.C. § 6297(b) .......................................................................................................8

42 U.S.C. § 6297(b)(6) ...............................................................................................7, 8

42 U.S.C. § 6297(c) .....................................................................................................7, 8

42 U.S.C. § 6297(c)(4) ...............................................................................................7, 9

42 U.S.C. § 6297(d)(1) ..................................................................................................9

42 U.S.C. § 6313(a)(4)(D) ...........................................................................................25

49 U.S.C. § 32919(a) ....................................................................................................21

Pub. L. No. 94-163, 89 Stat. 871 (1975).....................................................................3, 4

Pub. L. No. 95-619, 92 Stat. 3206 (1978).......................................................................3

Pub. L. No. 100-12, 101 Stat. 103 (1987)..................................................................4, 12

N.Y.C. Admin. Code § 27-4253 (2006).........................................................................23

N.Y.C. Admin. Code § 313-01 .....................................................................................23

N.Y.C. Admin. Code § 24-177.1 ....................................................................................2

N.Y.C. Admin. Code § 24-177.1(c)................................................................................2

N.Y.C. Admin. Code § 28-506.1 ....................................................................................2

N.Y.C. Admin. Code § 28-506.1(9)...............................................................................2

N.Y.C. Loc. L. No. 43 (2010).......................................................................................24

## FEDERAL REGULATIONS

10 C.F.R. § 430.32(e)...................................................................................................24

10 C.F.R. § 430.32(e)(1)(ii).........................................................................................22

10 C.F.R. pt. 430, subpt. B, app. G at 1.4.1 ...............................................................24

47 Fed. Reg. 14,424-01 (Apr. 2, 1982).................................................................10, 12

47 Fed. Reg. 57,198 (Dec. 22, 1982).............................................................11, 12, 16

62 Fed. Reg. 38,652-01 (July 18, 1997) ......................................................................17

71 Fed. Reg. 61,144-01 (Oct. 17, 2006) ......................................................................17

72 Fed. Reg. 20,586-01 (Apr. 25, 2007) ......................................................................18

75 Fed. Reg. 6474-01 (Feb. 9, 2010) ...........................................................................18

76 Fed. Reg. 54,294-01 (Aug. 31, 2011) .....................................................................17

## LEGISLATIVE HISTORY

133 Cong. Rec. 3070 (1987).........................................................................................12

H.R. Rep. No. 95-1751 (1978) (Conf. Rep.)..................................................................3

H.R. Rep. 100-11 (Mar. 3, 1987)....................................................................................

S. Rep. No. 100-6 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52.....................................4

## OTHER AUTHORITIES

EPA, EPA-600/1-77-013, Nitrogen Oxides (1977) ......................................................17

EPA, EPA/600/R-15/068, Integrated Science Assessment (ISA) for Oxides of Nitrogen –
Health Criteria (2016) ............................................................................................18

Press Release, Office of the Mayor, Mayor de Blasio and DEP Announce that All 5,300
Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to
Significantly Cleaner Air (Feb. 9, 2016) ...............................................................24

Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*,
N.Y. Times (Dec. 28, 1990)...................................................................................23

## PRELIMINARY STATEMENT

Combustion of fossil fuels inside of our homes, schools, and workplaces is making New Yorkers sick. And the combustion of these fuels in our buildings is accelerating the climate crisis that puts New York City's future—and the planet's future—in jeopardy. New York City has responded to the threats posed by indoor fossil fuel combustion by banning this harmful practice in most new buildings.

Plaintiffs seek to block the City's urgent action to protect New Yorkers. They maintain that New York City may take no action to restrict indoor emissions if in doing so the City requires that a single product covered by the Energy Policy and Conservation Act ("EPCA") be turned off. Under their theory, EPCA—a federal law that does not address emissions—preempts all state and local laws that prevent any covered appliance from operating at any time for any reason.

Plaintiffs' theory fails. There is nothing in EPCA's text, structure, or decades of history that supports the sweeping preemption claim they press here. Plaintiffs' theory would radically alter the relationship between federal and local authorities and prevent New York City from exercising its traditional police powers to protect the health and safety of its residents. Plaintiffs' lawsuit should be dismissed.

## BACKGROUND

### I.   LOCAL LAW 154

On December 22, 2021, the City of New York ("the City") enacted Local Law 154 in response to the intertwined threats that indoor air pollution and climate change pose to New Yorkers. Combustion of fossil fuels "emit[s] a wide range of air pollutants that harm the health of New Yorkers, especially our most vulnerable." Compl. Ex. A at *2, ECF No. 1-1. And "fossil

1

fuels used to heat, cool, and power our buildings are responsible for nearly 70% of greenhouse gas emissions in New York City." *Id.*

Local Law 154 reduces the city's dangerous combustion of fossil fuels by setting a strict emissions limit on indoor combustion in new buildings. Once the limit takes effect, "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within such building." N.Y.C. Loc. L. No. 154 (2021) (codified at N.Y.C. Admin. Code §§ 24-177.1, 28-506.1). The emissions restriction phases in in stages: newly constructed buildings of fewer than seven stories are subject to the limit beginning January 1, 2024, while new buildings with seven or more stories become subject to the limit beginning July 2, 2027. N.Y.C. Admin. Code § 28-506.1(1) to (2). Buildings for which "an application for the approval of construction documents" is submitted before the effective date are not subject to the law. *Id.* The law contains numerous exceptions, including for fuel used in equipment that is used intermittently, or on an emergency basis or for standby power. *Id.* §§ 24-177.1(c); 28-506.1(9). The law also exempts buildings used for manufacturing, along with laboratories, laundromats, hospitals, crematoria, and commercial kitchens. *Id.* § 28-506.1(9).

