# Exhibit G



**Founders**
Vernice Miller-Travis
Peggy M. Shepard
Chuck Sutton

**Board of Directors**

*Chair*
Jeff Jones

*Secretary*
Nancy E. Anderson

*Treasurer*
Ken P. Mak

*Members*
Gregory Anderson
Peter Bokor
Dennis Derryck, Ph.D.
David Evans, Ph.D.
Abiola Fasehun
Eric A. Goldstein, Esq.
Sarangi Iyengar
Marielle Villar Martiney
Vernice Miller-Travis
Phillip Morrow
Dart Westphal

*Executive Director*
Peggy M. Shepard



Dear Councilmember Gennaro,

My name is Annie Carforo, and I am the Climate Justice Organizer at WE ACT for Environmental Justice. Over the past 33 years, WE ACT has been combating environmental racism through policy and organizing in Northern Manhattan and fighting for a just transition off of fossil fuels. We are testifying today as a part of the #GasFreeNYC coalition in support of Introduction 2317, which sets tight air pollution limits and eliminates the use of natural gas and other fossil fuels in all new construction. This is the type of bold legislation needed to meet the magnitude of our current climate crisis. It is also vital if New York City is going to address the health impacts of local air pollution that disproportionately harms communities of color.

Over 1,000 New Yorkers die prematurely each year from air pollution as a result of the combustion of fossil fuels in New York City's buildings, which are responsible for 70% of our greenhouse gas emissions. A 2021 study published in the journal Science Advances found that racial-ethnic minorities in the United States are exposed to higher 17 percent more $PM_{2.5}$ pollution associated with residential gas combustion than the population average, with Black Americans facing 32 percent higher exposure. This has led to disparate health outcomes for communities of color, which experience higher rates of respiratory diseases like asthma.

Relying on dirty fuels like natural gas to heat our homes and cook our foods leads to startlingly high indoor air pollution - the use of a gas stove can create indoor nitrogen dioxide concentrations that often exceed US outdoor pollution standards, and living in a home with a gas stove can increase a child's risk of asthma by 42%. Building all electric has clear health benefits.

It is imperative that the city drastically improves air quality in more vulnerable communities, especially as summers continue to break record highs and trigger dangerous respiratory responses that lead to hospitalization and premature death. This can start with Intro 2317 and building electrification. There is an opportunity to ensure that neighborhoods, like Inwood, Jerome Avenue, East New York and East Harlem, that are hit first and worst with air pollution and climate change, see development that is all electric and improves the air quality for the residents who call these places home.

In the absence of global and national leadership after a disappointing COP26 Climate Summit that failed to make any firm commitments necessary to limit global temperature rise, local governments with global influence, like New York City, can

*West Harlem Environmental Action (WE ACT for Environmental Justice) is a 501(c) (3) nonprofit organization.*
*New York, NY Office:* 1854 Amsterdam Avenue, 2nd Floor | New York, NY 10031 | Phone: (212) 961-1000 | Fax: (212) 961-1015
*Washington, DC Office:* 50 F Street, NW, 8th Floor | Washington, DC 20001 | Phone: (202) 495-3036 | Fax: (202) 547-6009
www.weact.org

lead by example for cities around the world. That is why we must pass Intro 2317 and accelerate its implementation timeline to one year after enactment. Other large cities that have enacted versions of this type of legislation have made it apply to new permits on a going-forward basis within one year of enactment. A two year period would needlessly leave out another entire year of projects, locking in more pollution via new, long-lasting gas infrastructure. Additionally, it would likely cause a substantial crush of applications to be pulled forward and rushed in, hampering staff resources and time. It would also set a poor precedent for other localities and/or state action. A building built today to rely on a gas boiler is likely to have a hard time complying with Local Law 97's future years. It will waste money and raise costs in the decades to come when such buildings have to go back in and retrofit to heat pumps.

Expert commentary in the context of the hearing can clarify whether specific building types or uses should be allowed to comply on a longer timeline than one year. Two years is already longer than other cities. Even longer would further undercut other cities or state's potential action, as they will look to NYC as a relevant example.

In order to further strengthen Intro 2317, we must lower the threshold of the air pollution limit in the bill from 50 kg of $CO_2$ per BTU to 25 kg of $CO_2$ per BTU. The limit in the bill of 50 kg of $CO_2$ per BTU will prevent combustion of natural gas use as it is currently formulated or applied. However, given that the federal standards are just over 53 kg, we are concerned about the potential abuse of this provision through various potential blends, such as biomethane or hydrogen blends. As written, this could become an unintended loophole to escape the anti-pollution limit. We recommend that this level be brought down to 25 kg to eliminate any possible loophole and change the intent of the law.

