**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING COOLING CONTRACTORS–NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION NEW YORK CITY, INC., d/b/a/ MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC., <br><br>                    Plaintiffs, <br><br> v. <br><br> CITY OF NEW YORK, <br><br>                    Defendant. | CIVIL ACTION NO. 1:23-cv-11292-RA <br><br> **Proposed Amicus Curiae Brief by the Natural Resources Defense Council** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF INTEREST .......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 2

ARGUMENT ...................................................................................................................... 3

I.    EPCA preempts state and local energy conservation standards but
      does not generally displace state and local authority over health
      and safety .................................................................................................................. 3

II.   Plaintiffs' reading of EPCA lacks plausible limiting principles ......................... 9

CONCLUSION .................................................................................................................. 11

CERTIFICATE OF SERVICE ........................................................................................ 12

# TABLE OF AUTHORITIES

## Cases

*Bond v. United States,*
    572 U.S. 844 (2014) ............................................................................................... 9

*California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.,*
    519 U.S. 316 (1997) ............................................................................................... 9

*California Restaurant Association v. City of Berkeley,*
    89 F.4th 1101 (9th Cir. 2024) ................................................................. 4, 5, 9, 11

*Dolan v. U.S. Postal Serv.,*
    546 U.S. 481 (2006) ........................................................................................... 3, 9

*E. Ohio Gas Co. v. Tax Comm'n of Ohio,*
    283 U.S. 465 (1931) ............................................................................................... 8

*Esquivel-Quintana v. Sessions,*
    581 U.S. 385 (2017) ............................................................................................... 3

*FCC v. AT&T Inc.,*
    562 U.S. 397 (2011) ............................................................................................... 9

*Gen. Motors Corp. v. Tracy,*
    519 U.S. 278 (1997) ............................................................................................... 8

*NRDC v. Abraham,*
    355 F.3d 179 (2d Cir. 2004) .................................................................................. 1

*NRDC v. Edwards,*
    Civ. No. 81-2546 (D.D.C.) .................................................................................... 1

*NRDC v. Granholm,*
    No. 20-cv-9127-JMF (S.D.N.Y. 2020) ................................................................. 1

*NRDC v. Herrington,*
    768 F.2d 1355 (D.C. Cir. 1985) ............................................................................ 1

*ONEOK, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015) ............................................................................................... 8

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*
    484 U.S. 365 (1988) ............................................................................................. 10

*United States v. Morton,*
    467 U.S. 822 (1984) ............................................................................................... 3

*Van Buren v. United States,*
    141 S.Ct. 1648 (2021) ............................................................................................ 3

**Statutes**

15 U.S.C. § 717 .................................................................................................................. 8

42 U.S.C. § 6291 ............................................................................................................. 4, 5

42 U.S.C. § 6295 ................................................................................................................ 4

42 U.S.C. § 6297 ...................................................................................................... 2, 4, 5, 9

42 U.S.C. § 6311 ............................................................................................................. 4, 5

N.Y. Pub. Serv. Law Chapter 48, Art. 2, § 46 ............................................................. 10

Pub. L. No. 109-58, § 1802 ............................................................................................... 7

Wash. Rev. Code § 19.27A.060 ....................................................................................... 10

**Other Authorities**

Cal. Energy Resources Conservation & Dev. Comm'n,
    *Staff Report*: *Energy Conservation Standards for Nonresidential Buildings* (1977) ......... 7

DOE, *The Difference Between Source and Site Energy* ................................................ 6

 N.Y.C. Admin. Code § 28-506.1 ...................................................................................... 2

N.Y.C. Admin. Code § 24-177.1 ....................................................................................... 2

New York City Fire Code Guide ...................................................................................... 10

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................................... 3

**Regulations**

10 C.F.R. § 430.32(a) ......................................................................................................... 5

**Legislative History**

S. Rep. No. 100-6 (1987) .................................................................................................. 1

**Federal Register**

47 Fed. Reg. 14,424 ........................................................................................................... 6

53 Fed. Reg. 48,798 ........................................................................................................... 7

76 Fed. Reg. 51,281 ........................................................................................................... 8

