**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

ASSOCIATION OF CONTRACTING
PLUMBERS OF THE CITY OF NEW YORK,
INC., et al.,

                           Plaintiffs,

           v.

CITY OF NEW YORK,

                         Defendant.

-------------------------------------------------------------------

Civil Action No. 1:23-cv-11292-RA

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CITY'S MOTION TO DISMISS (DKT. 19)**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    A.  The Federal Energy Policy and Conservation Act .................................................. 2

    B.  New York City's Gas Ban ...................................................................................... 4

    C.  Plaintiffs File Suit to Block Enforcement of the Ban .......................................... 4

ARGUMENT ...................................................................................................................... 5

   I.  The City's Ban Is Preempted. ................................................................................ 5

    A.  Applying EPCA's Plain Text, the Ban Is a Regulation Concerning Energy Use. .......... 5

    B.  EPCA's Structure and Purpose Support Preemption. .............................................. 7

        1.  EPCA's exemption for local building codes shows that preemption extends to regulation of buildings' appliances. ........................................................................ 7

        2.  EPCA's context confirms that preemption is not limited to regulations affecting design and manufacturing choices; but in any event, the ban does just that. ..................................................................................................... 8

        3.  EPCA's history refutes the City's narrow account of its purpose. ...................... 10

        4.  Allowing local bans on appliances would upend the statutory scheme. .............. 11

  II.  The City's Contrary Arguments Cannot Be Squared with the Statute. ........................... 12

    A.  The City Offers No Consistent Reading of the Statute. ........................................... 12

    B.  The City's Arguments Write "Concerning" Out of the Statute. ................................ 15

        1.  The City's series of arguments about how "energy use" is calculated cannot get around "concerning." .................................................................................. 16

        2.  The City's ban falls within the ordinary scope of "concerning." ........................ 19

        3.  The City inexplicably ignores ERISA preemption's "connection with" prong, which readily encompasses its ban. .................................................................. 22

    C.  Plaintiffs' Claim Does Not Turn on an Unconstrained Right to Use. ........................ 24

    D.  The Natural Gas Act Has No Bearing on EPCA Preemption. ................................... 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*,
685 F.3d 174 (2d Cir. 2012)................................................................20

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) ...............................................2, 3, 10, 22

*Air Evac EMS, Inc. v. Cheatham*,
910 F.3d 751 (4th Cir. 2018) ................................................................5

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
569 U.S. 641 (2013)..............................................................................12

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
683 F.3d 1144 (9th Cir. 2012) ......................................................11, 19

*Buono v. Tyco Fire Prods., LP*,
78 F.4th 490 (2d Cir. 2023) ..................................................................5

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*,
519 U.S. 316 (1997)........................................................................21, 23

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ..................................................... *passim*

*Carson v. Monsanto Co.*,
72 F.4th 1261 (11th Cir. 2023) .............................................................5

*Coventry Health Care of Mo., Inc. v. Nevils*,
137 S. Ct. 1190 (2017)......................................................................6, 19

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013)..............................................................................21

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
144 S. Ct. 457 (2024)............................................................................15

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*,
938 F.3d 246 (5th Cir. 2019) ................................................................5

*EagleMed LLC v. Cox*,
868 F.3d 893 (10th Cir. 2017) ..............................................................5

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004)................................................................12, 21, 22

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
  554 U.S. 33 (2008).............................................................................15

*Gobeille v. Liberty Mut. Ins. Co.*,
  577 U.S. 312 (2016).....................................................................22, 23

*Lamar, Archer & Cofrin, LLP v. Appling*,
  138 S. Ct. 1752 (2018)...........................................................6, 19, 23

*Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernández*,
  58 F.4th 5 (1st Cir. 2023)...................................................................5

*Metro. Taxicab Bd. of Trade v. City of New York*,
  615 F.3d 152 (2d Cir. 2010)........................................................20, 23

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)......................................................................6, 25

*Nat. Res. Def. Council v. Abraham*,
  355 F.3d 179 (2d Cir. 2004)...............................................................2

*Obduskey v. McCarthy & Holthus LLP*,
  139 S. Ct. 1029 (2019).......................................................................8

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
  18 F.4th 956 (8th Cir. 2021)...............................................................5

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  136 S. Ct. 1938 (2016).......................................................................5

*Pulsifer v. United States*,
  No. 22-340, slip op. (U.S. Mar. 15, 2024)......................................8, 19

*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008)................................................................ *passim*

*Shuker v. Smith & Nephew, PLC*,
  885 F.3d 760 (3d Cir. 2018)................................................................5

*Simmons v. Himmelreich*,
  136 S. Ct. 1843 (2016).................................................................8, 15

*Sturgeon v. Frost*,
  136 S. Ct. 1061 (2016).......................................................................5

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) ..................................................................15

*Yates v. United States*,
   574 U.S. 528 (2015) ......................................................................15

*Ye v. GlobalTranz Enters.*,
   74 F.4th 453 (7th Cir. 2023) ...........................................................5

*Ysleta Del Sur Pueblo v. Texas*,
   142 S. Ct. 1929 (2022) ..................................................................14

**Statutes**

15 U.S.C. § 717(b) ...........................................................................25

29 U.S.C. § 1144(a) .........................................................................22

49 U.S.C. § 32919(a) .......................................................................20

Energy Policy and Conservation Act of 1975,
   42 U.S.C. §§ 6201-6422 .................................................1, 2, 24, 25

