**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING COOLING CONTRACTORS–NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDTATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION NEW YORK CITY, INC., d/b/a/ MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NEW YORK, <br><br> Defendant. | CIVIL ACTION NO. 1:23-cv-11292-RA |

**[PROPOSED] AMICUS BRIEF OF WE ACT AND NY-GEO IN SUPPORT OF DISMISSAL**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

STATEMENT OF INTEREST ................................................................................................... 1

      A.     WE ACT for Environmental Justice ................................................................. 1

      B.     New York Geothermal Organization ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 2

ARGUMENT ............................................................................................................................... 3

I.     LOCAL LAW 154 CONCERNS HEALTH AND WELFARE, NOT THE
ENERGY USE OF COVERED APPLIANCES ............................................................... 3

      A.     Local Law 154 addresses the health and safety effects of indoor fossil fuel
combustion. ........................................................................................................ 3

      B.     Local Law 154 addresses the urgent need to reduce carbon emissions and
accelerates the city's green transition. ............................................................... 6

      C.     Local Law 154 does not regulate "energy use" within the meaning of
EPCA. ................................................................................................................ 7

II.    PLAINTIFFS' READING OF EPCA'S PREEMPTION CLAUSE PRODUCES
ABSURD RESULTS. ........................................................................................................ 9

CONCLUSION .......................................................................................................................... 12

## TABLE OF AUTHORITIES

**CASES**

**Page number(s)**

*Cal. Rest. Ass'n v. City of Berkeley*,
  89 F.4th 1094 (9th Cir. 2024) ...........................................................................7, 8

*Dan's City Used Cars, Inc. v. Pelkey*,
  569 U.S. 251 (2013) ............................................................................................9

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) .....................................................................9

*Huron Portland Cement Co. v. City of Detroit*,
  362 U.S. 440 (1960) ..........................................................................................11

*Metro. Taxicab Bd. of Trade v. City of New York*,
  615 F.3d 152 (2d Cir. 2010) ...........................................................................7, 8

*Queenside Hills Realty Co., Inc. v. Saxl*,
  328 U.S. 80 (1946) ............................................................................................12

*Univ. Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) ............................................................................................9

**STATUTES**

42 U.S.C. § 6292(a)(9) ..............................................................................................10

42 U.S.C. § 6313(a)(4)(D) ........................................................................................11

N.Y.C. Admin. Code § 27-4253 (2006) ....................................................................10

N.Y.C. Admin. Code § 313-01 ..................................................................................10

N.Y.C. Loc. L. No. 43 (2010) .............................................................................10, 11

**FEDERAL REGULATIONS**

10 C.F.R. pt. 430, subpt. B, app. G at 1.4.1 ..............................................................10

62 Fed. Reg. 38,652-01 (July 18, 1997) ......................................................................4

71 Fed. Reg. 61,144-01 (Oct. 17, 2006) ......................................................................4

72 Fed. Reg. 20,586-01 (Apr. 25, 2007) ......................................................................5

75 Fed. Reg. 6474-01 (Feb. 9, 2010) ...........................................................................4

76 Fed. Reg. 54,294-01 (Aug. 31, 2011) .....................................................................4

**OTHER AUTHORITIES**

Am. Pub. Health Ass'n, Policy No. 20225, *Gas Stove Emissions Are a Public Health Concern*
  (Nov. 8, 2022) .....................................................................................................6

EPA, EPA-600/1-77-013, Nitrogen Oxides (1977) .....................................................4

EPA, EPA/600/R-15/068, Integrated Science Assessment (ISA) for Oxides of Nitrogen –
  Health Criteria (2016) ........................................................................................4

Gary Adamkiewicz et al., *Moving Environmental Justice Indoors: Understanding Structural Influences on Residential Exposure Patterns in Low-Income Communities*, 101 Am. J. Pub. Health S238 (2011)..................................................................................................5

Press Release, Office of the Mayor, Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to Significantly Cleaner Air (Feb. 9, 2016) ..........................................................................11

Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990)........................................................................................10

**STATEMENT OF INTEREST**

A.    **WE ACT for Environmental Justice**

WE ACT for Environmental Justice ("WE ACT") is a New York City membership organization whose mission is to build healthy environments for its members and the communities they represent. Since its formation in Harlem in 1988 as the first people-of-color-led environmental justice organization in New York State, WE ACT has been building healthy communities by ensuring that people of color and low-income residents participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.

