UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING COOLING CONTRACTORS–NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION NEW YORK CITY, INC., d/b/a MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC.,

Plaintiffs,

v.

CITY OF NEW YORK,

Defendant.

23-CV-11292 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs, a group of trade associations and a union whose members work in the construction, delivery, and servicing of fuel gas systems and appliances, bring this action against the City of New York, asserting that Local Law 154 of 2021, also known as the New York City Building Electrification Law, is preempted by the Energy Policy Conservation Act of 1975 (“EPCA”), *see* 42 U.S.C. §§ 6201–6422, and seeking a declaratory judgment and permanent injunction to that effect. Before the Court is Defendant’s motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted.

## BACKGROUND[1]

On December 22, 2021, the City of New York enacted Local Law 154 of 2021 ("Local Law 154" or the "Law"), which generally prohibits the use of fossil fuels such as natural gas and heating fuel in newly constructed residential buildings in New York City. The City enacted the law as part of an effort to "meet [New York City's] carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener." *Hearing on Intro. 2317-2021-A Before the N.Y. City Council Comm. on Env't Protection*, Nov. 17, 2021 (Testimony of the Mayor's Office). It provides that "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States [E]nergy [I]nformation [A]dministration," within buildings it covers. N.Y.C. Admin. Code § 24-177.1.[2] This category of substances includes all home and business fuel sources measured by the United States Energy Information Administration, *see Carbon Dioxide Emissions Coefficients*, U.S. Energy Info. Admin. (Sept. 18, 2024), https://www.eia.gov/environment/emissions/co2_vol_mass.php; Compl. ¶ 38–39, several of which are commonly used for home heating, cooking, and hot water, Compl. ¶ 3. After the Law's effective date, the Commissioner of the Department of Buildings may not approve a construction application for any non-compliant new building, although older buildings are exempted. N.Y.C. Admin. Code § 28-506.1.[3]

Plaintiffs are six trade associations and a union whose members work in the construction,

---

[1] The Court draws the following facts from the Complaint, accepting all "well-pleaded factual allegations" as true, as it must, for purposes of deciding a motion to dismiss. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).

[2] The Law provides an exception for, among other things, buildings where the combustion of prohibited substances is "necessary for a manufacturing use or purpose, or for the operation of a laboratory, laundromat, hospital, crematorium, commercial kitchen . . . , or where used for emergency or standby power, or other use allowed by rule of the [D]epartment [of Buildings], to the extent necessary for, and in the space occupied by such use or purpose." N.Y.C. Admin. Code § 28-506.1.

[3] The Law took effect on January 1, 2024 for most new buildings of less than seven stories, and will take effect on July 2, 2027 for most new buildings of seven or more stories. N.Y.C. Admin. Code § 28-506.1.

delivery, and servicing of fuel gas systems and appliances, and who rely on the availability of such systems for their livelihoods. Compl. ¶ 4. The Association of Contracting Plumbers of the City of New York, Inc. is a nonprofit trade association that represents union-affiliated licensed master plumbers in the City of New York. Compl. ¶ 11. The Plumbing-Heating-Cooling Contractors—National Association is a nonprofit trade association that represents the interests of plumbing and heating, ventilation, and air conditioning ("HVAC") contractors across the United States, *id.* ¶ 13, including approximately 212 plumbing and HVAC contractors in New York state, *id.* ¶ 14. The New York State Energy Coalition, Inc. is a nonprofit trade organization whose members include businesses in the heating oil industry. *Id.* ¶ 18. The Plumbing Foundation City of New York, Inc. is a nonprofit trade association whose members comprise approximately 195 union and non-union New York City licensed master plumbers. *Id.* ¶ 20. The Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York is a nonprofit trade association whose membership comprises licensed master plumbers and their affiliates in New York City. *Id.* ¶ 22. Building Industry Association of New York City, Inc. is a not-for-profit corporation whose members comprise builders, developers, architects, and related trades engaged primarily in the construction of one- and two-family houses and similar buildings in New York City. *Id.* ¶ 24. Finally, Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, is a labor union that represents the employees of New York City licensed plumbing contractors. *Id.* ¶ 16.