## II.   THE ENERGY POLICY AND CONSERVATION ACT ("EPCA")

"In 1975, Congress passed the Energy Policy and Conservation Act . . . in the immediate wake of the 1973–74 oil crisis." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 100–01 (2d Cir. 2018). The law's "purpose was to reduce the likelihood of another severe energy crisis through the creation of programs focused on energy regulation, energy conservation, and, most relevant to this case, 'improved energy efficiency of motor vehicles, major appliances, and certain other consumer products.'" *Id.* (quoting 42 U.S.C. § 6201(5)).

EPCA was amended numerous times in the following years to ensure that Congress's goal of energy conservation was accomplished.

Key to EPCA's effective implementation was "improving the energy efficiency of thirteen named home appliances that Congress determined contributed significantly to domestic energy demand, as well as any additional ones that the administrator of the Federal Energy Administration ("FEA," a precursor to [the Department of Energy]), in his discretion, determined similarly contributed to energy demand." *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). This improved efficiency was to be accomplished by the promulgation of federal energy conservation standards that barred products that used too much energy in absolute terms (an "energy use" standard), or that produced too little useful output in relation to the energy they consumed (an "energy efficiency" standard). As a corollary to the federal energy conservation standards mandated by EPCA, the law also includes a preemption clause expressly displacing competing state and local standards. *See* Pub. L. No. 94-163, sec. 327(a), 89 Stat. 871 (1975). In its 1978 amendment, Congress temporarily barred any new state or local efficiency standards for products that could be subject to federal standards under EPCA, not just those already standardized, a status termed "automatic preemption." H.R. Rep. No. 95-1751, at 117 (1978) (Conf. Rep.). The 1978 law thus preempted any regulation "respecting energy use or energy efficiency of a … covered product[]," Pub. L. No. 95-619, sec. 424(a), § 327(b)(1), 92 Stat. 3206 (1978), where "covered product" referred to an appliance that could be regulated under EPCA, *see* Pub. L. 94-163, sec. 322(a) (current version at 42 U.S.C. § 6292(a)).

Because the Department of Energy ("DOE") failed to expeditiously establish national standards, local authorities resorted to issuing their own standards, which DOE permitted

through issuing preemption waivers. This produced precisely the proliferation of local efficiency

standards that Congress had sought to avoid:

> Not only was the lack of standards a concern in the face of the
> significant amount of the nation's energy demand that continued to
> be attributable to home appliances, but Congress also was concerned
> with the 'growing patchwork' of state efficiency standards that had
> developed as the result of the absence of national standards in
> conjunction with DOE's policy of granting states exemptions from
> the EPCA's preemption provision.

*Abraham*, 355 F.3d at 187 n.3 (citing S. Rep. No. 100-6, at 4 (1987), *reprinted in* 1987

U.S.C.C.A.N. 52, 54–55).

Congress therefore amended EPCA's preemption language in a 1987 amendment,

resulting in the preemption clause at issue here. The 1987 EPCA both prescribed specific

standards and eliminated automatic preemption. Notably, however, Congress did not

substantively change the particular language at issue here. Before the 1987 amendments, the

relevant preemption provision covered "any energy efficiency standard or similar requirement

with respect to energy efficiency or energy use of a covered product." Pub. L. No. 94-163, sec.

327(a)(2). After 1987, the provision covered any "regulation concerning the energy efficiency or

energy use of [a] covered product" under a subsection heading that referred to "energy

conservation standards." Pub. L. No. 100-12, sec. 7, § 327(c), 101 Stat. 103, 118 (1987).

Congress generally replaced "energy efficiency standard" with the broader concept of "energy

conservation standard" throughout the statute. *See* Pub. L. No. 100-12, sec. 2, § 321(a)(6), 101

Stat. at 103 (defining "energy conservation standard" to include "a performance standard which

prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a

covered product").

### III.    THIS LAWSUIT

On December 29, 2023, this litigation was brought by trade associations and a union whose members anticipate deriving economic benefits from the protracted use of fossil fuel appliances and infrastructure and oppose the City's efforts to limit fossil fuel combustion in new buildings. *See* Compl. ¶ 4. Plaintiffs maintain that Local Law 154 is preempted by EPCA because the ordinance bars the combustion of fossil fuels in many new buildings, and thereby prevents the use of certain appliances covered by EPCA in certain buildings. *Id.* ¶¶ 65–68. According to the plaintiffs' theory, EPCA bars any restriction on the use of any covered appliance in any building.

### LEGAL STANDARD

Defendant–Intervenors WE ACT and NY-GEO move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' complaint. "It is well established that 'to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). All reasonable inferences must be drawn in the plaintiff's favor. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "[D]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Div. 1181*, 9 F.4th 91 at 94 (quoting *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015)).

## ARGUMENT

Plaintiffs have failed to state a claim for preemption under EPCA. As the statute's text, structure, and history confirm, EPCA's express preemption provision bars state and local energy conservation standards that compete with federal standards. By contrast, EPCA has no impact on the countless state and local laws that restrict the use of covered appliances based on reasons having nothing to do with energy conservation. Plaintiffs' contrary theory abandons any coherent and logical reading of EPCA, and relies on the omission of key text and the substitution of colloquial understandings for technical terms.