We also urge the term "within a building," in line 5, is changed to ensure a developer does not evade meeting the requirements of this law with unusual design, perhaps for example by placing equipment on the roof of a building.

**The bill must be amended to include a clear definition of gut renovation. We suggest using the Department of Buildings  Alt 1 permit as a scope threshold, plus three conditions: 50% of the flooring are replaced, 50% of windows are replaced, and the boiler is replaced within 12 months**.

Additional recommendations include:

Tighten and define "undue hardship" to avoid opening a loophole and give appropriate agency guidance. We agree that some deference and flexibility ought to be granted to the department to cover unanticipated, unusual circumstances. However, the blanket "undue hardship" term is overbroad. After all, any entity that is building a new building or undertaking a major renovation in New York City is not facing financial hardship. We could perhaps see some sort of hardship due to some unusual logistics or physical limits on a building project or structure.

We have consulted experts regarding this policy. Generally, we are told either that projects are effectively the same cost or perhaps slightly more expensive (as in low

*New York, NY Office*: 1854 Amsterdam Avenue, 2nd Floor | New York, NY 10031 | Phone: (212) 961-1000 | Fax: (212) 961-1015
*Washington, DC Office*: 50 F Street, NW, 8th Floor | Washington, DC 20001 | Phone: (202) 495-3036 | Fax: (202) 547-6009
www.weact.org

single digits higher in percentage terms) to be built using heat pumps versus gas infrastructure.

One potential way to address this is by creating a process for applicants to demonstrate an overly burdensome increased cost and physical or technological limitations that would have to be certified by a registered design professional and then approved by the department as an exemption. The current "undue hardship" language is simply overbroad and could be used by an   unscrupulous administration to grant undeserved exemptions to favored applicants.

Close or tighten some of the exemptions - there are various exemptions in the bill.

1. "Commercial kitchens" should be struck and replaced with a tight definition that applies only to large baking ovens. As we've conveyed, we believe that large ovens for commercial bakeries and other high-energy use ovens probably should be defined and exempted because they may currently be uneconomical to electrify. (this could be done with a BTU standard for the size of the oven, for example) However, a normal new restaurant kitchen *should* be electrified. There are already restaurants throughout the city that only use induction stoves and electric powered ovens. More and more professional chefs are adapting to induction cooking, and [they come to prefer it](). Typically, restaurants currently use a mix of induction and gas stoves. Groups that we are in touch with can bring testimony from prominent chefs to back up our contentions. It is not an unjustified burden for restaurants to move to induction stoves. Moreover, this legislation only affects *new* buildings. When we last met, we gathered that your intention for the draft was to include restaurants but exclude those large ovens. We strongly agree with such a structure for the bill, especially before a hearing.

2. Hospitals should not be exempted, but rather should be allowed to use gas for redundancy in the case of emergency and grid failure. The bill currently allows new hospital buildings to use gas for operations. Hospitals may need gas as a backup power source, since they must have redundant power in case of blackout. However, new buildings should not operate from gas. Instead, they should operate as other buildings would under this legislation, but be permitted to install and use gas for emergency power.

3. "No connection to a building's gas supply line" and "intermittent" use should be tightened. This definition could conceivably open the door to fuel oil use, which is not connected to a building by a gas supply line and arguably is used intermittently. We recommend tightening this definition. We also want to talk to more experts to double check that this section doesn't create any other unintended loopholes.

4. "Manufacturing" is overbroad and should be tightened.  As you know, our intention is not to end gas use where it is still prohibitively expensive or impractical to go electric. We understand concrete- and steel-making to be currently

uneconomical without gas. However, manufacturing that is economical without reliance on gas should be covered. Therefore, we recommend only specific exclusions for manufacturing or industrial processes that are, in fact, uneconomical to electrify. If some other process is not specifically defined by the bill, it could be taken in via an application process to the department where the applicant could show that this specific application needs gas (with certification from a relevant expert).

5.      "Laboratories" make us go hmmmm - we didn't want to conclude this memo without questioning what gas is used in labs. Is this a chemistry lab with Bunsen burners? Does that need a gas hookup? Are super villains creating super weapons in super secret labs that need lots of gas? The experts we've consulted do not know and some are concerned this creates an unnecessary loophole.

Thank you for your time and thoughtful analysis of Intro 2317. We look forward to working with you in the next few week on passage of the bill.

Sincerely,

Annie Carforo
**Climate Justice Organizer**
WE ACT For Environmental Justice