## STATEMENT OF INTEREST[1]

For decades, the Natural Resources Defense Council (NRDC) has been involved in the Department of Energy's (DOE) energy conservation standards program under the Energy Policy and Conservation Act (EPCA). NRDC has litigated several cases to compel DOE to set and maintain energy conservation standards. *See NRDC v. Herrington*, 768 F.2d 1355, 1362-64 (D.C. Cir. 1985) (challenging decision not to issue standards); *id.* at 1368 (noting that NRDC had earlier sued to compel promulgation of appliance efficiency standards in *NRDC v. Edwards*, Civ. No. 81-2546 (D.D.C.)); *NRDC v. Abraham*, 355 F.3d 179 (2d Cir. 2004) (challenging revocation of standards); *NRDC v. Granholm*, No. 20-cv-9127-JMF (S.D.N.Y. 2020) (challenging failure to abide by statutory deadlines). NRDC negotiated the energy conservation standards that Congress incorporated into EPCA in 1987. *See* S. Rep. No. 100-6, at 4 (1987), *as reprinted in* 1987 U.S.C.C.A.N. 52, 55. NRDC sits on the Appliance Standards and Rulemaking Federal Advisory Committee (ASRAC), which helps guide DOE's work on energy conservation standards. NRDC also has a longstanding interest in combating climate change, including by reducing carbon emissions from the built environment. Contrary to the premise of Plaintiffs' lawsuit, setting energy conservation standards and confronting climate change are complementary, rather than contradictory, actions, and NRDC has an interest in ensuring that EPCA's express preemption provision is not misinterpreted as an extraordinary obstacle to state and local climate change efforts.

---

[1] This brief was not authored, in whole or in part, by counsel for any party. No one other than amicus curiae, its members, or its counsel made a monetary contribution towards the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2021, New York City passed Local Law 154, which limits the types of fuels that can be combusted in new buildings. The law requires that any fuel combusted onsite emit less than 25 kg of carbon dioxide per million British thermal units of energy. N.Y.C. Admin. Code § 24-177.1(b). This would prohibit the combustion of oil and natural gas in these buildings, effectively requiring that space heating, water heating, and cooking be done with electric appliances (with some exceptions for commercial kitchens, crematoria, and a handful of other uses). *Id.* § 28-506.1. Local Law 154 takes a phased approach to compliance, with compliance dates ranging from Dec. 31, 2023, to Dec. 31, 2027, depending on the size and characteristics of the building. *Id.*

Plaintiffs' Complaint alleges that EPCA, 42 U.S.C. § 6297(c), preempts Local Law 154. That is incorrect. Plaintiffs' argument misinterprets EPCA's definition of "energy use" and the phrase "point of use." EPCA is a technical statute about setting energy conservation standards and, as one would expect, these terms have technical meanings. Those technical meanings make clear that Congress did not—and did not intend to—stealthily enact a preemption provision that broadly displaces state and local police powers that may affect the energy source that an appliance uses.

In addition to misinterpreting the law, Plaintiffs' theory of EPCA preemption would severely diminish state and local authority. Plaintiffs' arguments contain no limiting principle, and accepting their interpretation would result in myriad laws and ordinances—many of which are firmly accepted as well within a state or city's control—being preempted under federal law. Importantly, no federal authority would step in to fill the regulatory void that Plaintiffs' theory creates. For these reasons, in addition to the reasons in the memoranda of law from the City of

New York and the movant-Intervenors, ECF Nos. 20 & 23-1, NRDC urges this court to dismiss the Complaint for failure to state a claim.

## ARGUMENT

I.    **EPCA preempts state and local energy conservation standards but does not generally displace state and local authority over health and safety**

Local Law 154 is an air quality regulation that addresses the health effects of the combustion of fossil fuels. It does not set energy conservation standards or labeling requirements for any class of appliances. Plaintiffs argue that it is nevertheless preempted under EPCA because it concerns the "energy use" of appliances that run on natural gas. Compl. ¶¶ 65-68, ECF No. 1. Plaintiffs' argument stitches together disparate phrases in EPCA and wrenches them from context, badly distorting the meaning of the statute and turning it from a program establishing federal energy conservation standards for appliances into a steamroller displacing any local or state regulation that might affect how an appliance is used. That reading of EPCA is wrong, and the Court should reject it.

Statutory construction "begin[s], as always, with the text." *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2017). Yet text always exists in context. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute[.]"); *United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole."). Here, the vital context is that EPCA is a technical statute. When interpreting such statutes, technical definitions should not be supplanted by colloquial ones. *See Van Buren v. United States*, 141 S.Ct. 1648, 1658 n.7 (2021) ("But when a statute, like this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected.'" (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)).