42 U.S.C. § 6201 ..............................................................................10

42 U.S.C. § 6291(1) .........................................................................18

42 U.S.C. § 6291(1)-(2) .....................................................................6

42 U.S.C. § 6291(3) .......................................................................6, 7

42 U.S.C. § 6291(4) ......................................................................6, 13

42 U.S.C. § 6291(4)-(6) ...................................................................14

42 U.S.C. § 6291(6)(A) ....................................................................16

42 U.S.C. § 6291(8) .........................................................................22

42 U.S.C. § 6292(a) ...........................................................................6

42 U.S.C. § 6292(b)(1) .....................................................................16

42 U.S.C. § 6293(b)(3) .....................................................................17

42 U.S.C. § 6294(a)(2)(I)(i) ..............................................................17

42 U.S.C. § 6295 ................................................................................3

42 U.S.C. § 6295(*l*)(1) ....................................................................16

42 U.S.C. § 6295(o)(4) ...........................................................................11, 17

42 U.S.C. § 6297(a)(1) ..................................................................................22

42 U.S.C. § 6297(a)(2) ..................................................................................14

42 U.S.C. § 6297(a)(2)(A) ...............................................................................6

42 U.S.C. § 6297(c) ...............................................................................*passim*

42 U.S.C. § 6297(d)(1) ....................................................................................9

42 U.S.C. § 6297(d)(1)(A) .............................................................................14

42 U.S.C. § 6297(d)(3) ..............................................................................9, 16

42 U.S.C. § 6297(d)(4) .......................................................................3, 11, 17

42 U.S.C. § 6297(f)(3) ...........................................................................*passim*

42 U.S.C. § 6297(f)(3)(A)-(B) ........................................................................7

42 U.S.C. § 6297(f)(3)(B) .............................................................................19

42 U.S.C. § 6297(f)(3)(C) .............................................................................11

42 U.S.C. § 6297(f)(3)(F) ..........................................................................7, 18

42 U.S.C. § 6297(f)(3)(G) .............................................................................18

42 U.S.C. § 6311(2) ......................................................................................18

42 U.S.C. § 6311(2)(A) .................................................................................18

42 U.S.C. § 6311(4) ........................................................................................6

42 U.S.C. § 6311(7) ........................................................................................7

42 U.S.C. § 6316(b)(2)(A) ..............................................................................6

**Ordinances**

N.Y.C. Admin. Code § 24-117.1 .......................................................................4

N.Y.C. Admin. Code § 24-177.1(b) ..................................................................4

N.Y.C. Admin. Code § 28-506.1 .......................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................................5

**Other Authorities**

H.R. Rep. No. 94-340 (1975)........................................................................................10

H.R. Rep. No. 100-11 (1987)........................................................................................10

S. Rep. No. 94-516 (1975) (Conf. Rep.)......................................................................10

S. Rep. No. 100-6 (1987) ..................................................................................... *passim*

**INTRODUCTION**

The federal Energy Policy and Conservation Act ("EPCA") expressly preempts state and local "regulations concerning" certain appliances' "energy use."  New York City's gas ban is such a regulation.  The City wanted to require electric appliances in new construction, so it banned all appliances from combusting any fuel, and thus banned gas and oil appliances from using any energy.  Under the statute's plain text, banning an appliance from using any energy—and thus setting its maximum energy use to zero—concerns that appliance's energy use and is therefore preempted.  The only federal court of appeals to have addressed the scope of this preemption provision held just that.  *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1098, 1107 (9th Cir. 2024).  That New York City "took a more circuitous route" than directly banning the appliances makes no difference; "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*."  *Id.*

Faced with an unambiguous statute, the City attempts to rewrite it—several times over.  But no matter how hard the City tries, the statute cannot be made to bear any of its preferred meanings.  And for the most part, its revisions would not save its ban from preemption anyway.  The City otherwise spends much of its brief fighting a strawman—the idea that EPCA provides an unconstrained individual right to use any covered appliance.  But nothing in this case turns on such a right, and the City never explains why it thinks otherwise.  At the end of the day, none of the City's arguments can overcome the reality that EPCA unambiguously preempts its gas ban.

This case is not about whether Local Law 154 is good policy.  It is about who decides.  In our federal system, the answer is Congress.  Congress chose to create a national energy policy that pursued several complementary goals, including energy security, energy independence, and energy conservation.  It chose to both boost supply though a diverse array of domestic energy sources and cut demand through conservation efforts, including by reducing the amount of energy the nation's

appliances use.  And Congress chose not to let state and local governments pursue different policies on many of these issues.  Congress was well within its rights to decide that energy policy is a national issue requiring a cohesive approach—to choose uniformity over local experimentation.

The Court therefore should deny the City's motion to dismiss.

## BACKGROUND

### A.     The Federal Energy Policy and Conservation Act

Responding to the early 1970s oil crisis, Congress enacted the Energy Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422,[1] to create a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005).  To that end, EPCA both encouraged domestic supply and promoted energy conservation.  One component of Congress's national policy is EPCA's regulation of many appliances' energy efficiency and energy use.

EPCA's appliance provisions originally focused on labeling, on the theory that well-informed consumers would choose more efficient appliances.  *Air Conditioning*, 410 F.3d at 498-99.  But over time, Congress shifted toward mandating federal standards while limiting state and local governments' role.  *Id.* at 499; *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 186 (2d Cir. 2004).  In 1978, Congress amended EPCA to require the Department of Energy to prescribe federal standards, while also strengthening preemption.  *Air Conditioning*, 410 F.3d at 499.  The Department refused, instead "initiat[ing] a general policy of granting petitions from States requesting waivers from preemption."  *Id.* (attribution omitted).

So Congress amended EPCA again in 1987, prescribing standards for many appliances and

---

[1] All further statutory references are to Title 42 of the U.S. Code unless otherwise noted.

adopting the preemption provision at issue here.  *Air Conditioning*, 410 F.3d at 499-500.  The Department's abdication of its standard-setting responsibility and its freewheeling waiver policy had created "a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans."   S. Rep. No. 100-6, at 4 (1987).  Congress thus bolstered preemption and restricted waivers, including by barring waivers "likely to result in the unavailability in the State of a product type or of products of a particular performance class."  *Id.* at 2; § 6297(d)(4).  The preemption provision now reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [§ 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product . . . .

§ 6297(c) (emphasis added).  That provision is subject to several narrow exceptions, including an exemption for certain regulations "contained in a State or local building code for new construction" that comply with strict requirements, § 6297(f)(3).

The Ninth Circuit—the only federal court of appeals to have considered the issue—recently held that EPCA's "plain text and structure" preempted Berkeley, California's ordinance that, instead of banning covered gas appliances outright, "prohibit[ed] natural gas *piping* in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless."  *Cal. Rest.*, 89 F.4th at 1098.  As the Ninth Circuit recognized, "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings."  *Id.* at 1107.  "And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves."  *Id.* at 1103.[2]

---

[2] After Plaintiffs filed their complaint, the Ninth Circuit amended its opinion and denied rehearing en banc. 89 F.4th at 1098.  Though some of the language quoted in the complaint has been adjusted, the substance is unchanged.

B.      New York City's Gas Ban

In December 2021, the City followed Berkeley's lead by adopting Local Law 154, which bans gas and fuel oil appliances in new buildings with limited exceptions.  N.Y.C. Local Law No. 154 (2021) (codified at N.Y.C. Admin. Code §§ 24-117.1, 28-506.1); *see* Dkt. 1 ¶¶ 32-44. The ban works by prohibiting in new buildings "the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within such building."  N.Y.C. Admin. Code § 24-177.1(b); *see id.* § 28-506.1 (setting out the ban's scope).  Because every combustible fuel for which the Energy Information Administration reports such a figure far exceeds the City's limit, the result is to ban all appliances that run on gas or fuel oil.  Dkt. 1 ¶¶ 38-40.