For the past thirty-five years, WE ACT has sought to address health disparities caused by environmental factors, including higher burdens from climate change and other impacts of pollution from fossil fuels, such as indoor air quality. WE ACT's work includes organizing, research, public education, and advocacy and design of legal reforms. WE ACT's integrated advocacy has been instrumental in enacting reforms to improve New Yorkers' air quality. For example, WE ACT followed its production of a report on pediatric asthma disparities with a lead role in drafting the Asthma-Free Housing Act in New York City, which the City Council passed in December 2017. WE ACT played a critical role in the development and passage of Local Law 154. In 2021, WE ACT launched a pilot program and published a report, *Out of Gas, In with Justice*, to demonstrate the feasibility and benefits of transitioning from fossil fuels to renewable energy in affordable housing. WE ACT has a direct interest in Local Law 154 because its membership is composed of low-income tenants who depend on local regulation to control how much indoor pollution they are subjected to.

B.    **New York Geothermal Organization**

Founded in 2014, New York Geothermal Organization ("NY-GEO") is a not-for-profit trade association which represents the geothermal heat pump industry in New York State. The

seventy founding members, including geothermal system designers, installers, drillers, general contractors, engineers, manufacturers, distributors, renewable energy consultants and industry stakeholders, install and advocate for the use of ground-source heat pumps to heat and cool buildings throughout New York State. NY-GEO provides job training opportunities, hosts an annual ground source heat pump conference, and engages in advocacy for policies that promote the transition to clean heating and cooling technologies.

Electric heat pumps are a central part of the elimination of fossil fuel combustion required by Local Law 154. NY-GEO's members and others involved in the heat pump industry represent a quickly growing sector of the City and State economy, and their growth stands to substantially accelerate as a result of Local Law 154. The heat pump industry is responsible for jobs that will remain in-state and cannot be outsourced. NY-GEO has estimated there are approximately 2,000 New Yorkers currently employed in ground source heat pump marketing, sales, system design and installation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Combustion of fossil fuels inside of our homes, schools, and workplaces is making New Yorkers sick. And the combustion of these fuels in our buildings is accelerating the climate crisis that puts New York City's future—and the planet's future—in jeopardy. New York City has responded to the threats posed by indoor fossil fuel combustion by banning this harmful practice in most new buildings.

Plaintiffs seek to block the City's urgent action to protect New Yorkers. They maintain that New York City may take no action to restrict indoor emissions if in doing so the City requires that a single product covered by the Energy Policy and Conservation Act ("EPCA") be prevented from unrestricted operation. Under their theory, EPCA—a federal law that does not

2

address emissions—preempts all state and local laws that prevent any covered appliance from operating at any time for any reason.

Plaintiffs' theory fails. EPCA does not preempt Local Law 154, which addresses the health, safety, and environmental impacts of indoor fossil fuel combustion. Local Law 154 does not regulate energy use or energy efficiency as those terms are defined under EPCA, nor does its prohibition on emissions establish an energy conservation standard. Plaintiffs' contrary theory produces absurd results and would radically curtail the traditional health and safety authority that allows cities to protect their residents. There is no indication that Congress intended such a result.