Plaintiffs assert that Local Law 154 is expressly preempted by EPCA, which prescribes energy conservation standards for various consumer and industrial products identified therein ("covered products"). The City has moved to dismiss the complaint, arguing that EPCA's preemption clause does not reach Local Law 154. *See* ECF No. 20 ("Mot."). Plaintiffs opposed

the motion, *see* ECF No. 41 ("Opp'n"), and the City filed a reply, *see* ECF No. 43. The Court has received amicus curiae submissions from the Natural Resources Defense Council, *see* ECF No. 29-1, and WE ACT for Environmental Justice and the New York Geothermal Energy Organization, *see* ECF No. 47-1. The Court heard oral argument on the motion to dismiss on March 13, 2025.

## LEGAL STANDARDS

### I. Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action," which are "supported by mere conclusory statements, do not suffice." *Id.* In deciding a motion to dismiss, the Court construes "the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), although the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555.[4]

### II. Preemption

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Thus, state laws that interfere with, or are contrary to, federal law must be invalidated."

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

*Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009). "There are three types of preemption:" express, field, and conflict preemption. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024). In this action, Plaintiffs contend that EPCA expressly preempts Local Law 154.

"Preemption is a matter of statutory interpretation," and thus the Court must "ascertain the intent of Congress." *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023). Accordingly, "[a]s with any question of statutory interpretation," the Court must "begin with the text of the statute," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017), and "move on, as need be, to the structure and purpose of the Act in which it occurs," *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). If "the statute's language is plain," then that is "where the inquiry should end." *Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016).

The Court, "do[es] not invoke any presumption against pre-emption when a statute contains an express-preemption clause." *Buono*, 78 F.4th at 495. However, "if a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* at 495–96. Thus, in interpreting a preemption clause, a court must "identify the domain expressly pre-empted." *Id.* at 496.

**DISCUSSION**

This case turns on the scope of EPCA's preemption clause, which provides as follows:

> "[O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product."

42 U.S.C. § 6297(c).[5] Plaintiffs contend that this provision preempts Local Law 154 because the latter "concern[s]" the "energy use" of covered products, in that it "ban[s] an appliance from using any energy[,] . . . thus setting its maximum energy use to zero." Opp'n at 1. For the reasons that follow, the Court disagrees and concludes that EPCA's preemption clause does not apply. Plaintiffs have therefore failed to state a claim upon which relief can be granted.

## I. The Energy Policy Conservation Act

Congress enacted EPCA in 1975, "in the aftermath of the oil embargo imposed against the United States in 1973 and 1974 by certain petroleum-producing countries." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985). "EPCA was designed, in part, to reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005). Initially, Congress pursued this goal by requiring manufacturers to label their appliances with measures of energy efficiency and energy use, as it "believed that better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499.

"A few years later, Congress took EPCA a step further, establishing a nationwide conservation program for consumer appliances." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1120 (9th Cir. 2024) (Friedland, J., dissenting from denial of rehearing en banc). The National Energy Conservation and Policy Act, Pub. L. No. 95–619, 92 Stat. 3206 (1978), "created a nationwide conservation program for appliances and required the [Department of Energy] to

[5] This provision pertains to consumer products, as opposed to industrial equipment. *See* 42 U.S.C. § 6292. However, EPCA also preempts state and local regulations "concerning the energy efficiency or energy use" of industrial equipment for which federal standards are prescribed. *See* 42 U.S.C. § 6316(b)(2)(A). Because the two preemption provisions function in the same manner, the Court considers them together. For simplicity, all citations are to the provisions governing consumer products unless otherwise noted.

prescribe minimum energy efficiency standards for thirteen covered products," *Air Conditioning*, 410 F.3d at 499, such as kitchen ranges and ovens, clothes dryers, and furnaces, *Herrington*, 768 F.2d at 1362 n.1. The Department of Energy largely failed to prescribe such standards, however, and instead granted waivers that allowed states to establish their own standards. *Air Conditioning*, 410 F.3d at 499. This resulted in a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing" of appliances. *Id.* at 500 (quoting S. Rep. No. 100–6, at 4 (1987)).