EPCA does not preempt Local Law 154, which addresses the health, safety, and environmental impacts of indoor fossil fuel combustion. Local Law 154 does not regulate "energy use" or "energy efficiency" as those terms are defined under EPCA, nor does its prohibition on emissions establish an energy conservation standard.

Finally, Plaintiffs' theory produces absurd results and would radically curtail the traditional health and safety authority that allows cities like New York to protect their residents, without any indication that Congress intended such a result.

Plaintiffs' claim fails as a matter of law and should be dismissed.

## I.      EPCA PREEMPTS ONLY LAWS CONCERNING APPLIANCES' EXCESSIVE OR INEFFICIENT ENERGY USE.

### A.      The statute's text, context, and history demonstrate that only state and local regulations prescribing energy conservation standards are preempted.

EPCA authorizes the Department of Energy to regulate the design of covered appliances to prevent designs that either use too much energy in absolute terms (an "energy use" standard) or produce too little useful output relative to the energy they consume (an "energy efficiency" standard). EPCA's preemption clause is directed at state and local laws that compete with DOE's federal standards by regulating excessive or inefficient energy use at a local level. This

straightforward conclusion is confirmed by the preemption clause itself, EPCA's overall structure and context, the agency's consistent interpretation of the preemptive language and Congress's incorporation of that interpretation through re-enactment of identical language, and the statute's legislative history.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted). Here, the text of EPCA's express preemption clause, 42 U.S.C. § 6297(c), the context in which it appears, and the overall statutory scheme of EPCA all point towards the same straightforward result: EPCA expressly preempts only those laws and regulations that require EPCA-covered products to meet the equivalent of a local energy conservation standard that competes with the federal standard.

"[W]hen 'a federal law contains an express preemption clause, we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)). The preemption provision at issue here is triggered only when a federal "energy conservation standard" comes into effect "for any covered product." 42 U.S.C. § 6297(c). An "energy conservation standard" is defined, in relevant part, as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or ... water use, for a covered product, determined in accordance with test procedures." *Id.* § 6291(6). Once the federal government issues a standard for a covered product prescribing that product's performance in one of those categories—energy efficiency, energy use, or water use—EPCA provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to

7

such product." *Id.* § 6297(c). The statute's preemption provision thus mirrors the scope of authority that EPCA confers on DOE to issue performance standards. EPCA uses the same elements—the "energy efficiency," "energy use," and "water use" of a "covered product"—to define both the federal energy conservation standards that DOE issues for covered products, and to define the scope of state and local law that is preempted by the issuance of such standards. 42 U.S.C. §§ 6291(6), 6295, 6297(c).

The preemption clause's title likewise indicates that the focus of the provision is on competing "energy conservation standards." The provision is titled "[g]eneral rule of preemption for energy conservation standards when [a] Federal standard becomes effective for [a] product." 42 U.S.C. § 6297(c). Titles of sections and subsections, while "not commanding" on their own, "supply cues" regarding a statute's reach. *Yates v. United States*, 574 U.S. 528, 540 (2015). Here, Congress's use of a title describing the preemption of "energy conservation standards" to label a provision displacing state "regulation[s] concerning energy efficiency [or] energy use" indicates that Congress viewed the local laws subject to displacement to be those that qualify as local "energy conservation standards."

Along the same lines, Congress carved out specific state laws that prescribed the types of energy standards that would otherwise be subject to preemption under EPCA. *See* 42 U.S.C. § 6297(b)–(c). These carve-outs indicate that EPCA preemption applies only to competing energy conservation standards: the specific preemption exemptions in sections 6297(b) and (c) all involve state laws directly regulating how much energy or water specific classes of covered products may use. *See, e.g.*, 42 U.S.C. § 6297(b)(6) (exempting from preemption "a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of

television sets"); (c)(4) (exempting "a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992").

EPCA's waiver provision points to the same conclusion. The statute allows DOE to waive preemption if, among other things, DOE finds that a local regulation is "needed to meet unusual and compelling State or local energy or water interests," such as when the "energy or water savings resulting" from an otherwise preempted law outweigh its overall costs. 42 U.S.C. § 6297(d)(1)(B), (C). Congress thus tailored the waiver standard to match the kind of regulations that are preempted under a straightforward reading of EPCA's preemption clause: Local energy or water conservation standards tailored to unusual local conditions may result in such significant conservation benefits that they qualify for waiver based on the energy and water savings. State regulations aimed at health and safety goals (such as fire safety or the avoidance of pollution), by contrast, do not fit the prescribed waiver standard. Health and safety regulations concerning air pollution or fire safety might not produce any energy or water savings, no matter how compelling the other interests they serve.

It is highly implausible that Congress intended EPCA to preempt both state energy conservation standards as well as health and safety laws but only authorized DOE to regulate and waive preemption of energy conservation standards. Such an interpretation would be neither  "a symmetrical and coherent regulatory scheme" nor would it fit "all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted). The more reasonable interpretation is that Congress tailored the waiver standard to match the universe of preempted regulations. This is particularly so because EPCA does not grant DOE any authority to address local health and welfare, nor to restrict the types of fuels that covered products use. It makes little sense to construe a "[g]eneral rule of preemption

for energy conservation standards when Federal standard becomes effective" to preempt a local regulation unrelated to energy conservation that DOE could not adopt on its own. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (courts look to "the objectives of the … statute as a guide to the scope of the state law that Congress understood would survive").