There are two parts of EPCA relevant to Plaintiffs' Complaint: the definition of "energy use" and the preemption provision. First, EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4); *see also id.* § 6311(4) (using the same definition of energy use for commercial appliances). Second, another part of EPCA, entitled "[g]eneral rule of preemption for energy conservation standards when Federal standard becomes effective for product," provides that once "an energy conservation standard established in or prescribed under section 6295 of this title" goes into effect, then "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," subject to certain exceptions. *Id.* § 6297(c).

Plaintiffs argue—echoing the Ninth Circuit's recent decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1101-02 (9th Cir. 2024)—that "energy use" refers to the energy running the appliance for the end user, and that EPCA preempts any regulation relating to the end user's consumption of energy. Compl. ¶¶ 61-67. The problem with this argument, as the City of New York explained, is that "energy use" in the context of EPCA is not a free-floating reference to energy consumption. Mot. to Dismiss at 9-11, ECF No. 20. As the *entire* statutory definition clarifies, "energy use" refers to an energy performance regulation developed using specified test procedures and expressed in terms of total energy consumed. *See id.* at 10-11. Energy conservation standards in EPCA are expressed in terms of either energy use or energy efficiency, which is the ratio of useful output divided by energy use. *See* 42 U.S.C. § 6291(5); *id.* § 6311(3). Indeed, "energy conservation standard" means, in relevant part, "a minimum level of

energy efficiency or a *maximum quantity of energy use*." *Id.* § 6291(6)(A) (emphasis added);

*accord id.* § 6311(18) (using the same definition for industrial products).[2]

      Understanding that the "energy use" of a product under EPCA is determined according to

test procedures set by DOE, *see id.* §§ 6291(4), 6311(4), is critical because EPCA's energy

conservation standards program is primarily a regulation of manufacturers and sellers, not of end

users. Someone who frequently leaves their refrigerator door open—and thereby consumes more

energy than the maximum allowable kWh per year for a refrigerator—does not violate EPCA.

Indeed, EPCA warns consumers that a "disclosure with respect to energy use, energy efficiency,

or estimated annual operating cost . . . shall not create an express or implied warranty under State

or Federal law that such energy efficiency will be achieved or that such energy use or estimated

annual operating cost will not be exceeded under conditions of actual use." *Id.* § 6297(g). It

follows that the "energy use" of a federal energy conservation standard does not refer to the

energy that every consumer uses to power the product—indeed, that would be impossible

because "energy use" is supposed to be determined in accordance with specified test procedures.

*See id.* § 6291(4).

      Plaintiffs, again echoing the Ninth Circuit, argue that EPCA references the "point of use"

within the definition of "energy use," and that this means the statute preempts local regulations

of energy use "on premises where covered natural gas appliances are used." Compl. ¶ 67, ECF

No 1 (quoting *Berkeley*, 89 F.4th at 1051). But "point of use" is not a roundabout way to greatly

expand the meaning of "energy use" and the scope of EPCA's preemption provision. It is another

---

[2] Standards set in terms of maximum energy use are more useful and appropriate for products
that run more-or-less constantly, such as consumer refrigerators. *See* 10 C.F.R. § 430.32(a)
(energy conservation standards for residential refrigerators, expressed in terms of maximum
allowable kilowatt-hours (kWh) per year).

technical phrase that instructs DOE how to measure energy use when setting energy conservation standards.

There are two broad ways to think about the energy consumed in a building. One is the amount of energy consumed by a product directly, that is, the amount you would read if you were directly measuring how many kWh a product consumed. This is called "site energy," the energy measured at the *point of use*. This is distinct from source energy, sometimes referred to as full fuel cycle energy, which also captures the energy that is consumed in the production and distribution of site energy. For example, because power generation is not one hundred percent efficient, and because some energy is lost through the distribution of electricity, it takes more than one kWh to deliver a single kWh to a home. *See* DOE, *The Difference Between Source and Site Energy*, https://www.energystar.gov/buildings/benchmark/understand-metrics/source-site-difference (last visited Mar. 6, 2024).[3]

This is how DOE has understood EPCA's reference to "point of use" for decades. *See Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424, 14,427 (Apr. 2, 1982) ("'Energy use' is defined in the Act as the quantity of energy directly consumed by a consumer product at point of use. This is sometimes referred to as 'site' energy, as opposed to source energy."); *Energy Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearing Regarding Energy Conservation Standards for 3 Types of Consumer Products*, 53 Fed.