The City concedes that "Local Law 154 will effectively require new construction to be electric."  Dkt. 20 at 3.  As the City's Department of Buildings put it, the City "is phasing out the usage of natural gas and fuel oil in buildings for cooking, heating and service hot water," which "impacts appliances such as cooking ranges and clothes dryers."  Dkt. 1 ¶ 44 & Ex. D.

C.      Plaintiffs File Suit to Block Enforcement of the Ban

Plaintiffs are trade associations and a union whose members rely on the availability of gas and oil appliances and systems for their livelihoods.  Dkt. 1 ¶¶ 4, 11-26.  Their members work in various industries, including construction, delivery, and servicing related to the banned appliances. *Id.* ¶ 4.  The City's ban is decreasing Plaintiffs' job opportunities and construction project work, disrupting their long-term business strategy and asset planning, and jeopardizing their jobs and hiring and training programs.  *Id.*  The City has outlawed some of what Plaintiffs do for a living, and its ban is scheduled to outlaw even more of it over time.

To put a stop to the irreparable harms caused by the City's preempted gas ban, Plaintiffs brought this suit for declaratory and injunctive relief.  Dkt. 1.  The City moved to dismiss under

Rule 12(b)(6), arguing that its ban is not preempted.  Dkt. 19.[3]

## ARGUMENT

## I.     The City's Ban Is Preempted.

Express preemption is analyzed just like any question of statutory interpretation: by beginning with the text—and ending there if the text is unambiguous.  *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023).  That is because the statute's plain meaning "necessarily contains the best evidence of Congress' pre-emptive intent."  *Franklin*, 136 S. Ct. at 1946.  Courts "do not invoke any presumption against pre-emption" when interpreting express preemption provisions.  *Id.*; *accord Buono*, 78 F.4th at 495 (same).[4]  Of course, like any other statutory text, preemption provisions must be read in context.  *See, e.g.*, *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016).

## A.     Applying EPCA's Plain Text, the Ban Is a Regulation Concerning Energy Use.

EPCA's plain text is the beginning and end of the preemption inquiry here.  The City's ban is a "State regulation concerning" the "energy use" of "covered product[s]," § 6297(c), because it regulates the quantity of energy used by covered gas appliances.[5]

To see why, take the statutory terms step by step.  "State regulation" includes local

---

[3] WE ACT for Environmental Justice and New York Geothermal Energy Organization have moved to intervene.  Dkt. 23.  Because that contested motion remains pending, the proposed intervenors' proposed motion to dismiss is not yet, and may never be, before this Court.  This brief accordingly responds only to the City's motion.

[4] The City suggests in a footnote that it is "unclear" whether a presumption against preemption applies here because there is a circuit split on whether the Supreme Court meant what it said in *Franklin*.  Dkt. 20 at 6 n.3.  To be sure, the Third Circuit alone appears in a footnote to have confined *Franklin* to bankruptcy cases.  *See Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018).  But the City neglects to mention that binding Second Circuit precedent holds, as did *Franklin*, that there is no presumption against preemption in express preemption cases.  *Buono*, 78 F.4th at 495.  As has every other circuit that has weighed in.  *See, e.g.*, *Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernández*, 58 F.4th 5, 11-12 & n.5 (1st Cir. 2023); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019); *Ye v. GlobalTranz Enters.*, 74 F.4th 453, 465 (7th Cir. 2023); *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967 (8th Cir. 2021); *Cal. Rest.*, 89 F.4th at 1101 (9th Cir.); *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023); *cf. Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018) (suggesting that Supreme Court precedent is confusing but declining to apply a presumption).

[5] As discussed, Local Law 154 bans gas and fuel oil appliances alike.  Because the exact fuel makes no legal difference, this brief refers to the banned appliances as "gas appliances" for simplicity.

regulations. § 6297(a)(2)(A). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use." § 6291(4). "[E]nergy" includes "fossil fuels," such as natural gas and fuel oil. § 6291(3). And "covered products" include a wide range of consumer appliances, such as water heaters, furnaces, dishwashers, and stoves. §§ 6291(1)-(2), 6292(a).

Perhaps the most important term, though, is "concerning," which carries a well-established meaning in preemption provisions. "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (cleaned up). Those terms "express[] a broad pre-emptive purpose," *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1197 (2017) (attribution omitted), "ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," *Lamar*, 138 S. Ct. at 1760. *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) ("broad," "deliberately expansive" language, "conspicuous for its breadth"). At the very least, "by using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Cal. Rest.*, 89 F.4th at 1103.

Taking these definitions together, Local Law 154 is a "State regulation concerning" the "energy use" of "covered products." By banning combustion, the regulation "concern[s]" "the quantity of energy" consumed by gas appliances because it prohibits those products from using any energy, or in other words, it allows only gas appliances with zero energy use. *See Cal. Rest.*, 89 F.4th at 1102-03 (holding that a ban on gas piping "necessarily regulates" how much energy gas appliances consume and thus is preempted). That, after all, was the point of the law. Dkt. 1 ¶¶ 33, 41-44; *see* Dkt. 20 at 3 (conceding that the law bans gas appliances).[6] Because the City

---

[6] EPCA's industrial appliance provisions work the same way. The industrial provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which" there is a federal standard. § 6316(b)(2)(A). "[E]nergy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use." § 6311(4). And "energy" is defined in the same way as for consumer products.

does not contend that any exception to preemption applies, Dkt. 20 at 12 n.9, its ban is preempted.

### B.      EPCA's Structure and Purpose Support Preemption.

EPCA's structure and purpose confirm that the statute's preemption provision is broad and that its concern does not stop at the end of the assembly line.

### 1.      EPCA's exemption for local building codes shows that preemption extends to regulation of buildings' appliances.

EPCA's structure underscores that Congress intended broad preemption of state and local regulations, subject to specific exceptions.  As discussed, EPCA begins with a broad preemption provision covering any "State regulation concerning the energy efficiency, energy use, or water use" of a covered product.  § 6297(c).  It then offers specific exceptions, including § 6297(f)(3), which exempts building codes from preemption when they meet certain requirements.  When, as here, Congress "explicitly lists a set of exceptions" to preemption, those exceptions are helpful in determining Congress's intent.  *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008).