**ARGUMENT**

**I.    LOCAL LAW 154 CONCERNS HEALTH AND WELFARE, NOT THE ENERGY USE OF COVERED APPLIANCES.**

**A.    Local Law 154 addresses the health and safety effects of indoor fossil fuel combustion.**

As the documents attached to Plaintiffs' complaint confirm, Local Law 154 is concerned with the public health of New Yorkers. "The fossil fuels used to heat, cool, and power our buildings . . . emit a wide range of air pollutants that harm the health of New Yorkers, especially our most vulnerable." Compl. Ex. A at 2, ECF No. 1–1. "Robust research exists on the health impacts of gas stoves at the national level," *id.* at 4, establishing the extent and severity of the connection between indoor gas combustion and adverse health outcomes. Indoor fossil fuel combustion has a significant impact on human health and can lead to a range of serious negative health outcomes, including the development and exacerbation of lung diseases, such as asthma and chronic obstructive pulmonary disease, cardiovascular disease, cognitive deficits, cancer, and death. Government regulations, peer-reviewed scientific literature, the nation's leading

3

public health bodies, and local experts all support the urgency of reducing air pollution inside buildings.

Research demonstrates that methane gas combustion releases harmful pollution such as nitrogen oxides (NOx, which collectively describes gases including nitric oxide (NO) and nitrogen dioxide ($NO_2$)), fine particulate matter ($PM_{2.5}$), and carbon monoxide (CO), as well as benzene, formaldehyde, and, in the case of incompletely burned gas, polyaromatic hydrocarbons and ultrafine particles. *See, e.g.*, WE ACT, *Out of Gas, In with Justice* at 8 (2021), ECF No. 25–3. According to the U.S. Environmental Protection Agency ("EPA"), nitrogen oxide pollution is "an inherent consequence of fossil fuel combustion." EPA, EPA-600/1-77-013, Nitrogen Oxides at 1-1 (1977). Carbon monoxide "is formed primarily by the incomplete combustion of carbon-containing fuels." 76 Fed. Reg. 54,294-01, 54,297 (Aug. 31, 2011). $PM_{2.5}$, or fine particulate matter, refers to inhalable particles with diameters that are 2.5 micrometers and smaller and is mainly produced by "combustion processes and by atmospheric reactions of various gaseous pollutants." 62 Fed. Reg. 38,652-01, 38,654 n.6 (July 18, 1997); 71 Fed. Reg. 61,144-01, 61,146 (Oct. 17, 2006).

These pollutants pose serious risks to human health. EPA has determined that even short-term $NO_2$ exposure can cause respiratory health effects, such as impaired lung function, respiratory symptoms, inflammation of the airway, and asthma exacerbations requiring hospitalization. 75 Fed. Reg. 6474-01, 6479-80 (Feb. 9, 2010). In 2010, EPA concluded that short-term CO exposure can cause cardiovascular morbidity and mortality, such as heart attacks, congestive heart failure, and ischemic heart disease. EPA, EPA/600/R-15/068, Integrated Science Assessment (ISA) for Oxides of Nitrogen – Health Criteria at 1-17, 5-55 (2016). Elevated $PM_{2.5}$ levels have been linked to premature mortality; heart attacks, strokes, worsening

of chronic heart failure, and sudden cardiac death; impaired fetal and childhood lung function development; acute and chronic decreases in lung function; respiratory infections and emergency department visits, hospitalizations, and deaths; and development and exacerbation of asthma. *See* 72 Fed. Reg. 20,586-01, 20,586-87 (Apr. 25, 2007).

Exposure to pollution from indoor fossil fuel combustion has been increasingly linked to negative human health effects, including higher rates of respiratory and cardiovascular illnesses, childhood asthma, as well as reduced lung function and premature death. *See Out of Gas* 15, ECF No. 25–3. WE ACT's local study confirms the importance of eliminating indoor fossil fuel combustion. WE ACT conducted a pilot study comparing gas stoves to electric stoves in New York City Housing Authority apartments. *See id.* The *Out of Gas, In with Justice* study is "the first study of its kind to focus on the effects of residential cooking electrification with tenants in-place in an urban public housing setting with low-income residents and residents of color." *Id.* at 3. The study's findings include that "$NO_2$ concentrations when cooking with gas stoves increased to an average of 197 ppb," nearly double the level that EPA has determined to be "'[u]nhealthy for sensitive groups' (100 ppb)." *Id.* at 4. Concentrations in kitchens that did not combust gas "remained at an average of 14 ppb, similar to background levels of $NO_2$." *Id.*