"Frustrated by the lack of uniformity, manufacturer trade associations negotiated with the Natural Resources Defense Council to establish uniform national standards that would ease the burden on manufacturers while promoting energy conservation." *California Rest. Ass'n*, 89 F.4th at 1120 (Friedland, J.). Congress adopted those standards into the National Appliance Energy Conservation Act of 1987, Pub. L. No. 100–12, 101 Stat. 103 (1987), which established federal energy efficiency standards for residential appliances and amended EPCA's preemption clause to "counteract the systems of separate state appliance standards." *Air Conditioning*, 410 F.3d at 499–500.

Thus, in its current iteration, EPCA requires that covered products meet statutorily and/or administratively prescribed energy conservation standards. *See* 42 U.S.C. §§ 6295, 6313. In general, before a manufacturer may distribute a covered product in commerce, it must (1) perform test procedures on the product, *see generally*, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430–31; (2) certify to the Department of Energy that the product meets the applicable energy conservation standard, *see* 10 C.F.R. § 429.12, i.e., a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or a "design requirement" for the product, 42 U.S.C. § 6291(6); and (3) include on the product a label containing the energy

efficiency and energy use information required by applicable regulations, *see* 42 U.S.C. §§ 6294, 6315; *see also, e.g.,* 16 C.F.R. § 305.17.

## II. Express Preemption under EPCA

As relevant here, EPCA preempts state regulations "concerning the . . . energy use" of covered products. 42 U.S.C. § 6297(c). Accordingly, the Court must determine (1) the meaning of "energy use;" and (2) whether Local Law 154 "concern[s]" energy use within the meaning of EPCA. The City contends that "energy use" refers to a fixed value—determined through pre-market testing—that is used to measure a product's compliance with energy conservation standards. Thus, the City argues, EPCA's preemption clause reaches only state regulations that "directly or indirectly establish energy conservation standards." Mot. at 12. Plaintiffs respond, first, that "energy use" includes the actual ability of covered products to consume energy, and second, that Local Law 154 sets fossil-fuel-powered appliances' maximum energy use to zero by prohibiting them from using any energy. *See* Opp'n at 1. Accordingly, they argue that Local Law 154 "concern[s]" the energy use of covered products, and that the City is prohibited from "doing indirectly what Congress says [it] can't do directly." *Id.*; *see also id.* at 19–20. Although Plaintiffs are generally correct that a state may not indirectly regulate subject matter that it is preempted from directly regulating, *see, e.g, Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371–73 (2008); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385–86 (1992), the Court concludes that EPCA does not preempt Local Law 154 because it does not concern energy use as EPCA defines that term.

### A. The Meaning of "Energy Use"

"When a statute includes an explicit definition of a term," a court "must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S.

374, 387 (2021). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4).[6] Section 6293 requires that such test procedures be "reasonably designed to produce test results which measure [the] . . . energy use . . . of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Considered together, these provisions indicate that "energy use" is a fixed value, determined using administratively prescribed testing procedures, *see* 10 C.F.R. § 429.13, that represents the amount of energy a product consumes under typical conditions.