In addition to the text of the statute, its interpretive history and amendments confirm that EPCA's preemption clause reaches only competing energy conservation laws, rather than unrelated local regulations such as health and safety laws. The limited scope of EPCA's preemption clause has been consistently interpreted by the agency charged with administering the statute, and Congress is presumed to have incorporated the agency's prior interpretations when it used identical language in the 1987 preemption clause at issue here. "As the Supreme Court has instructed, 'when administrative interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative interpretations as well.'" *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 98 (2d Cir. 2020) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)).

In 1982, the Department of Energy interpreted the scope of EPCA's preemption clause as it existed at that time, under the statute's 1978 amendment: "The statute at section 327(a)(2) clearly provides that only those regulations which provide for 'any energy standard or other requirement with respect to energy efficiency or energy use of a covered product' will be superseded." 47 Fed. Reg. 14,424-01, 14,456 (Apr. 2, 1982) (quoting 42 U.S.C. § 6297(a)(2) (1982)). Therefore, according to the agency, "[a] rule whose purpose is other than energy efficiency[,] such as a law on fire safety, would not appear to be preempted by the Federal rule,

even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.* Later in 1982, the agency offered further illustration of the scope of preemption: "Prohibition of hook-ups for appliances with less than a certain efficiency would be subject to preemption," because the rule effectively required all appliances to meet an efficiency standard. 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982). But a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings"—a ban that does not directly regulate efficiency or energy use, even though it prohibits any use of certain covered appliances in certain buildings—"would not be subject to preemption." *Id.*

DOE's longstanding and consistent interpretation of the scope of EPCA's preemption clause is particularly persuasive because agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The Second Circuit has likewise given weight to an agency's longstanding views on the preemptive scope of the statute it administers. *See Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 775 (2d Cir. 1999), *holding modified by Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136 (2d Cir. 2006) ("[T]o the extent that our reading of the safety exemption may touch upon delicate matters of public policy, this view carefully tracks the interpretation given by the U.S. Department of Transportation.").

When Congress amended EPCA's preemption clause in 1987, it elected to re-use the identical phrase that the agency had consistently interpreted as limiting preemption to energy conservation standards. In enacting the National Appliance Energy Conservation Act of 1987, which includes the clause at issue here, Congress once again chose the phrase "energy efficiency

11

or energy use of [a] covered product," to describe the subject matter of state and local laws preempted by the existence of a federal energy standard. Pub. L. No. 100-12, sec. 7, § 327, 101 Stat. 103, 118. Congress had every reason to believe that this phrase would be interpreted in accord with DOE's earlier-expressed view and would, therefore, not preempt state and local regulations "whose purpose is other than energy efficiency," 47 Fed Reg. at 14,456, so that health and safety bans like a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings would not be subject to preemption," 47 Fed. Reg. at 57,215. "[W]hen Congress plants the same seed in the same soil, it can expect the same plant to grow." *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d at 98.

Finally, the statute's legislative history too confirms that Congress's concern in enacting the preemption clause at issue here was guarding against competing energy conservation standards, rather than laws that restrict the use of particular appliances or fuels for other reasons. As the Second Circuit has recounted, Congress enacted the 1987 statute that amended EPCA because "Congress also was concerned with the 'growing patchwork' of state *efficiency* standards that had developed as the result of the absence of national standards in conjunction with DOE's policy of granting states exemptions from the EPCA's preemption provision." *Abraham*, 355 F.3d at 187 n.3 (citing S. Rep. No. 100-6, at 4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52, 54–55) (emphasis added); *see also* 133 Cong. Rec. 3070 (1987) (statement of Sen. Johnston) (sponsor's description of act as having "two basic principles": "to establish efficiency standards" and "to preempt State efficiency standards"). There is no evidence that Congress intended to block regulations that restrict the use of covered appliances based on reasons having nothing to do with energy conservation. As described in Section III *infra*, a

statute that swept so broadly would radically alter the relationship between federal and state government; there is no indication that Congress ever contemplated doing so.

### B.    Plaintiffs' expansive preemption theory is based on a misreading of EPCA.

Plaintiffs attempt to refashion EPCA's logical and straightforward displacement of competing local efficiency standards into a sweeping prohibition on any use restrictions for appliances covered by EPCA. Plaintiffs arrive at this theory based on their reading of the Ninth Circuit's decision in *California Restaurant Association v. City of Berkeley*. *See* Compl. ¶¶ 65–68. That decision is wrong on its own terms, and eleven judges wrote to "urge any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistakes." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1119 (9th Cir. 2024) (Friedland, J., dissenting from denial of rehearing en banc).[1] But even the Ninth Circuit decision did not go as far as Plaintiffs now urge this Court to travel. Should Plaintiffs' theory prevail, New Yorkers would stand to lose many vital regulations that have nothing to do with energy conservation and everything to do with protecting our health and safety. *See infra* Section III.