---

[3] "Source energy" and "full fuel cycle energy" are sometimes used interchangeably. This brief uses "source energy" for convenience, as distinct from "site energy."

Reg. 48,798, 48,803 (Dec. 2, 1988) (similar). Congress could have directed DOE to regulate products on the basis of source energy, but this would have raised a number of problems. The amount of energy a product would consume would depend in part upon the composition of the electric grid where it was being used. Even if DOE were to use a national average, it would be variable over time, and therefore difficult for manufacturers to know if their products would comply with a standard. By defining "energy use" in terms of point-of-use or site energy, ECPA avoided these problems.

The distinction between site and source energy has a long history, including before EPCA was passed. In California, the Energy Resources Conservation and Development Commission (today more commonly known as the California Energy Commission) was tasked with considering source energy when setting certain building standards. *See* Cal. Energy Resources Conservation & Dev. Comm'n, *Staff Report*: *Energy Conservation Standards for Nonresidential Buildings* 5 (1977), *available at* https://babel.hathitrust.org/cgi/pt?id=uc1.31970023119545 (referring to a requirement that "the standards 'shall take into consideration the indirect costs of energy production,'" which the Commission did by considering "power plant and distribution losses").

After Congress passed EPCA, the Energy Policy Act of 2005 directed the National Academy of Sciences to study "whether the goals of energy efficiency standards are best served by measurement of energy consumed, and efficiency improvements, at the actual site of energy consumption, or through the full fuel cycle, beginning at the source of energy production." *See* Pub. L. No. 109-58, § 1802, 119 Stat. 594, 1123 (2005). Subsequent to this report, DOE began quantifying the energy savings from conservation standards on a full fuel cycle basis. *See* Energy Conservation Program for Consumer Products and Certain Commercial and Industrial

Equipment: Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program, 76 Fed. Reg. 51,281 (Aug. 18, 2011). But the fact that DOE quantifies the source energy savings from new conservation standards does not change the fact that the standards themselves are defined and set in terms of point-of-use energy consumption.

Plaintiffs are also incorrect that EPCA established a regulatory scheme that "requires a practical approach to energy regulation, maintaining neutrality on energy sources and recognizing the need for a diverse energy supply." Compl. ¶ 5, ECF No 1. While EPCA's energy conservation standards are "fuel neutral" in the sense that DOE regulates both gas and electric products (and thus neither can avoid reducing energy consumption), plaintiffs cite no provision of EPCA that purportedly establishes a nationwide policy of fuel neutrality that requires cities and states to supply fuels on an equivalent basis.

In fact, federal energy law respects state and local control of decisions about distribution. The Natural Gas Act of 1938 established federal authority over interstate transmission of natural gas but preserved the authority of state and local governments over retail sales and delivery. 15 U.S.C. § 717(b); *see also E. Ohio Gas Co. v. Tax Comm'n of Ohio*, 283 U.S. 465, 471 (1931) ("[T]he furnishing of gas to consumers … is not interstate commerce, but a business of purely local concern exclusively within the jurisdiction of the state."); *see also ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. 373, 384-85 (2015) ("As we have repeatedly stressed, the Natural Gas Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." (citations and internal quotation marks omitted)); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 292 (1997) ("Congress's purpose in enacting the [Natural Gas Act] was to fill the regulatory void created by the Court's earlier decisions prohibiting States from regulating interstate transportation and sales for resale of natural gas, while at the same time leaving

undisturbed the recognized power of the States to regulate all in-state gas sales directly to consumers."). Congress did not disturb this existing balance with EPCA's requirements for energy conservation standards—which says nothing about obligating cities and states to create or maintain natural gas service. *See Bond v. United States*, 572 U.S. 844, 858 (2014) ("If the Federal Government would radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it." (cleaned up)).[4]