The building code exemption provision has strict requirements.  Building codes for new construction cannot qualify unless (among other things) they set an overall conservation objective and allow builders to "select[] items whose combined energy efficiencies meet the objective" without requiring any covered product to exceed federal standards.  § 6297(f)(3)(A)-(B), (F); *see also* S. Rep. No. 100-6, at 10-11 (explaining that Congress meant to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met").  So to qualify for the exemption, the building code *cannot* impose product-specific requirements.  But under the City's statutory interpretation, preemption extends only to product-specific requirements (or their equivalent)—and there thus

---

§§ 6311(7), 6291(3).  The City's gas ban therefore is preempted as to covered industrial equipment for the same reasons as for covered consumer products.  The City agrees that the analysis is the same.  *See* Dkt. 20 at 8 n.4 ("EPCA regulates consumer products and industrial equipment in the same manner." (citations omitted)).

would be nothing preempted in the first place that could qualify for the building code exemption, leaving § 6297(f)(3), an entire paragraph, with no work to do.  Because Congress would not have created a pointless exception, it must have thought that it was preempting more than just product-specific requirements.  *See Pulsifer v. United States*, No. 22-340, slip op. at 17 (U.S. Mar. 15, 2024) ("When a statutory construction thus renders an entire subparagraph meaningless, . . . the canon against surplusage applies with special force." (cleaned up)).

        **2.**      **EPCA's context confirms that preemption is not limited to regulations affecting design and manufacturing choices; but in any event, the ban does just that.**

The City contends that EPCA is concerned only with what manufacturers do "*before* a consumer product is marketed"; the point, it says, was to make manufacturers "design more energy efficient products."   Dkt. 20 at 11; *see also id.* at 17 (arguing that "EPCA's substantive provisions . . . focus on a covered product's manufacture and design"); *id.* at 24 (similar).  That argument is both wrong and beside the point:  EPCA does not ignore what happens after "products roll off the factory floor," *Cal. Rest.*, 89 F.4th at 1103.  And regardless, Local Law 154 does affect manufacture and design.

Nothing in § 6297(c)'s text limits preemption to regulations concerning appliances' design. Rather, § 6297(c) preempts any "regulation concerning" a covered product's "energy use."  "[I]f Congress meant to cover only" design regulations and performance standards, "it could have said so."  *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1038 (2019); *accord Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says.").  For example, it might have preempted "regulations of appliance design" or simply "energy conservation standards."  Instead, Congress chose a broader approach.

Context confirms the point.  Congress allowed the federal government to waive preemption

in certain circumstances, § 6297(d)(1), but prohibited waivers when the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," § 6297(d)(3). "So the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition. Such a provision would make little sense if the scope of ECPA's preemption ends with the design or manufacture of the product." *Cal. Rest.*, 89 F.4th at 1104. So too for the building code exemption, which would make little sense if federal preemption ended at the factory door. *Supra* pp. 7-8.

But even if EPCA preemption were limited to regulations affecting manufacturers' design decisions, the City's ban would still be preempted. To be sure, once a manufacturer decides to make a gas appliance, Local Law 154 has nothing more to say. But the ban kicks in a step earlier, when manufacturers are deciding what kind(s) of energy their appliances should run on. To sell in New York City, manufacturers must design appliances around a prohibition on the use of gas or oil, and they must make production decisions based on which appliances they will be able to sell and where. This impact on design and production is the point of the City's ban. *See, e.g.*, Dkt. 1 ¶ 41 & Ex. A (Mayor's Office: "The next generation of buildings is electric."). The only way to sell appliances for new construction in New York City is to do exactly what the City wants: design and produce all-electric appliances. EPCA prohibits the City from forcing manufacturers and builders down that path. *See Cal. Rest.*, 89 F.4th at 1104 ("[N]o doubt Berkeley's ban, if adopted by States and localities throughout the country, would 'significantly burden' the 'sale' of covered products 'on a national basis.'" (quoting § 6297(d)(3))).

That aligns with EPCA's legislative history. *Contra* Dkt. 20 at 13. Congress wanted to avoid both "the unavailability in [any] State of a product type or of products of a particular performance class," S. Rep. No. 100-6, at 2, and a "patchwork" of regulations in which an

appliance would be legal in some places but not others, *id.* at 4; *accord* H.R. Rep. No. 100-11, at 24 (1987).  A patchwork of banned products is just as disruptive as a patchwork of different standards.  And for that matter, a patchwork of standards can be expressed as a patchwork of bans; appliances would be banned wherever they did not meet state or local standards.

### 3.    EPCA's history refutes the City's narrow account of its purpose.

The notion that EPCA's "overarching goal" is merely "reducing energy consumption of certain appliances" is irreconcilable with the statute's text and history.  *Contra* Dkt. 20 at 9.  Taken as a whole, EPCA is a sweeping national energy policy that includes a policy regarding appliances. *See, e.g.*, § 6201 (listing purposes).  Its impetus was rising fuel prices and energy security concerns with dependency on imported oil.  *Air Conditioning*, 410 F.3d at 498.  The resulting policy was deliberately neutral as to the type of fuel; Congress chose to encourage diverse energy sources and rely on neutral energy consumption and conservation objectives.  *See* S. Rep. No. 94-516, at 116-18 (1975) (Conf. Rep.); H.R. Rep. No. 94-340, at 1 (1975).  Diversity of fuel sources was vital to the national policy Congress pursued—one that reduced dependence on imported oil and focused on encouraging use of domestic resources, even including coal.  *See* H.R. Rep. No. 94-340, at 316 (noting that it was "necessary for the government to protect our society from the devastating impact of ever-increasing energy prices, until we can develop alternative energy sources and restore competition to the energy market"); *id.* at 10-11 ("The Committee's bill includes a number of provisions designed to make better use of coal resources.").

Later, the focus shifted from reducing dependence on imported oil to also creating a uniform standard for appliance manufacturers to help achieve the nation's energy independence goals.  *E.g.*, S. Rep. No. 100-6, at 4.  Importantly, though, Congress did not want any standards that would "result in the unavailability in the United States in any covered product type (or class) of performance characteristics, such as size or capacity."  *Id.* at 8-9.  Congress wanted to reduce

10

energy use of existing appliances, not eliminate appliances.  Congress provided the following example: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." *Id.*  Accordingly, Congress was concerned with the unavailability of types of covered products (like certain gas furnaces) and curtailed authority even to the Department to permit regulations that would "result in minimal demand" for such products. *Id.*; *see* § 6297(d)(4).  Moreover, Congress also recognized that regulations in populous states (like New York) might carry national weight, S. Rep. No. 100-6, at 4, and therefore prohibited any attempt by state and local governments to supplant its policy.