Low-income communities and renters are particularly vulnerable to indoor air pollution. *See* Physicians for Soc. Resp., WE ACT & Sierra Club, *The Outdoor Pollution Is Coming from Inside the House: National Building Pollution Report* 11–12 (2023), ECF No. 25–10. Smaller units, higher occupant density, and inadequate ventilation all contribute to higher levels of $NO_2$ in lower-income multifamily buildings. *See* Gary Adamkiewicz et al., *Moving Environmental Justice Indoors: Understanding Structural Influences on Residential Exposure Patterns in Low-Income Communities*, 101 Am. J. Pub. Health S238 (2011). A 2022 study by the National Center

5

for Healthy Housing revealed that 90% of rental homes did not have adequate ventilation, and another study showed that gas stove pollution was highest in multi-unit buildings. *See* Am. Pub. Health Ass'n, Policy No. 20225, *Gas Stove Emissions Are a Public Health Concern* (Nov. 8, 2022), https://www.apha.org/Policies-and-Advocacy/Public-Health-Policy-Statements/Policy-Database/2023/01/18/Gas-Stove-Emissions.

While New Yorkers who own their homes can choose whether to use gas stoves in their kitchens and may take advantage of high-priced ventilation systems to mitigate emissions, poorer New Yorkers are subjected to greater indoor air pollution burdens. The City's requirement that new buildings not combust fossil fuels will have direct and substantial effects on air pollution, abate negative health outcomes, and address environmental justice disparities.

**B.     Local Law 154 addresses the urgent need to reduce carbon emissions and accelerates the city's green transition.**

Local Law 154 targets the combustion of carbon-intensive fuels in buildings because this combustion is the source of the overwhelming majority of New York City's carbon emissions. While in most of the country the proportion of greenhouse gas emissions attributable to fossil fuel combustion for residential and commercial buildings accounts for a relatively smaller portion of total emissions, "[t]he fossil fuels used to heat, cool, and power our buildings are responsible for nearly 70% of greenhouse gas emissions in New York City." Compl. Ex. A at 2, ECF No. 1–1. As testimony from the Mayor's Office explains, "we must take every opportunity to reduce greenhouse gas emissions for our city and our planet." *Id.* The Intergovernmental Panel on Climate Change has reported that "unless there are immediate and large-scale reductions in greenhouse gas emissions, the world will continue to see increases in the frequency and intensity of extreme weather events and heat waves that would imperil global agriculture and health." *Id.* Local Law 154 recognizes this reality and protects New Yorkers' health and well-being.

C.   **Local Law 154 does not regulate "energy use" within the meaning of EPCA.**

Local Law 154 neither sets energy conservation standards nor affects the design of any product covered by EPCA. It universally prohibits combustion of certain fuels in certain buildings. Because methane gas combustion emits 52.91 kg of $CO_2$ per million Btu regardless of any appliance's design, Compl. ¶ 38, the law effects no mandate as to the energy efficiency or energy consumption of any gas-burning appliance. Local Law 154 thus "gives manufacturers no reason to change the design of their fossil-fuel-burning products to meet standards higher than those prescribed by the Department of Energy ("DOE"). It simply directs consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest. Ass'n v. City of Berkley*, 89 F.4th 1094, 1126 (9th Cir. 2024) (Friedland, J., dissenting) (citing 42 U.S.C. § 6295(e)(1)(A), (C) (setting one standard for gas water heaters and another for electric water heaters)). There is no inherent relationship between the energy conservation achieved by a product and the question of whether it may be used in new buildings. Electric appliances—regardless of energy consumption or efficiency—are permitted; gas-combustion appliances—regardless of energy consumption or efficiency—are prohibited.