The Court therefore declines to adopt the interpretation of "energy use" employed by the Ninth Circuit in *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which, in this Court's view, rested on a flawed reading of the term "point of use." In that case, which involved a challenge to a municipal regulation prohibiting the installation of natural gas piping within newly constructed buildings, the court interpreted "point of use" to mean the "place where something is used." *Id.* at 1101. Based on that interpretation, the court concluded that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations." *Id.* at 1102. But as Judge Friedland persuasively explained in dissent, "EPCA is a technical statute," and thus "key terms" must be interpreted in accordance with their "specialized meanings." *Id.* at 1121 (Friedland, J.). "Point of use" is one such term; it means only that a covered product's energy use—when determined in accordance with prescribed test procedures—should be measured "without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of Energy, https://www.energy.gov/eere/analysis/energy-intensity-indicators-terminology-and-

[6] EPCA uses a substantively identical definition of "energy use" for provisions pertaining to industrial equipment. *See* 42 U.S.C. § 6311(4).

definitions. *See also*, *California Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J.) (discussing technical definition of "point of use"). It does not, however, expand EPCA's scope to reach the actual use of covered products, nor does it grant consumers an absolute right to use such products. Rather, it fits neatly into the statutory definition of "energy use," which refers to a covered product's characteristics as manufactured.

This conclusion finds support in EPCA's structure, as well as in the context of its implementing regulations, which are incompatible with Plaintiffs' interpretation of "energy use." First, the energy conservation standard applicable to a covered product sets either a maximum energy use or a minimum energy efficiency, *see id.* § 6291(6), the latter of which is calculated based on the product's energy use, *see* 42 U.S.C. § 6291(5) ("'Energy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title."). A covered product may not enter commerce if it does not meet these standards. *See* 10 C.F.R. § 429.12. If, as Plaintiffs contend, "energy use" refers to the amount of energy a product actually consumes in the hands of a consumer, then this rule would be impossible to implement. Second, and relatedly, EPCA "permits [the Department of Energy] to require that manufacturers submit information or reports with respect to the energy use of covered products to demonstrate their compliance with EPCA's standards and to facilitate DOE's administration of the statute." *California Rest. Ass'n*, 89 F.4th at 1122–23 (Friedland, J.) (citing 42 U.S.C. § 6296(d)(1)). "This provision does not require manufacturers to somehow monitor consumers' use of appliances after installation." *Id.* at 1123. Third, energy use and energy efficiency information are used to populate blank fields on a standardized label, *see, e.g.,* 16 C.F.R. § 305.17(a)(9) (requiring that labels for water heaters contain the text: "Estimated yearly energy use: ______ [kWh or therms]"), which must be affixed

to a product *before* it enters commerce, *see generally* 42 U.S.C. § 6294. In sum, none of these applications of "energy use" would function effectively if that term accounted for the quantity of energy actually used by covered products in the hands of consumers.

Accordingly, considering EPCA's text, structure, and context, the Court concludes that "energy use" refers to a predetermined fixed value that measures the characteristics of a covered product as manufactured.

**B. Local Law 154 Does Not Concern Energy Use**

With the statutory definition of "energy use" in mind, the Court next considers whether Local Law 154 "concern[s] . . . energy use" such that it is preempted by EPCA. 42 U.S.C. § 6297(c). As an initial matter, it notes that the binding authority addressing express preemption of indirect state regulation largely involves federal statutes preempting state laws that "relate to" the subject matter of the federal statute. *See, e.g., Rowe*, 552 U.S. at 368; *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004); *Morales*, 504 U.S. at 378–79; *Metro. Taxicab*, 615 F.3d at 156. The Supreme Court has described the phrase "related to" as "express[ing] a broad pre-emptive purpose," *Morales*, 504 U.S. at 383, that "reach[es] any subject that has a connection with, or reference to, the topics the statute enumerates," *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 96 (2017). By contrast, here, EPCA preempts state regulations "*concerning* the . . .energy use" of covered products. 42 U.S.C. § 6297(c) (emphasis added). "As with any preemption provision," the Court must "construe [EPCA] fairly but narrowly, mindful in the appropriate case that each phrase within the provision limits the universe of state action pre-empted by the statute." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445 (2d Cir. 2015). The Supreme Court has, in some instances, suggested that "concerning" and "related to" carry the same meaning, *see*, *e.g, Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S.