According to Plaintiffs, any law that prevents a covered appliance from "'using' fossil fuels, such as propane or natural gas . . . is preempted by federal law." Compl. ¶ 65 (quoting *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1048 (9th Cir. 2023)). Plaintiffs derive this rule from a Ninth Circuit decision that interpreted EPCA's preemption clause to bar a local regulation that effectively prevented gas appliances from operating in new construction by barring new hookups for gas appliances. While the Ninth Circuit has since issued an amended decision that

---

[1] Judge Friedland's dissenting opinion was joined by Chief Judge Murguia, Judges Wardlaw, Gould, Koh, Sung, Sanchez, and Mendoza. *See* 89 F.4th at 1119. Judge Berzon, joined by Judges Paez, and Fletcher, wrote to "agree with Judge Friedland's dissent from the denial of rehearing en banc, including her explanation as to why this is the type of case in which dissent from denial of rehearing en banc is appropriate." 89 F.4th at 1126.

eliminated the specific language that Plaintiffs quoted, *see* 89 F.4th 1094 (9th Cir. 2024), the amended decision maintains the panel's original conclusion that EPCA's preemption clause "encompasses an ordinance that effectively eliminates the 'use' of an energy source" by preventing a covered appliance from operating," 89 F.4th at 1102. Yet the panel simultaneously emphasized that its decision was "limited," and "narrow," and that it concerned only "building codes" addressing "natural gas piping." *Id.* at 1101, 1106. Plaintiffs' theory is broader, reaching any law that operates to prevent the indoor combustion of a particular fuel source so long as the fuel is used to power an EPCA-covered appliance.

Plaintiffs' theory sets aside the text, structure, and history of EPCA described above, *supra* I.A., and instead proposes that EPCA preempts any regulation that restricts any covered product from operating at any location at any time. Plaintiffs construct this theory on a series of implausible readings of EPCA's preemption clause and definitions, ultimately resting on the omission of key statutory text. Plaintiffs' fundamental claim is that "regulations concerning the . . . energy use" of covered products under EPCA encompass all laws "relating to 'the quantity of [fossil fuel] directly consumed by' covered consumer appliances at the place where those appliances are used." Compl. ¶ 62. Therefore, according to Plaintiffs, EPCA's preemption clause reaches all laws that in any way restrict the operation of a covered appliance by an end user, because a restriction on using a product would prevent it from consuming fuel.

Plaintiffs arrive at this conclusion by selectively quoting EPCA's definition of "energy use" and supplying a colloquial interpretation of this partial definition. The statute defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). But Plaintiffs truncate this definition, omitting the clause referring to test procedures.

*See* Compl. ¶ 61 ("'Energy use' is defined as 'the quantity of energy directly consumed by a consumer product at point of use.'" (quoting 42 U.S.C. § 6291(4)). Having dispensed with the statutory test procedures, Plaintiffs maintain that "point of use" simply means "the place where those appliances are used" (Compl. ¶ 62)—here, presumably, new construction in New York City.

But the determination of energy usage at a "point of use" using the "test procedures" referenced in Section 6293 does not refer to the energy actually used by a product that has been delivered to a consumer. Instead, "energy use" is a technical measurement of average, anticipated energy consumption derived from standardized testing that occurs *before* an appliance is even offered for sale. The test procedures measure energy use "during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Thus, a gas appliance's "energy use" under EPCA is the quantity of gas that it is designed to consume in operation, as determined by federal test procedures, even if no end-user ever actually installs and operates the appliance in any particular building. This reflects EPCA's overriding concern with standardizing energy efficiency and testing. *See Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 133 (S.D.N.Y. 2019) ("[EPCA] authorizes DOE to adopt energy conservation standards for consumer products and set test procedures by which manufacturers certify their products' compliance with applicable standards.").[2]

As Judge Friedland's dissenting opinion explains, only by misreading EPCA can one arrive at the conclusion that "regulations concerning the . . . energy use" of covered products refers to something besides a performance standard. Rather than describing the energy a

---

[2] Moreover, as Judge Friedland's dissenting opinion explains, the reference to "point of use" has a longstanding technical definition. "Industry and regulatory sources consistently use the term 'point of use' in this technical sense, and many expressly recognize that EPCA does so as well. *Cal. Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting) (citing examples).

particular appliance actually uses or is allowed to use in practice, the "energy use" of an appliance under EPCA "is a fixed number that measures the efficiency of an appliance as manufactured." *Cal. Rest. Ass'n*, 89 F.4th at 1121 (Friedland, J., dissenting). "'Energy efficiency' and 'energy use' are both technical terms that refer to different aspects of an appliance's efficiency: 'Energy use' standards prevent appliances from using too much energy overall, while 'energy efficiency' standards prevent appliances from using too much energy relative to their useful output." *Id.* at 1122. Thus, a state or local regulation that "concerns energy use" would be a law that required a covered appliance to meet a competing cap on standardized energy use measured under test conditions, such as a local law prohibiting the use of refrigerators that are designed to consume some maximum amount of kilowatt hours per year different from the federal energy use standard. *See* 42 U.S.C. § 6295(b)(1) (setting federal standard for "maximum energy use allowed in kilowatt hours per year" for refrigerators). But, as DOE has consistently explained, a health and safety prohibition against placing oversized refrigerators in new buildings—i.e., a law that in practice would prevent oversized refrigerators from operating in certain locations, and thereby prohibit covered appliances from using energy in those locations—would not be preempted, because it did not seek to regulate the "energy use" of the product under EPCA. 47 Fed. Reg. at 57,215.