## II.    Plaintiffs' reading of EPCA lacks plausible limiting principles

Plaintiffs' theory of preemption is striking in its breadth. In their view, the statute's preemption of state regulations "concerning the energy efficiency, energy use, or water use," 42 U.S.C. § 6297(c), of covered products means that any law "relating to the use of energy, such as gas or heating oil, by covered appliances and equipment" would be preempted. Compl. ¶ 2, ECF No. 1. This would call into question myriad laws and regulations that previously—and without controversy—have been firmly within the domain of cities and states. Congress did not intend such a radical result by using the word "concerning." "[C]onstruing statutory language is not merely an exercise in ascertaining 'the outer limits of a word's definitional possibilities.'" *FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011) (quoting *Dolan*, 546 U.S. at 486) (cleaned up). The

---

[4] The Ninth Circuit's opinion in *Berkeley* concluded that its reading of EPCA's preemption provision and the Natural Gas Act were not "irreconcilable." 89 F.4th at 1106. But the issue is not whether the two statutes are in direct conflict, but rather the plausibility of a reading of EPCA which concludes that Congress *sub silentio* gave DOE the ability to regulate the local distribution of natural gas, despite the Natural Gas Act. *See California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 331 & n.7 (1997) (construing the Employee Retirement Income Security Act's preemption clause and noting that while it was not "inconceivable for the ERISA Congress to intend the pre-emption of state statutes resulting from the pre-existing Fitzgerald Act . . . [i]t does, however, aid our conclusion that Congress' silence on the pre-emption of state statutes that Congress previously sought to foster counsels against pre-emption here"). Here, too, the lack of evidence that Congress meant to displace local authority over the distribution of natural gas counsels against a finding of preemption.

Court should uphold Local Law 154 and give EPCA's preemption provision a "meaning[] [that] produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

A few examples illustrate the problems that follow without a limiting principle for Plaintiffs' preemption theory. First, New York law allows cities and utilities to suspend service during emergencies to protect emergency workers, reduce the risk of fire, and address risks to the grid as a whole. *See* N.Y. Pub. Serv. Law Chapter 48, Art. 2, § 46. But suspending service would affect the energy used by appliances and so these laws would be preempted by EPCA under Plaintiffs' theory.

Second, water heaters are capable of heating water to different temperatures, and many models allow the user to adjust this setting. Setting a temperature that is overly hot can create a risk of scalding. Recognizing this, jurisdictions in the United States have requirements relating to the set-point temperature of a water heater. For instance, Washington state has required, since 1985, that water heaters sold in the state have their thermostats set to no more than 120 degrees Fahrenheit. Wash. Rev. Code § 19.27A.060(2). Setting a default set-point temperature for water heaters will affect the energy consumption of those products and, therefore, Plaintiffs' theory of preemption would strike it down.

Third, Plaintiffs' theory of preemption would also prohibit cities from imposing basic fire safety measures. For example, electrical codes prohibit people in homes and offices from running more than a 12-ampere load on a 15-ampere circuit. *See* New York City Fire Code Guide at 47, *available at* https://www.nyc.gov/assets/fdny/downloads/pdf/business/nyc-fire-code-guide.pdf. This may prohibit someone from running a space heater, a refrigerator, and a

microwave on the same outlet at the same time, and under Plaintiffs' theory, that would be an impermissible regulation of "energy use" at a consumer's preferred "point of use."

These results are neither what Congress intended nor what it wrote in EPCA. The preemption provision saves manufacturers from having to comply with a patchwork of state and local energy conservation standards and manufacture different models for sale in different locations. Regulations that "give[] manufacturers no reason to change the design of their natural gas products to meet standards higher than those prescribed by DOE" are not preempted by EPCA. *See Berkeley*, 89 F.4th at 1126 (Friedland, J., dissenting). Instead, they "simply direct[] consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Id.*

## CONCLUSION

Plaintiffs advance an atextual interpretation of "energy use" and "point of use" in service of a reading of EPCA's preemption provisions that would strike down Local Law 154 and countless other laws and regulations addressing subjects firmly within local control. For these reasons, NRDC urges the court to grant the City's motion to dismiss.

Respectfully submitted,

*/s/ Joseph Vukovich*
Joseph Vukovich (*pro hac vice* forthcoming)
Thomas Zimpleman (*pro hac vice* forthcoming)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
202-289-6868
jvukovich@nrdc.org
tzimpleman@nrdc.org

*Attorneys for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of New York by using the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

Dated: March 8, 2024

*/s/ Joseph Vukovich*
Joseph Vukovich