### 4.    Allowing local bans on appliances would upend the statutory scheme.

Finally, if the City were right, evading EPCA's preemption provision would be a trivial task.  The crux of the City's position is that EPCA has nothing to say about banning any particular covered appliance.  So if the City wanted to impose a particular design requirement or efficiency standard more stringent than the federal standard—both of which are undeniably preempted if done expressly—all it would need to do is make a list of appliances that do not meet its standard and ban them.  Conversely, it could make a list of appliances that satisfy its requirements and ban all others.  Either approach is fair game under the City's interpretation, and neither is distinguishable from what it has done here: ban all appliances that use disfavored fuels.  This statutory interpretation would gut the preemption provision and enable the very patchwork Congress sought to avoid.  And it would undermine Congress's careful attention to preserving consumer choice. *See, e.g.*, §§ 6295(o)(4), 6297(d)(4); *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1153 (9th Cir. 2012) (regulations cannot discriminate among or favor "particular products or methods" (citing § 6297(f)(3)(C))).

Nothing in EPCA's text, structure, or purpose suggests that it is so easy to evade.  To the

contrary, Congress had every reason to expect that it would not "make[] any difference" for preemption purposes if a state were to "select[] an indirect but wholly effective means" of achieving a prohibited purpose. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (collecting cases rejecting states' attempts to end-run preemption provisions); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-55 (2004) (rejecting an interpretation that "would undo Congress's carefully calibrated regulatory scheme").  In short, "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases).

## II.    The City's Contrary Arguments Cannot Be Squared with the Statute.

### A.    The City Offers No Consistent Reading of the Statute.

For all its insistence that EPCA is "clear" in its favor, Dkt. 20 at 9, 11 & n.7, 12, 15, 16, 17, the City offers no consistent account of what § 6297(c) does.  Its various formulations include:

1. "EPCA preempts state or local regulations that 'concern' the energy consumption of products that are subject to a federal standard." Dkt. 20 at 1; *accord id.* at 13-14 ("regulations regarding [covered] product's [sic] energy consumption"); *id.* at 24 ("regulations relating to appliance energy consumption"); *see also id.* at 7 ("does not preempt local regulations unrelated to appliance energy consumption").

2. EPCA preempts "state and local regulations affecting appliance energy consumption." *Id.* at 6.

3. "EPCA preempts any state or local regulation that addresses a covered product's energy consumption once" a federal standard is in place.  *Id.* at 8.

4. Regulations are not preempted if they "do[] not regulate the energy consumption of any regulated product," whether "directly" or "indirectly."  *See id.* at 14; *accord id.* at 22.

5. Regulations are preempted if they "prevent the *actual use* of some regulated products . . . because of their energy consumption."  *See id.* at 14-15.

6. "[A] regulation concerns the 'energy use' of a covered product when it burdens manufacturers such that they must modify their appliance in order to meet the regulation's requirements."  *Id.* at 23; *accord id.* at 24 (regulations with an "impact on the amount of energy an[] appliance is design [sic] to consume").

7. EPCA preempts "state or local regulations which directly or indirectly establish energy

> conservation standards—that is, performance standards or design requirements addressing the 'energy efficiency' or 'energy use' of covered products." *Id.* at 12; *accord id.* at 17-18 ("protecting manufacturers from compliance with a competing state or local energy conservation standard").

Many of these formulations are never explained. And they all suffer from the same fundamental problem: They do not apply the preemption provision Congress wrote. In any event, the City's ban is preempted under most of its own formulations.

Replacing the statutory term "energy use" with the City's preferred term "energy consumption" gets the City nowhere. The statute defines "energy use" in terms of "the quantity of energy directly *consumed*" by an appliance. § 6291(4) (emphasis added). So the City's regulation concerns (affects; addresses; at least indirectly regulates) appliances' energy consumption for the same reason it concerns their energy use: It bans gas appliances from consuming (using) any energy. *Supra* pp. 5-7. Put another way, it bans gas appliances whenever their energy consumption exceeds zero. *Id.* The City thus loses under its first four formulations.

It loses under its fifth formulation, too. The City suggests that Local Law 154 would be preempted if it "indirectly regulate[d] the energy consumption of a regulated product by preventing the purchase" or "*actual use*" of a product "because of its energy consumption." Dkt. 20 at 14-15. Local Law 154 does just that. It prohibits the actual use in new buildings of gas appliances that comply with federal standards because of their energy consumption (and thus makes purchasing those appliances futile). Those appliances consume gas—which necessarily involves combustion of a substance prohibited by Local Law 154—and for that reason, they are banned. Dkt. 20 at 8 (admitting that "Local Law 154 will ultimately prevent the actual use of an appliance relying on a prohibited fuel source"). So once again, on the City's own theory, its ban is preempted.

Next, as discussed above, the design- and manufacturing-based formulation (the sixth) would also preempt the City's law. *Supra* pp. 9-10. Manufacturers selling gas appliances "must

modify their appliance[s]" so that they no longer use gas "in order to meet the regulation's requirements," Dkt. 20 at 23.  And manufacturers must "design" their appliances "to consume" zero gas (*i.e.*, use electricity instead), *id.* at 24, to do business in New York City.

That leaves the seventh formulation, in which the City argues that only "energy conservation standards" or their equivalents are preempted.  Dkt. 20 at 12, 17-18.  The City inexplicably cites the Ninth Circuit's *California Restaurant Ass'n* decision in support.  *Id.*  But the Ninth Circuit rejected exactly this argument, that EPCA preempts only "regulations that are the equivalent of 'energy conservation standards,'" *Cal. Rest.*, 89 F.4th at 1105—and for good reason.

The argument hinges on giving different phrases—"energy conservation standard" and "regulation concerning [appliances'] energy use"—the same meaning.  That is contrary to the statutory language and structure.  In the very sentence at issue, EPCA uses "energy conservation standard" as the trigger for preemption, while using "regulation concerning the energy efficiency, energy use, or water use" to describe what is preempted.  § 6297(c); *see also* § 6297(d)(1)(A) (allowing waiver for a regulation "which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use").  Courts usually presume that "differences in language like this convey differences in meaning."  *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (attribution omitted).  All the more so here, where Congress gave the terms "energy efficiency, energy use," and "energy conservation standard" distinct definitions, indicating that, though related, they are not identical.  § 6291(4)-(6).

Congress's changes to the text confirm the point.  The 1978 provision Congress replaced with § 6297(c)'s "regulation concerning" language *used to say* almost exactly what the City insists that § 6297(c) means *now*:  It preempted "any energy efficiency standards or other requirement with respect to energy efficiency or energy use of a covered product."  § 6297(a)(2) (1982).  "When

Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Van Buren v. United States*, 141 S. Ct. 1648, 1660-61 (2021) (attribution omitted).

True, § 6297(c)'s heading refers to "energy conservation standards." But headings, though sometimes helpful, "cannot substitute for the operative text." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *accord Yates v. United States*, 574 U.S. 528, 540 (2015) (headings are "not commanding"). Replacing the operative statutory phrase with a phrase from the heading, let alone a phrase Congress used elsewhere in the same operative sentence, would be rewriting the statute, not "clarifying doubt." *Contra* Dkt. 20 at 12.