The Second Circuit's decision in *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157–58 (2d Cir. 2010) illustrates the difference between laws that effectively establish energy conservation standards—and are therefore subject to EPCA preemption—and laws like Local Law 154, which do not directly or indirectly regulate energy conservation. In that decision, the Second Circuit addressed a City rule that incentivized the use of hybrid taxicabs by increasing "the maximum dollar amount per shift for which [such] taxis can be leased." *Id*. at 155. As the Second Circuit determined, the rule was entirely aimed at fuel efficiency: "The

7

requirement that a taxi be a hybrid in order to qualify for the upwardly adjusted lease cap does nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157. Similar to its preemption of laws relating to appliance energy conservation standards, EPCA "preempts state laws that are 'related to fuel economy standards.'" *Id.* (quoting 49 U.S.C. § 32919(a)). Therefore, because "'hybrid' is simply a proxy for 'greater fuel efficiency' . . . the rules in question directly regulate the relevant preempted subject matter." *Id.* at 158.

As the Second Circuit's analysis shows, Local Law 154 is readily distinguishable from laws that directly or indirectly concern energy conservation standards. First, while in the taxicab case, "[t]he equivalency of the term 'hybrid' with 'greater fuel efficiency' for purposes of the new rules is self-evident," there is no such equivalency between the emissions addressed by Local Law 154 and the efficiency of any EPCA-covered appliance. *Id.* at 157. "Indeed, some gas appliances are more efficient than electric appliances, so the ordinance may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)). Second, while "imposing reduced lease caps solely on the basis of whether or not a vehicle has a hybrid engine has no relation to an end other than an improvement in fuel economy across the taxi fleets operating in New York City," the ends served by Local Law 154 are wholly distinct from energy efficiency. *Metro. Taxicab Bd. of Trade*, 615 F.3d at 157. As described above, Local Law 154 produces no inherent improvement of the city's energy usage or energy conservation. Instead, the law serves different ends: reducing harmful emissions that are making New Yorkers sick, and mitigating the climate crisis that threatens the city's future.

## II. PLAINTIFFS' READING OF EPCA'S PREEMPTION CLAUSE PRODUCES ABSURD RESULTS.

Plaintiffs press an interpretation of EPCA's preemption clause that is breathtakingly expansive. Once an appliance is subject to a federal energy efficiency standard, no state or local authority can ever restrict its use in any location. *See* Compl. ¶¶ 65–68 ("New York City's gas ban is preempted by EPCA's express preemption provisions" because under the City law "fuel gas appliances—including those covered by EPCA—cannot be used in new buildings."). According to Plaintiffs' theory, it makes no difference that EPCA does not authorize DOE to set standards regarding a product's effects on safety, health, wellness, or the environment, or on the suitability of a product for a particular use in a particular location. In their view, once DOE has prescribed an energy efficiency standard for a product, state and local authorities lose all power to restrict the use of that product on any ground. And because DOE has no concomitant power to take over local authority over fire safety, health, wellness, the environment, and suitability, under this theory products subject to federal energy conservation standards are effectively insulated from these unrelated forms of regulation.

Plaintiffs' claims are based on an interpretation of EPCA's preemptive clause that is radically "inconsisten[t] with the design and structure of the statute as a whole," *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). According to Plaintiffs' view, the promulgation of a federal energy conservation guarantees the unlimited use of any EPCA-covered appliance, free from local control, under any circumstance, even though EPCA does not concern the health, safety, or environmental impacts of appliances. *See generally Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 347 (D. Vt. 2007) ("It bears noting here that EPCA expresses no environmental objective or purpose . . . "). The "[f]ederal law does not speak to these issues." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). If EPCA

nonetheless preempts Local Law 154, it would appear to preempt much of the local authority that New Yorkers take for granted.