709, 717 (2018) ("The Court finds no basis to conclude, however, at least in this [non-preemption] context, that 'related to' has a materially different meaning than 'about,' 'concerning,' 'with reference to,' and 'as regards.'"); *Morales*, 504 U.S. at 383 (defining "related to" as, among other things, "to have bearing or concern"), and the parties urge the Court to adopt that interpretation here. However, both the Second Circuit and the Supreme Court have also suggested that, at least in the context of preemption, the word "concerning" is analogous to the term "with respect to," both of which convey a "preemptive scope" that is "narrower than the broad form of 'relating to' preemption." *Galper*, 802 F.3d at 446, 447 n.8; *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013) (using "concern" and "with respect to" interchangeably, and noting that "the addition of the words 'with respect to the transportation of property' . . . massively limits the scope of preemption"). Congress may therefore have intended EPCA to have a narrower preemptive scope than statutes that use "related to."

The Court need not rely on this interpretive distinction, however, because Local Law 154 does not "relate to" the subject matter of EPCA any more than it "concern[s]" it. A state regulation "relates to" preempted subject matter if it has a (1) "connection with;" or (2) "reference to" that subject matter. *Morales*, 504 U.S. at 384. "[T]o determine whether a state law has the forbidden connection," a court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law" on the subject matter of the federal statute. *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997). Relatedly, "[w]here a State's law acts immediately and exclusively upon" the subject matter of the federal statute, "or where the existence of [that subject matter] is essential to the law's operation, . . . that 'reference' will result in pre-emption." *Id.* In conducting this analysis, the Court is mindful that, although the words

"related to" have an "expansive sweep," *Morales*, 504 U.S. at 384, that breadth "does not mean the sky is the limit," *Dan's City*, 569 U.S. at 260.

As discussed above, with respect to the statutory scheme at issue here, EPCA sets energy conservation standards for covered products and requires that they be tested for compliance with such standards and labeled accordingly. A covered product's "energy use" is a component of that scheme; it represents the amount of energy a covered product consumes under typical conditions. Once a federal energy conservation standard takes effect for a covered product, state regulations concerning the product's energy efficiency or energy use—the bases upon which energy conservation standards are determined, *see* 42 U.S.C. § 6291(6)—are preempted. Moreover, Section 6297(c) is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product," which suggests that Congress intended to preempt state regulations that act as energy conservation standards, i.e., requirements that bear on the performance of a product as manufactured. *See Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring) ("Titles can be useful devices to resolve doubt about the meaning of a statute[,] . . . especially [where they] reinforce[] what the text's nouns and verbs independently suggest."). EPCA's text and structure thus make clear that its objective is "the establishment of national energy conservation standards for major residential appliances," S. Rep. 100-6, at 2 (1987), to "avoid the burdens of a patchwork of conflicting and unpredictable State regulations," *id.* at 12. The preemption clause ensures that state regulations do not frustrate that purpose.

Local Law 154 does not have a connection with EPCA's subject matter because it does not "focus[] on" the performance standards applicable to covered products. *Rowe*, 552 U.S. at 371. Indeed, the Law does not draw any distinction between products based on their energy efficiency or energy use as manufactured. It instead regulates, indirectly, the type of fuel that a covered