## II.    LOCAL LAW 154 CONCERNS HEALTH AND WELFARE, NOT THE ENERGY USE OF COVERED APPLIANCES.

### A.    Local Law 154 addresses the health and safety effects of indoor fossil fuel combustion.

As the documents attached to Plaintiffs' complaint confirm, Local Law 154 is concerned with the public health of New Yorkers. "The fossil fuels used to heat, cool, and power our buildings . . . emit a wide range of air pollutants that harm the health of New Yorkers, especially our most vulnerable. Compl. Ex. A at *2, ECF No. 1-1. "Robust research exists on the health

16

impacts of gas stoves at the national level," *id.* at 4, establishing the extent and severity of the connection between indoor gas combustion and adverse health outcomes. Indoor fossil fuel combustion has a significant impact on human health and can lead to a range of serious negative health outcomes, including the development and exacerbation of lung diseases, such as asthma and chronic obstructive pulmonary disease, cardiovascular disease, cognitive deficits, cancer, and death. Government regulations, peer-reviewed scientific literature, the nation's leading public health bodies, and local experts all support the urgency of reducing air pollution inside buildings.

Research demonstrates that methane gas combustion releases harmful pollution such as nitrogen oxides (NOx, which collectively describes gases including nitric oxide (NO) and nitrogen dioxide ($NO_2$)), fine particulate matter ($PM_{2.5}$), and carbon monoxide (CO), as well as benzene, formaldehyde, and, in the case of incompletely burned gas, polyaromatic hydrocarbons and ultrafine particles. *See, e.g.*, WE ACT, *Out of Gas, In with Justice* at 8 (2021), Jessel Decl. Ex. C. According to the U.S. Environmental Protection Agency ("EPA"), nitrogen oxide pollution is "an inherent consequence of fossil fuel combustion." EPA, EPA-600/1-77-013, Nitrogen Oxides at 1-1 (1977). Carbon monoxide "is formed primarily by the incomplete combustion of carbon-containing fuels." 76 Fed. Reg. 54,294-01, 54,297 (Aug. 31, 2011). $PM_{2.5}$, or fine particulate matter, refers to inhalable particles with diameters that are 2.5 micrometers and smaller and is mainly produced by "combustion processes and by atmospheric reactions of various gaseous pollutants." 62 Fed. Reg. 38,652-01, 38,654 n.6 (July 18, 1997); 71 Fed. Reg. 61,144-01, 61,146 (Oct. 17, 2006).

These pollutants pose serious risks to human health. EPA has determined that even short-term $NO_2$ exposure can cause respiratory health effects, such as impaired lung function,

respiratory symptoms, inflammation of the airway, and asthma exacerbations requiring hospitalization. 75 Fed. Reg. 6474-01, 6479-80 (Feb. 9, 2010). In 2010, EPA concluded that short-term CO exposure can cause cardiovascular morbidity and mortality, such as heart attack, congestive heart failure, and ischemic heart disease. EPA, EPA/600/R-15/068, Integrated Science Assessment (ISA) for Oxides of Nitrogen – Health Criteria, at 1-17, 5-55 (2016). Elevated $PM_{2.5}$ levels have been linked to premature mortality; heart attacks, strokes, worsening of chronic heart failure, and sudden cardiac death; impaired fetal and childhood lung function development; acute and chronic decreases in lung function; respiratory infections and emergency department visits, hospitalizations, and deaths; and development and exacerbation of asthma. *See* 72 Fed. Reg. 20,586-01, 20,586–87 (Apr. 25, 2007).

Exposure to pollution from indoor fossil fuel combustion has been increasingly linked to negative human health effects, including higher rates of respiratory and cardiovascular illnesses, childhood asthma, as well as reduced lung function and premature death. *See* Jessel Decl. Ex. C at 15. WE ACT's local study confirms the importance of eliminating indoor fossil fuel combustion. WE ACT conducted a pilot study comparing gas stoves to electric stoves in New York City Housing Authority apartments. *See id.* The *Out of Gas, In with Justice* study is "the first study of its kind to focus on the effects of residential cooking electrification with tenants in-place in an urban public housing setting with low-income residents and residents of color." Jessel Decl. Ex. C at 3. The study's findings include that "$NO_2$ concentrations when cooking with gas stoves increased to an average of 197 ppb," nearly double the level that EPA has determined to be "'[u]nhealthy for sensitive groups' (100 ppb)." *Id.* at 4. Concentrations in kitchens that did not combust gas "remained at an average of 14 ppb, similar to background levels of $NO_2$." *Id.*

While New Yorkers who own their homes can choose whether to use gas stoves in their kitchens and may take advantage of high-priced ventilation systems to mitigate emissions, poorer New Yorkers are subjected to greater indoor air pollution burdens. In accord with WE ACT's study data, the City's requirement that new buildings not combust fossil fuels will have direct and substantial effects on air pollution, abate negative health outcomes, and address the environmental justice implications of appliance pollution.

### B.     Local Law 154 addresses the urgent need to reduce carbon emissions and accelerates the city's green transition.

Local Law 154 targets the combustion of carbon-intensive fuels in buildings because this combustion is the source of the overwhelming majority of New York City's carbon emissions. While in most of the country the proportion of greenhouse gas emissions attributable to fossil fuel combustion for residential and commercial buildings accounts for a relatively smaller portion of total emissions, "[t]he fossil fuels used to heat, cool, and power our buildings are responsible for nearly 70% of greenhouse gas emissions in New York City." Compl. Ex. A at *2, ECF No. 1-1. As testimony from the Mayor's Office explains, "we must take every opportunity to reduce greenhouse gas emissions for our city and our planet." *Id.* The Intergovernmental Panel on Climate Change has reported that "unless there are immediate and large-scale reductions in greenhouse gas emissions, the world will continue to see increases in the frequency and intensity of extreme weather events and heat waves that would imperil global agriculture and health." *Id.* Local Law 154 recognizes this reality and protects New Yorkers' health and well-being.