All in all, Congress easily could have, but did not, use "energy conservation standard" to define the preempted subject matter. Courts must "presume that Congress means what it says" and cannot "simply reconfigure the statute to fit the [City's] needs." *Cal. Rest.*, 89 F.4th at 1105; *accord Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 474 (2024) (courts' "role is to apply the law, not rewrite it"); *Simmons*, 136 S. Ct. at 1848.

### B.      The City's Arguments Write "Concerning" Out of the Statute.

The City never provides a satisfying explanation for the work done by the term "concerning." Lacking any persuasive response to that term's well-established breadth, the City focuses instead on how "energy use" is calculated. But that does nothing to address the impact of "concerning," much less explain why that term does not capture the City's ban. When the City finally addresses "concerning," it argues only that the term should not be stretched to its literal limits, which nobody is asking the Court to do here. Finally, the City attempts to cabin "concerning" by importing only half of the two-prong test courts have developed for applying ERISA's similar "relating to" preemption provision, skipping the prong that readily encompasses its ban. In the end, none of those tactics allow the City to outrun EPCA's plain text.

### 1. The City's series of arguments about how "energy use" is calculated cannot get around "concerning."

The City spends page after page explaining how "energy use" is calculated. *See* Dkt. 20 at 9-11, 16-22. To no avail. The question in this case is not how to calculate the energy use of an appliance, but rather whether a regulation precluding certain appliances from using any energy at all is a regulation concerning those appliances' energy use.

According to the City, the only role "energy use" plays is as a measure that can be "used to craft energy conservation standards that apply to manufacturers before a consumer product is marketed." Dkt. 20 at 11 (emphasis omitted). Not so. An "energy conservation standard" can, of course, be "a performance standard which prescribes . . . a maximum quantity of energy use . . . for a covered product." § 6291(6)(A). But "energy use" does other things in the statute, too. It informs whether the Department can classify products as covered products, *see* § 6292(b)(1) (setting a minimum "average annual per-household energy use by products of" the type to be covered); it informs whether the Department can impose new energy conservation standards, § 6295(*l*)(1) (similar); and—most importantly here—it is among the preempted subject matter, § 6297(c). And as discussed, statutory context refutes the notion that preemption ends at the manufacturer, as the City's reading requires. *See* § 6297(d)(3), (f)(3); *supra* pp. 8-9.

Next, the City contends that the term "point of use" in the "energy use" definition should be given a technical meaning, not its ordinary meaning. Dkt. 20 at 7, 18. But it provides no support for its preferred meanings; its lawyers' say-so is no reason to discard ordinary English. In any event, preemption does not turn on whether "point of use" takes its ordinary meaning of the "place where something is used," as the Ninth Circuit held, *Cal. Rest.*, 89 F.4th at 1101 (attribution omitted); refers to measuring consumption at a representative place "where the product would typically be used," as the City asserts, Dkt. 20 at 18; or distinguishes "site energy" from "source

16

energy," as amicus Natural Resources Defense Council says, Dkt. 29-1 at 6-8; *see Cal. Rest.*, 89 F.4th at 1123-25 (Friedland, J., dissenting from denial of rehearing en banc) (same).

Even assuming that "energy use" is only ever calculated in the lab under representative conditions based on a product's design, EPCA nonetheless preempts regulations that operate in the real world. Section 6297(c) does not say it is preempting "regulations requiring recalculation of a covered product's energy use"; it says "regulations concerning . . . energy use." Regulations that, like the City's, categorically prohibit gas appliances' energy use (or viewed from another angle, ban gas appliances whenever their energy use exceeds zero) "concern[]" those appliances' energy use. *Cal. Rest.*, 89 F.4th at 1102-03. That understanding of § 6297(c) aligns with the well-settled meaning of "concerning" in preemption provisions, *infra* pp. 19-22, and with the statutory context, including the building code exemption, § 6297(f)(3), and Congress's repeated indications that it did not want to make types of products unavailable, §§ 6295(o)(4), 6297(d)(4).

Nor do the statute's instructions to use particular "test procedures" when measuring quantities of energy establish that Congress cared only about regulations on appliances' theoretical energy use (at a lab) and gave free rein to local governments to regulate their energy use in practice. *Contra* Dkt. 20 at 19-22. Congress required test procedures to measure "a representative average use cycle or period of use." § 6293(b)(3). That reinforces Congress's concern with real-world conditions. The fact that representative energy use is calculated in a lab does not mean regulations that operate outside the lab cannot be regulations concerning energy use.

So too for the City's labeling argument. According to the City, because EPCA directs the Department to promulgate regulations "prescrib[ing] labeling or other disclosure requirements for the energy use of" certain appliances, § 6294(a)(2)(I)(i), EPCA must not have anything to say about appliances' energy use from the moment the manufacturer "affixes a label" with that

information.  *See* Dkt. 20 at 20-21.  But again, Congress preempted regulations concerning energy use, not just regulations that require it to be recalculated for purposes of affixing a label.

The City's argument based on EPCA's definitions distinguishing between consumer products and industrial equipment fares no better.  The City says those definitions indicate that EPCA "is unconcerned with the actual use of a covered product" because those products are defined "without regard to whether" any particular product "is in fact distributed in commerce for personal use or consumption," on the one hand, § 6291(1); or "for industrial or commercial use," on the other, § 6311(2)(A).  *See* Dkt. 20 at 16-17.  That argument fundamentally misunderstands the definitions.  In context, the language the City latches on to simply means that products are classified as consumer or industrial based on the purpose for which they are typically sold, rather than on the use to which a particular purchaser puts them.  In other words, a specific unit does not switch regulatory schemes based on who happens to buy it.  If a product is "of a type" that, "to any significant extent, is distributed in commerce for personal use or consumption by individuals," then it is a consumer product, even if a business buys a particular "article of such type."  § 6291(1). And if a qualifying "article of equipment" is not a consumer product, then it is "industrial equipment," even if an individual buys it.  § 6311(2).  These definitions say nothing about where preemption ends.