For example, New York City, one of the densest residential locations in the country, has long banned the use of kerosene space heaters for fire safety reasons. *See* N.Y.C. Admin. Code § 313-01 (requiring label stating "The New York City Fire Code prohibits the . . . use of kerosene fueled heaters for space heating."). Such heaters have been banned from use in all New York City homes since 1959, *see* N.Y.C. Admin. Code § 27-4253 (2006), and are so "highly flammable" that "fire officials confiscate[] them whenever they [a]re spotted in homes or apartments." Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990) (quoting N.Y.C. Fire Department spokesman).

Yet kerosene space heaters are a covered appliance under EPCA. *See* 42 U.S.C. § 6292(a)(9). And DOE has issued regulations governing testing standards for any "unvented oil heater utilizing kerosene." *See* 10 C.F.R. pt. 430, subpt. B, app. G at 1.4.4.

Under Plaintiffs' theory, therefore, the City may not prevent kerosene space heaters from "using fossil fuels" such as kerosene, regardless of the City's interests in preserving the health and safety of its residents. Compl. ¶ 65. This is an absurd and dangerous reading of EPCA.

Moreover, if Plaintiffs' theory is correct, the promulgation of a DOE efficiency standard requires that New Yorkers forfeit not only local control over fire safety, but also over local air quality protections specifically developed to address the city's unique housing stock. In 2010, the City enacted a law addressing the disproportionate air pollution caused by the small number of New York City buildings that combusted high-sulfur fuel oil in their boilers. *See* N.Y.C. Loc. L. No. 43 (2010) ("[T]he strongest predictor of particulate matter and sulfur dioxide in the air in New York City is the density of nearby buildings that burn fuel oil."). Finding it "necessary to

10

address pollutants from the heating oil sector," the City imposed limits on the type of fuel that could be burned in the city's large boilers. *Id.* The law was immediately successful at improving air quality, and by December 31, 2015, all buildings that were burning the dirtiest heating oil had switched to cleaner fuels. *See* Press Release, Office of the Mayor, Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to Significantly Cleaner Air (Feb. 9, 2016), https://www.nyc.gov/office-of-the-mayor/news/152-16/mayor-de-blasio-dep-that-all-5-300-buildings-have-discontinued-use-most-polluting. The result was "a substantial reduction in air pollution, which models show will prevent 210 premature deaths and 540 hospitalizations each year." *Id.*

Yet, if Plaintiffs are correct that "EPCA preempts state and local laws relating to the use of energy, such as gas or heating oil, by covered appliances and equipment," Compl. ¶ 2, then it is not clear how the City possessed this local authority over its own air quality. Large oil-fired packaged boilers are subject to an EPCA efficiency standard. *See* 42 U.S.C. § 6313(a)(4)(D). If the City was therefore stripped of local authority to regulate the type of heating oil burned in its boilers, New Yorkers would be forced to endure hundreds of excess deaths simply because DOE had promulgated an efficiency standard that had nothing to do with health concerns.

As these examples illustrate, Plaintiffs' theory would radically rewrite the relationship between the federal government and local authorities, without any indication that Congress could have intended such a result. A federal law aimed at preserving energy would automatically displace a staggering number of state and local laws that have nothing to do with energy conservation and everything to do with the States' traditional police powers. *See. e.g.*, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most

traditional concept of what is compendiously known as the police power."); *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80, 82–83 (1946) ("Protection of the safety of persons is one of the traditional uses of the police power of the States. . . It is for the legislature to decide what regulations are needed to reduce fire hazards to the minimum."). And because EPCA does not authorize DOE to grant waivers on health and safety grounds, DOE would have no authority to reinstate the countless state and local laws EPCA would displace.

Plaintiffs' theory produces myriad absurd results, and in this instance would leave unprotected the New Yorkers who most rely on the City guaranteeing them a future freer of indoor air pollution. The Court should reject it.

## CONCLUSION

The Court should dismiss the Complaint.

DATED: February 26, 2025

*s/Dror Ladin*
Dror Ladin
Meagan Burton
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Amici Curiae WE ACT and NY-GEO*