product may consume in certain settings, irrespective of that product's energy efficiency or use. Regulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral to municipal construction and fire codes. *See*, *e.g.,* N.Y.C. Admin. Code, Fuel Gas Code § 623.1.1 (prohibiting cooking appliances from using liquefied petroleum gas); *id.*, Mechanical Code § 922.1 (prohibiting the installation of kerosene and oil-fired stoves); *id.* § 918.1 (prohibiting unvented fuel-fired furnaces); *id.*, Fire Code § 313.3 (prohibiting the indoor use of kerosene space heaters); *id.*, Mechanical Code § 917.2 (prohibiting the installation of commercial cooking appliances in domestic dwelling units). Were Plaintiffs correct about the scope of EPCA, these vital safety regulations would likewise be preempted—an absurd result that the Court must avoid. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007). For example, if EPCA preempts a regulation effectively banning the use of fossil fuel powered appliances in a subset of new residential buildings, then by the same logic it might preempt a regulation that effectively prohibits the use of such appliances in close proximity to gas station pumps, *see, e.g.,* N.Y.C. Admin. Code, Fire Code § 2304.1.1, or in "sleeping rooms, bathrooms, toilet rooms, storage closets or surgical rooms," *see id.*, Fuel Gas Code § 303.3. Nothing in EPCA's text, structure, or legislative history suggests that Congress did not expect such regulations to survive preemption. To the contrary, regulations of that sort are "peculiarly within the province of state and local legislative authorities," and thus it is "hardly doubtful that [they] . . . fall[] outside the preemptive sweep" of EPCA. *Dan's City*, 569 U.S. at 264.

Nor does Local Law 154 have a "significant impact" on "Congress' deregulatory and pre-emption-related objectives," *Rowe*, 552 U.S. at 371, which in EPCA focus on eliminating the "burdens" imposed on manufacturers by "a patchwork of conflicting and unpredictable State regulations." S. Rep. 100-6, at 12, (1987). Unlike "differing State regulations," which "complicate

[manufacturers'] design, production and marketing plans," *id.* at 4, state laws like Local Law 154 do not risk creating a patchwork of conflicting standards because they neither require anything of manufacturers nor constrain their activities, *see Dan's City*, 569 U.S. at 263–64. Manufacturers may see reduced demand for certain products as a result of the Law, but they remain subject to a single, nationally uniform set of energy conservation standards. Local Law 154 is therefore "not the kind of burdensome state . . . regulation Congress sought to preempt." *Id.* at 264.

Further, as discussed, the Law affects the type of fuel that covered products may use in certain settings, not the performance standards applicable to covered products, and thus it neither "acts immediately and exclusively upon" EPCA's regime of uniform national standards, nor makes "the existence of" such standards "essential to [its] operation." *Dillingham*, 519 U.S. at 325. Plaintiffs' reliance on *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010), is therefore misplaced. That case involved City rules that favored hybrid and clean diesel taxis and penalized non-hybrid, non-clean diesel taxis. *Id.* at 155. Interpreting a provision of EPCA that preempts state laws "related to fuel economy standards," *see* 49 U.S.C. § 32919(a), the Second Circuit held that the City rules "reference[d]" fuel economy standards because the rules' distinction between hybrid and non-hybrid vehicles was "equivalen[t]" to distinguishing between "vehicles with greater or lesser fuel efficiency." *Id.* at 157. Here, by contrast, prohibiting certain fuel types in certain settings does not impose performance standards by proxy. Indeed, "some gas appliances are more efficient than electric appliances, so [the Law] may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *California Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J.) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)). Accordingly, Local Law 154 does not "reference" the subject matter of EPCA.

In sum, the Court concludes that Local Law 154 does not "relate to," and thus does not "concern," "energy use" within the meaning of EPCA.[7] It is therefore not preempted.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss is granted. Because "an amended complaint could not cure the substantive deficiencies of these claims," the complaint is dismissed with prejudice. *Peralta v. New York City Dep't of Educ.*, No. 21-CV-6833, 2023 WL 6201507, at *6 (E.D.N.Y. Sept. 22, 2023). The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: March 18, 2025
New York, New York

Ronnie Abrams
United States District Judge

[7] To the extent those terms do not carry the same meaning, the Court interprets EPCA's use of "concerning" to indicate Congress's intent that the statute's preemptive reach be no greater than that of statutes that use "related to." *See Galper*, 802 F.3d at 446, 447 n.8.