At the same time that the climate crisis requires a drastic reduction in greenhouse gas emissions, the transition away from fossil fuels "presents an opportunity for us to shape the future of our city and lead the world in developing the high-efficiency, electric buildings of the future." Compl. Ex. A at *3, ECF No. 1-1. The need to rapidly reduce carbon emissions from

buildings will help "grow the electric building industry in New York," and will complement the City's existing efforts to "creat[e] green jobs." *Id.* at 2.

### C.    Local Law 154 does not regulate "energy use" within the meaning of EPCA.

While EPCA is concerned with standards for energy conservation, Local Law 154's restriction on any combustion of greenhouse-gas-emitting fuels bears no inherent relationship with the quantity of energy used by New York City appliances. In most New York City buildings, which include existing construction as well as new buildings used for manufacturing, laboratories, laundromats, hospitals, crematoria, and commercial kitchens, Local Law 154 has no effect at all. *See* Compl. ¶¶ 35–37. In the remaining new buildings, Local Law 154 bars all fossil fuel combustion. The law sets an emissions limit; it does not prescribe standards for any appliance's energy use of energy efficiency. In fact, some electric appliances used in new buildings consume more energy than the gas-burning alternatives available in older construction, or perform less efficiently. Thus, "[t]ransitioning from fossil fuels to non-greenhouse-gas-producing energy sources may not decrease total energy consumption." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting).

Local Law 154 neither sets energy conservation standards nor affects the design of any product covered by EPCA. It universally prohibits combustion of certain fuels in certain buildings. Because methane gas combustion emits 52.91 kg of $CO_2$ per million Btu regardless of any appliance's design, Compl. ¶ 38, the law effects no mandate as to the energy efficiency or energy consumption of any gas-burning appliance. Local Law 154 thus "gives manufacturers no reason to change the design of their fossil-fuel-burning products to meet standards higher than those prescribed by DOE. It simply directs consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J.,

dissenting) (citing 42 U.S.C. § 6295(e)(1)(A), (C) (setting one standard for gas water heaters and another for electric water heaters)). There is no inherent relationship between the energy conservation achieved by a product and the question of whether it may be used in new buildings. Electric appliances—regardless of energy consumption or efficiency—are permitted; gas-combustion appliances—regardless of energy consumption or efficiency—are prohibited.

The Second Circuit's decision in *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157–58 (2d Cir. 2010) illustrates the difference between laws that effectively establish energy conservation standards—and are therefore subject to EPCA preemption—and laws like Local Law 154, which do not directly or indirectly regulate energy conservation. In that decision, the Second Circuit addressed a City rule that incentivized the use of hybrid taxicabs by increasing "the maximum dollar amount per shift for which [such] taxis can be leased." *Id.* at 155. As the Second Circuit determined, the rule was entirely aimed at fuel efficiency: "The requirement that a taxi be a hybrid in order to qualify for the upwardly adjusted lease cap does nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157. Similar to its preemption of laws relating to appliance energy conservation standards, EPCA "preempts state laws that are 'related to fuel economy standards.'" *Id.* (quoting 49 U.S.C. § 32919(a)). Therefore, because "'hybrid' is simply a proxy for 'greater fuel efficiency' . . . the rules in question directly regulate the relevant preempted subject matter." *Id.* at 158.

As the Second Circuit's analysis shows, Local Law 154 is readily distinguishable from laws that directly or indirectly concern energy conservation standards. First, while in the taxicab case, "[t]he equivalency of the term 'hybrid' with 'greater fuel efficiency' for purposes of the new rules is self-evident," there is no such equivalency between the emissions addressed by Local Law 154 and the efficiency of any EPCA-covered appliance. *Id.* at 157. "Indeed, some gas

appliances are more efficient than electric appliances, so the ordinance may have the indirect

effect of *increasing* energy consumption in new buildings in some circumstances." *Cal. Rest.*

*Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a

more stringent standard for gas furnaces than for electric furnaces)). Second, while "imposing

reduced lease caps solely on the basis of whether or not a vehicle has a hybrid engine has no

relation to an end other than an improvement in fuel economy across the taxi fleets operating in

New York City," the ends served by Local Law 154 are wholly distinct from energy efficiency.

*Metro. Taxicab Bd. of Trade*, 615 F.3d at 157. As described above, Local Law 154 produces no

inherent improvement of the city's energy usage or energy conservation. Instead, the law serves

different ends: reducing harmful emissions that are making New Yorkers sick, and mitigating the

climate crisis that threatens the city's future. *See supra* Sections II.A & II.B.

## III.   PLAINTIFFS' READING OF EPCA'S PREEMPTION CLAUSE PRODUCES ABSURD RESULTS.

Plaintiffs press an interpretation of EPCA's preemption clause that is breathtakingly

expansive. Once an appliance is subject to a federal energy efficiency standard, no state or local

authority can ever restrict its use in any location. *See* Compl. ¶¶ 65–68 ("New York City's gas

ban is preempted by EPCA's express preemption provisions" because under the City law "fuel

gas appliances—including those covered by EPCA—cannot be used in new buildings").