Ultimately, the City's theory that Congress preempted only regulations that change an appliance's "energy use" as determined in the lab is not just contrary to § 6297(c)'s text but also irreconcilable with § 6297(f)(3)'s building code exemption.  Suppose a building code sets a maximum building-wide energy consumption that is "specified in terms of an estimated total consumption of energy," § 6297(f)(3)(F), and calculated by adding up all the appliances' off-the-rack, lab-tested "estimated energy use" values, § 6297(f)(3)(G).  So long as no appliance is

required to exceed federal standards, § 6297(f)(3)(B), such a building code could qualify for exemption from preemption.  *See Bldg. Indus.*, 683 F.3d at 1145-46, 1148-49 (building code requiring a "15% reduction in new buildings' energy consumption"—which was undisputedly a regulation "concerning the energy efficiency or energy use" of covered appliances—qualified for the exemption).  But if the City were right, the regulation would not be preempted in the first place because it does not change the lab-tested value for any appliance model's energy use.  That would make the building code exemption superfluous.  *See, e.g.*, *Cal. Rest.*, 89 F.4th at 1101 (exemption indicates that building codes concerning energy use would otherwise be preempted).  "[T]hat kind of superfluity, in and of itself, refutes [the City's] reading."  *Pulsifer*, slip op. at 17.

### 2.    The City's ban falls within the ordinary scope of "concerning."

The City fails to confront the well-established meaning of "concerning."  Instead, it attacks a strawman, arguing that the Court should not "stretch the scope of EPCA's preemption so far as to include any regulation that might prevent the use of covered products," "make preemption turn on infinite connections," or "engage in uncritical literalism."  Dkt. 20 at 22-24 (cleaned up).  Nobody is asking for any of that.  All Plaintiffs ask is for the Court to apply the preemption provision Congress wrote, which given its choice of "concerning" is broad but not unlimited.

As noted, Congress uses "concerning"—like "relating to"—to "express[] a broad pre-emptive purpose."  *Coventry*, 137 S. Ct. at 1197; *accord Lamar*, 138 S. Ct. at 1759-60.  These terms, while not unbounded, are not easily evaded.  For example, in *Rowe v. New Hampshire Motor Transport Ass'n*, *supra*, the Supreme Court confirmed that at the very least, laws with "a significant impact related to Congress's deregulatory and pre-emption-related objectives" are preempted by a "related to" provision.  *Id.* at 371 (cleaned up).  Specifically, the Court concluded that a state law was impermissibly "related to" the prices of motor carriers (*e.g.*, trucking services) because, although the law did not directly regulate trucking companies, it accomplished the same

result by prohibiting retailers from accepting deliveries from trucking companies that did not follow certain rules. *See id.* at 368-69, 372. That the state law was "less 'direct' than it might be" could not save it from preemption because it "produce[d] the very effect that the federal law sought to avoid." *Id.* at 372; *see also id.* at 373 (noting that allowing this type of law "could easily lead to a patchwork of state" laws, which would be "inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace"). Put another way, state and local governments cannot evade preemption "concerning" or "related to" a subject of federal regulation just by taking an indirect route to the destination they are prohibited from reaching directly. *See Cal. Rest.*, 89 F.4th at 1107 (collecting cases).

The Second Circuit has rejected similar attempts to end-run preemption provisions. *See, e.g.*, *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156-58 (2d Cir. 2010) (holding that the City could not evade EPCA's provision preempting regulations "related to fuel economy standards," 49 U.S.C. § 32919(a), by using "hybrid" as a "proxy for 'greater fuel efficiency'"); *23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 (2d Cir. 2012) (rejecting the City's argument that its law did not "explicitly" regulate preempted activity as "ignor[ing] the practical effect" of the law).

Just as in those cases, the City's ban is preempted. If a state cannot impose otherwise preempted regulations on trucking companies by moving the regulations one step down the distribution chain to retailers, then the City is forbidden from imposing an otherwise preempted ban on covered gas appliances by moving the regulations one step down the energy chain to ban their use of energy by banning any combustion. Nor can the City evade the undisputed prohibition on imposing energy conservation standards on manufacturers by banning its residents from using appliances whose energy use (or energy efficiency) it dislikes.

20

None of that leaves § 6297(c) without a limiting principle. Congress's intent—as understood through the statute it wrote—is the limiting principle, just as it is for similarly broad preemption provisions. *See, e.g.*, *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997) ("[T]o determine whether a state law has the forbidden connection [with ERISA plans], we look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." (cleaned up)); *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 263-64 (2013) (considering congressional purpose, as evidenced by the text). For example, generally applicable regulations with only a tangential effect on the preempted subject matter are ordinarily not preempted. *See, e.g.*, *Dan's City*, 569 U.S. at 264 (noting that the provision at issue in *Rowe* would not preempt generally applicable zoning laws even if they tangentially affected trucking operations). Likewise, by prohibiting state and local governments from regulating concerning appliances' energy use, EPCA says nothing about whether those governments must take actions to ensure access to gas distribution (or any other type of energy) that is not already available.

The City's approach to the limits of "concerning," by contrast, is at odds with Supreme Court precedent. The City revises § 6297(c) to add a new "limiting principle": A regulation concerning energy use is one that "burdens manufacturers such that they must modify their appliance in order to meet the regulation's requirements." Dkt. 20 at 23-24; *accord id.* at 24 ("impact on the amount of energy any appliance is design [*sic*] to consume"). Such a regulation would indeed be preempted. But § 6297(c) is not so limited, and the City's rewrite is irreconcilable with EPCA's text and structure. *Supra* pp. 5-12. The City "engraft[s]" a "limiting component" onto Congress's work, incorrectly narrowing its preemptive reach. *See Engine Mfrs.*, 541 U.S. at 253; *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases). "In addition to having no basis in the text

of the statute," the City's claimed authority to ban New Yorkers from using appliances that meet federal standards simply because it has not ordered manufacturers to stop selling them "would make no sense." *Cf. Engine Mfrs.*, 541 U.S. at 255. "The manufacturer's right to sell federally approved [appliances] is meaningless in the absence of a purchaser's right to [use] them." *Id.*; *see* Dkt. 20 at 17 (City acknowledging that "when a manufacturer develops covered products in compliance with EPCA's energy conservation standards, the manufacturer may offer [them] for sale"). True, the City's local ban "do[es] not eliminate all demand for covered" gas appliances. *Engine Mfrs.*, 541 U.S. at 255. "But if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." *Id.*

The Ninth Circuit's *Air Conditioning* decision is not to the contrary. *Contra* Dkt. 20 at 23-24. *Air Conditioning* held that EPCA's separate provision preempting state regulations requiring "the disclosure of information with respect to any measure of energy consumption," § 6297(a)(1), did not preempt a requirement that appliances be labeled with the "manufacturer's name, the model name, and the date of manufacture"—none of which is a "measure of energy consumption" as defined by § 6291(8). 410 F.3d at 500-02. That straightforward application of § 6297(a)(1)'s plain text says nothing about whether § 6297(c) preempts local gas bans. The City understandably does not rely on the same circuit's answer to that question: Yes. *Cal. Rest.*, 89 F.4th at 1107.