According to Plaintiffs' theory, it makes no difference that EPCA does not authorize DOE to set

standards regarding a product's effects on safety, health, wellness, or the environment, or on the

suitability of a product for a particular use in a particular location. In their view, once DOE has

prescribed an energy efficiency standard for a product, state and local authorities lose all power

to restrict the use of that product on any ground. And because DOE has no concomitant power to

take over local authority over fire safety, health, wellness, the environment, and suitability, under

22

this theory products subject to federal energy conservation standards are effectively insulated from these unrelated forms of regulation.

Plaintiffs' claims are based on an interpretation of EPCA's preemptive clause that is radically "inconsisten[t] with the design and structure of the statute as a whole," *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). According to Plaintiffs' view, the promulgation of a federal energy conservation guarantees the unlimited use of any EPCA-covered appliance, free from local control, under any circumstance, even though EPCA does not concern the health, safety, or environmental impacts of appliances. *See generally Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 347 (D. Vt. 2007) ("It bears noting here that EPCA expresses no environmental objective or purpose . . . ."). The "[f]ederal law does not speak to these issues." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). If EPCA nonetheless preempts Local Law 154, it would appear to preempt much of the local authority that New Yorkers take for granted.

For example, New York City, one of the densest residential locations in the country, has long banned the use of kerosene space heaters for fire safety reasons. *See* N.Y.C. Admin. Code § 313-01 (requiring label stating "The New York City Fire Code prohibits the . . . use of kerosene fueled heaters for space heating."). Such heaters have been banned from use in all New York City homes since 1959, *see* N.Y.C. Admin. Code § 27-4253 (2006), and are so "highly flammable" that "fire officials confiscate[] them whenever they [a]re spotted in homes or apartments." Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990) (quoting N.Y.C. Fire Department spokesman).

Yet kerosene space heaters are a covered appliance under EPCA. *See* 42 U.S.C. § 6292(a)(9). And DOE has issued regulations governing testing standards for any "unvented oil

heater utilizing kerosene." *See* 10 C.F.R. pt. 430, subpt. B, app. G at 1.4.4. Under Plaintiffs'

theory, once a federal energy efficiency standard has been promulgated for a covered appliance,

the City may not prevent the appliance from "using fossil fuels" such as kerosene, regardless of

the City's interests in preserving the health and safety of its residents. Compl. ¶ 65.

Moreover, if Plaintiffs' theory is correct, the promulgation of a DOE efficiency standard

requires that New Yorkers forfeit not only local control over fire safety, but also over local air

quality protections specifically developed to address the city's unique housing stock. In 2010, the

City enacted a law addressing the disproportionate air pollution caused by the small number of

New York City buildings that combusted high-sulfur fuel oil in their boilers. *See* N.Y.C. Loc. L.

No. 43 (2010) ("[T]he strongest predictor of particulate matter and sulfur dioxide in the air in

New York City is the density of nearby buildings that burn fuel oil."). Finding it "necessary to

address pollutants from the heating oil sector," the City imposed limits on the type of fuel that

could be burned in the city's large boilers. *Id.* The law was immediately successful at improving

New Yorkers' health and air quality, and by December 31, 2015, all buildings registered as

burning the dirtiest heating oil had switched to cleaner fuels. *See* Press Release, Office of the

Mayor, Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of

Most Polluting Heating Oil, Leading to Significantly Cleaner Air (Feb. 9, 2016),

https://www.nyc.gov/office-of-the-mayor/news/152-16/mayor-de-blasio-dep-that-all-5-300-

buildings-have-discontinued-use-most-polluting. The result was "a substantial reduction in air

pollution, which models show will prevent 210 premature deaths and 540 hospitalizations each

year." *Id.*

Yet, if Plaintiffs are correct that "EPCA preempts state and local laws relating to the use

of energy, such as gas or heating oil, by covered appliances and equipment," Compl. ¶ 2, then it

is not clear how the City possessed this local authority over its own air quality. Large oil-fired packaged boilers are subject to an EPCA efficiency standard. *See* 42 U.S.C. § 6313(a)(4)(D). If the City was therefore stripped of local authority to regulate the type of heating oil burned in its boilers, New Yorkers would be forced to endure hundreds of excess deaths simply because DOE had promulgated an efficiency standard that had nothing to do with environmental or health concerns.

As these examples illustrate, Plaintiffs' theory would radically rewrite the relationship between the federal government and local authorities, without any indication that Congress could have intended such a result. A federal law aimed at preserving energy would automatically displace a staggering number of state and local laws that have nothing to do with energy conservation and everything to do with the States' traditional police powers. *See. e.g.*, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power."); *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80, 82–83 (1946) ("Protection of the safety of persons is one of the traditional uses of the police power of the States. . . It is for the legislature to decide what regulations are needed to reduce fire hazards to the minimum."). And because EPCA does not authorize DOE to grant waivers on health and safety grounds, DOE would have no authority to reinstate the countless state and local laws EPCA would displace.

Plaintiffs' theory produces myriad absurd results, and in this instance would leave unprotected the New Yorkers who most rely on the City guaranteeing them a future freer of indoor air pollution. The Court should reject it.

## CONCLUSION

WE ACT and NY-GEO request that the Court dismiss the Complaint.

DATED: March 1, 2024

_s/Dror Ladin_
Dror Ladin
Meagan Burton
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Proposed Intervenor-
Defendants*

26