### 3. The City inexplicably ignores ERISA preemption's "connection with" prong, which readily encompasses its ban.

Finally, the City appears to turn to the test courts use for ERISA's provision preempting state laws "relate[d] to" a covered employee benefit plan, 29 U.S.C. § 1144(a), to define the scope of "concerning." *See* Dkt. 20 at 14-15. Under that test, ERISA preempts a state law "if it has a reference to" *or* "an impermissible connection with ERISA plans." *Gobeille v. Liberty Mut. Ins.*

*Co.*, 577 U.S. 312, 319-20 (2016) (cleaned up).  The "reference to" prong preempts a law if it "acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation."  *Id.* (cleaned up).  The "connection with" prong is broader and considers "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," as well as "the nature of the effect of the state law on ERISA plans." *Id.* at 320 (cleaned up).  That test can inform the application of similar preemption provisions. *Metro. Taxicab*, 615 F.3d at 156-57.

But without acknowledging its maneuver, let alone offering any argument in support, the City imports only the "reference to" prong and ignores the "connection with" prong.  The City contends that its ban does not satisfy the first prong because, in the City's view, it "does not reference" the preempted subject matter (which the City incorrectly conflates with "energy conservation standards"), and that subject matter is not "essential to [the ban's] operation." Dkt. 20 at 14; *see also id.* at 6-7 (suggesting that the test is whether "the preempted subject matter is essential to a challenged law's operation").  Neither case the City cites justifies stopping with the first prong of the ERISA test.  *See Dillingham*, 519 U.S. at 325 ("A law that does not refer to ERISA plans may yet be pre-empted if it has a 'connection with' ERISA plans."); *Metro. Taxicab*, 615 F.3d at 156-57 & n.4 (applying the ERISA test to another of EPCA's preemption provisions and noting that, "[e]ven if there is no reference to or essential incorporation of the preempted subject matter, courts must still ask whether the law nevertheless contains requirements that amount to connections with the preempted subject matter" (cleaned up)).

The City's ban easily satisfies the "connection with" prong.  The ban "would have a significant impact upon"—indeed, is inextricably intertwined with—covered appliances' energy use.  *See Lamar*, 138 S. Ct. at 1759-60 (cleaned up).  And it would "produce the very effect that

the federal law sought to avoid," *Rowe*, 552 U.S. at 371-72 (cleaned up), by banning a type of appliance at a local level and thus fraying Congress's national approach into a patchwork.

### C.    Plaintiffs' Claim Does Not Turn on an Unconstrained Right to Use.

Nothing about recognizing that the City's ban is preempted depends on the idea that EPCA "guarantee[s] consumers' [*sic*] the ability to actually use covered products." *Contra* Dkt. 20 at 8; *id.* at 1, 15, 17-19, 23-24.  That is a strawman.  Recognizing that EPCA takes a real-world approach—not one confined to the factory floor—does not require the conclusion that no regulation can ever limit any individual's use of any covered appliance under any circumstance. The statute limits preemption to regulations "concerning" a covered product's "energy efficiency, energy use, or water use."  § 6297(c).  The City's ban is such a regulation because banning the combustion of a fuel by "products that operate on [that fuel] 'concerns' the energy use of those products," *Cal. Rest.*, 89 F.4th at 1103, not because it happens to affect the circumstances under which an individual may use a covered appliance.

As Judge Baker explained in the Ninth Circuit, EPCA is "unlikely" to preempt regulations that only "incidentally impact" covered products' gas consumption, such as "state and local taxes" or a decision to not extend a utility distribution system.  *Cal. Rest.*, 89 F.4th at 1117 (Baker, J., concurring).  Local Law 154, by contrast, "cuts to the heart of what Congress sought to prevent." *Id.* at 1119.  The City's ban on combustion is inextricably linked to covered gas appliances' energy use.  It is preempted not because it incidentally "impact[s] a consumer's ability to actually use a covered product" in certain circumstances, Dkt. 20 at 24, but because its effect—and admitted purpose—is to categorically prohibit gas appliances' energy use.  In this regard, the City's ban is indistinguishable from Berkeley's ban; the City merely banned the gas fuel instead of the gas piping.  Nothing about applying EPCA's plain text to hold that the City's ban is preempted endangers local health and safety regulations that have long coexisted with EPCA.

24

To be clear, merely invoking health and safety purposes cannot switch off preemption. "Despite the importance of [those] objective[s]," EPCA does not "create[] an exception on that basis." *See Rowe*, 552 U.S. at 373-74.  The point is simply that applying EPCA's plain text to the City's ban will not cause the sky to fall.  *Contra* Dkt. 29-1 at 10-11 (presenting a parade of horribles with no resemblance to the ban).  Broad preemption provisions like EPCA's are ill suited to bright-line rules.  No single case can map the outer boundaries of EPCA preemption, much less one that, as here, "does not present a borderline question."  *See Morales*, 504 U.S. at 390.

### D.     The Natural Gas Act Has No Bearing on EPCA Preemption.

The NRDC briefly contends that the Natural Gas Act's division of federal and state authority over gas distribution "counsels against a finding of preemption."  Dkt. 29-1 at 8-9 & n.4. It does not.  The Natural Gas Act provides for federal control over interstate transportation of natural gas but states that it "shall not apply to . . . the local distribution of natural gas."  15 U.S.C. § 717(b).  "By its terms, then, the Natural Gas Act only prevents [the Federal Energy Regulatory Commission] from regulating the local distribution of gas."  *Cal. Rest.*, 89 F.4th at 1106.  It does not prevent Congress from later "deciding to supplant building codes that prevent the operation of natural gas appliances," as it did in EPCA.  *Id.*  This case has nothing to do with whether "cities and states [must] create or maintain natural gas service."  *Contra* Dkt. 29-1 at 9.  The City's ban does not regulate gas distribution; it simply bans the use of any combustible fuel in new buildings. Deciding that EPCA preempts a ban on "*using* available gas to run a covered appliance" does not require deciding "whether the City has any obligation to maintain or expand the availability of a utility's delivery of gas to meters."  *Cal. Rest.*, 89 F.4th at 1106.

### CONCLUSION

For these reasons, the City's motion should be denied.

Dated: March 29, 2024

Respectfully submitted,

/s/ Sarah O. Jorgensen

Caroline M. Walters (NY Bar No. 5780739)
REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
cwalters@reichmanjorgensen.com

Sarah O. Jorgensen (*pro hac vice*)
REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
sjorgensen@reichmanjorgensen.com

Brian C. Baran (*pro hac vice*)
REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
bbaran@reichmanjorgensen.com

Courtland L. Reichman (*pro hac vice*)
REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
creichman@reichmanjorgensen.com

*Attorneys for Plaintiffs*