P3DRASSo

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  ASSOCIATION OF CONTRACTING
    PLUMBERS OF THE CITY OF NEW
 4  YORK, INC.,

 5                Plaintiffs,

 6           v.                              23 Civ. 11292 (RA)

 7  CITY OF NEW YORK,

 8                                           Oral Argument

                  Defendant.
 9
    ------------------------------x
10                                           New York, N.Y.
                                             March 13, 2025
11                                           11:00 a.m.

12  Before:

13                    HON. RONNIE ABRAMS,

14                                           District Judge

15                         APPEARANCES

16  REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
         Attorneys for Plaintiffs
17  BY:  BRIAN C. BARAN
         SARAH O. JORGENSEN
18
    CITY OF NEW YORK
19       Attorneys for Defendant City of New York
    BY:  CHRISTIAN CHASE HARNED
20       ALICE R BAKER

21

22

23

24

25
```

P3DRASSo

```
1              (Case called)

2              MR. BARAN:  Good morning, your Honor.  Brian Baran for

3     plaintiffs along with my colleague, Sarah Jorgensen.

4              THE COURT:  Good morning.

5              MR. HARNED:  Good morning, your Honor.  Christian

6     Harned for the City of New York along with Alice Baker.

7              THE COURT:  Good morning.  I'll ask everyone, and I'll

8     do the same, to speak into the microphone because it can be

9     difficult to hear in this courtroom.

10             We are here for oral argument on defendant's motion to

11    dismiss.  I have, of course, reviewed your papers, but why

12    don't we start with defendant?

13             MR. HARNED:  Thank you, your Honor.

14             The complaint here fails to state a plausible claim.

15    It must be dismissed because the theory of the preemption that

16    it relies on was incompatible with the text from the section of

17    the statute that Congress wrote.  That statute is, of course,

18    the Energy Policy and Conservation Act, or EPCA.

19             The preemptive scope of EPCA is appliance efficiency

20    regime, which are the relevant portions of the statute for this

21    complaint, are equal in scope to its regulatory regime.  So I'd

22    like to start by briefing describing EPCA's --

23             THE COURT:  Just bring your microphone a little bit

24    closer.  Thank you.

25             MR. HARNED:  Sure.  Is this better, your Honor?
```

P3DRASSo

```
 1              THE COURT:  Yes.  Thank you.

 2              MR. HARNED:  So, as I said, I'd like to briefly start

 3    by describing EPCA's regulatory regime.  EPCA regulates

 4    appliance efficiency in three key ways by imposing regulations

 5    on manufacturers.  First, EPCA requires that manufacturers

 6    design their products to comply with energy conservation

 7    standards.  These are standards that regulate the energy

 8    efficiency or energy use of covered products by imposing limits

 9    on their consumption of energy.  I will refer to those

10    standards as either appliance efficiency standards or key

11    conservation standards interchangeably.

12              THE COURT:  Sure.

13              MR. HARNED:  The second obligation EPCA imposes on

14    manufacturers is with regards to testing.  Manufacturers must

15    test their products in accordance with test procedures

16    promulgated by the Department of Energy in order to measure the

17    amount of energy that clients will use during the

18    representative average-use cycle or period of use and to ensure

19    those products comply with the energy conservation standards

20    that the Department of Energy promulgates.

21              Third, your Honor, EPCA obligates manufacturers to

22    label their appliances to state the amount of energy the

23    consumer can expect that appliance to use during a typical-use

24    cycle.  Manufacturers must comply with all of these obligations

25    before they may market their appliance, before a consumer ever
```

P3DRASSo

1    can purchase their appliance.  And in exchange for their

2    compliance with these obligations, EPCA preempts state or local

3    regulations in those same three areas.

4           Here, your Honor, there can be no real dispute about

5    whether Local Law 154, the law that is challenged by the

6    complaint, regulates within those three areas.  It plainly does

7    not.  It does not impose an appliance efficiency standard.  It

8    does not impose a labeling requirement.  It does not impose a

9    test procedure requirement on manufacturers.

10           Instead what Local Law 154 does is it prohibits the

11    use of the certain fuel sources in new construction in New York

12    City.  And the effect of that is that for new buildings

13    constructed subject to the requirements of the law, and it is

14    in fact with respect to some buildings now, you cannot have

15    natural gas or any other fossil fuel in the building.

16           The complaint here relied on a candidly wrongly

17    decided decision out of the Ninth Circuit.  It asserts that one

18    of EPCA's preemption provisions, located at 42 U.S.C. 6297(c),

19    extends beyond compliance efficiency regulations to capture any

20    regulation that prevents consumers from using federally

21    regulated products.  But we know, from looking at the text of

22    the statute, that the preemption provision does not do this.

23           Your Honor, the preemption provision at issues states

24    in relevant part that once the Department of Energy promulgates

25    the appliance efficiency standard for a regulated product, no

P3DRASSo

1   state or local regulation concerning the energy efficiency or

2   energy use of that covered product shall be effective with

3   respect to that covered product.  And the effect of that

4   provision really turns on two key words in the provision which

5   are "energy use."

6           Thankfully we don't have to guess what energy use

7   means because Congress told us what they intended it to mean.

8   The definition that Congress assigned to energy use is the

9   quantity of energy directly consumed by consumer products at

10  point of use determined in accordance with test procedures

11  under 6293, the test procedures regime.  Plaintiffs never use

12  this definition of energy use.  They don't use it in the

13  complaint.  They didn't use it in their opposition.

14          Instead, plaintiffs assign a different meaning to

15  energy use, and they assign various definitions to it.  But at

16  base, their definition of energy use is the quantity of energy

17  directly consumed by covered products at the place where those

18  appliances are used.  And on their reading of that definition

19  of energy use, they allege that Local Law 154 is preempted

20  because it prevents appliance use, the use of certain

21  appliances that are regulated by EPCA.

22          We know that their rewritten definition of energy use

23  fails for a number of reasons.  Many of them we address in our

24  brief, your Honor, but I would like to focus on two key reasons

25  here today.  The first is that plaintiff's definition of energy

P3DRASSo

```
1    use will lead to absurd results under the statute if it is

2    accepted by this Court.  Energy use is only defined once in the

3    statute.  So it must have the same meaning in the preemption

4    provision as it does in other provisions of EPCA's appliance

5    regulatory regime.

6          Take, for instance, the labeling regime.  EPCA's

7    labeling regime requires that manufacturers again label their

8    products for certain products like personal computers to state

9    the energy use of that product.  If energy use is the amount of

10   energy that consumers use when they actually use the product,

11   you could not label an appliance to state its energy use before

12   you market it, because you will not know how any consumer will

13   use their product and they haven't used the product.  Energy

14   use in that context hasn't existed yet, right.

15         The same is true for EPCA's test procedure regime.  A

16   test procedure is a test that measures energy use during a

17   representative average use cycle or period of use.  If energy

18   use, as plaintiffs allege here, is the energy that consumers

19   use when they use an appliance, you couldn't possibly test a

20   product's energy use before it's marketed.  Again, a consumer

21   hasn't used the product, so they haven't generated this measure

22   of energy use that plaintiffs say energy use is defined as.

23         Finding that plaintiff's rewritten definition of

24   energy use is true would lead to absurd results under the

25   statute because it would necessarily require you to find that
```

P3DRASSo

1    Congress imposed obligations on factors that it couldn't

2    satisfy.  It required them to know how each consumer will use

3    their covered product and how much energy each consumer will

4    consume when they use their product before that product ever

5    reaches manufacturers, but we know that's not true.  If you use

6    the statutory definition, the definition of energy use that

7    Congress wrote, energy use is the same for a product that is

8    purchased and used on a daily basis as one that is never

9    purchased and never used.  They have the exact same measure of

10   energy use under the statute.

11        Your Honor, the second key reason that we know energy

12   use is not the quantity of energy that consumers use when they

13   use the product is because EPCA contains a provision that

14   directly tells us that energy use is different from the energy

15   consumed and the definitions of actual use.  That provision is

16   42 U.S.C. 6297(g).  In that provision, Congress protected

17   manufacturers from claims that the energy use that they state

18   on their label is different from the energy use that would be

19   achieved under conditions of actual use.  If Congress intended

20   for energy use to mean the energy achieved under conditions of

21   actual use, they would not have needed to protect manufacturers

22   from these claims.  Your Honor, plaintiff's theory of

23   preemption requires that their definition of energy use be

24   true.  Again, that's how they reach the conclusion that 6297(c)

25   preempts regulations that prevent the use of a given appliance.

P3DRASSo

1          However, for the reasons that we discussed here and as

2     further stated in our brief, we know that energy use does not

3     have the meaning that they have assigned it.  Instead, it has

4     the meaning that Congress gave it.  Because their theory of

5     preemption relies on this definition of energy use, their

6     theory of preemption fails, and the complaint must be

7     dismissed.

8          Unless your Honor has further questions, I'll reserve

9     the remainder of my time.

10          THE COURT:  Why don't we wait until rebuttal?  Thanks.

11          MR. BARAN:  Your Honor --

12          THE COURT:  Please, after you.  Go ahead.

13          MR. BARAN:  This case is not about how energy use is

14     measured.  I think you can accept everything the city says

15     about how to measure energy use and still find that this is a

16     regulation concerning the energy use of a covered product.  My

17     friend on the other side said that the key words are energy

18     use, but the key word is actually concerning.  That term has a

19     well established scope when Congress uses it in preemption

20     provisions.  It means the same thing as related to and --

21          THE COURT:  Walk me through that, what exactly the

22     definition of concerning is.  In your view, it is the same as

23     related to?

24          MR. BARAN:  Yes.  It's the same as related to.  The

25     Supreme Court said that in *Lamar, Archer & Cofrin*.  And I think

P3DRASSo

1    when Congress uses "regulation concerning," you could swap in

2    "related to" there, and it would mean the same thing.  So I

3    think the simplest place to look is to the many, many cases

4    about "related to" that apply the test originally developed for

5    ERISA about "reference to" or "connection with."  And this case

6    fits squarely within the "connection with" strain of that text,

7    and I think that's where you find the limiting principle.

8         We've heard a lot in the briefing about how we don't

9    have a limiting principle.  The limiting principle is there in

10   the many cases on preemption provisions that Congress

11   structured in just this way.  And those don't -- you've got

12   Justice Scalia's point about how, to the curbstone philosopher,

13   everything is related to everything else.  That's, of course,

14   not the scope of concerning.  The question is, you know, among

15   other things:  Is there a significant impact on what Congress

16   was trying to do?  Here the answer is yes.  Congress wanted to

17   prevent a patchwork of conflicting requirements for federally

18   regulated appliances, and allowing states and local governments

19   to ban covered appliances would create exactly the patchwork

20   that Congress was trying to prevent.

21        By contrast, an incidental impound -- there's several

22   examples in Judge Baker's concurrence in the Ninth Circuit of

23   general regulations that incidentally impact how much energy an

24   appliance used.  Those are unlikely to be preempted under the

25   well-established meaning of concerning.

P3DRASSo

1          THE COURT:  Aren't regulations prohibiting the use of

2    certain types of fuels in appliances in certain settings

3    commonplace in the realm of municipal construction and fire

4    codes?  How is this different from that?

5          MR. BARAN:  I think this is different from your sort

6    of typical fire or electric code——I think there was an example

7    in the brief of 12 amps on a 15-amp circuit——because this a

8    categorical ban on any appliance in any situation in the

9    covered buildings that uses a particular fuel.  And Congress

10   told us that it cared about preserving choice among appliances.

11   It wanted to increase efficiency, but it also wanted to

12   preserve choice among appliances.  That's why 6295(q)(1)

13   requires the department to set standards differently based on

14   the fuel types.  Because otherwise a standard might not achieve

15   as much as it could if it has to bring all the other fuels with

16   it, or it will be set to high for a particular fuel to be used.

17          Congress could have taken a different approach.  It

18   could have said, pursue efficiency at all costs even if that

19   means making some fuel types unavailable, but Congress decided

20   not to do that.  It prohibited the department from doing that,

21   and it prohibited the department from allowing waivers from

22   preemption that would let states and local governments do that.

23   So I think Congress was concerned about preserving consumer

24   choice among the appliances that it decided to regulate, and

25   that was a choice that was within Congress's power to make and

P3DRASSo

1   to enforce on state and local governments.

2           I think things like your more typical fire or

3   electrical code, those coexisted with EPCA for a long time.

4   And I think if we're talking about, you know, you can't put a

5   furnace if it is too big for the room, I think that's

6   fundamentally different from what the city has done here, which

7   has said that effectively any gas or fuel-oil appliance that

8   has an energy use value calculated under the statute that

9   exceeds zero can't be used because the fuels necessary to use

10  it, the fuels that the way its energy use works are prohibited

11  in new buildings.  And I think it's exactly the same result as

12  if the city had expressly set an energy-use cap on all of the

13  affected appliances of zero.  And I think even under the city's

14  reading of the statute, it couldn't do that because that would

15  be setting an energy conservation standard.  And so, it can't

16  do indirectly what it can't do directly.

17          THE COURT:  Can you respond to Mr. Harned's analysis

18  of just the statutory language?  And then, I also want to talk

19  about legislative history as well.

20          MR. BARAN:  Do you mean the statutory language of

21  energy use specifically or just more generally?

22          THE COURT:  I mean EPCA and then the Local Law 154 as

23  well.

24          MR. BARAN:  So I think for EPCA, you know, we agree

25  that energy use is a value that you can calculate for an

P3DRASSo

```
 1    appliance.  That's a value that gets stuck on a label.  But I
 2    think the core question here is:  What does the preemption
 3    provision preempt?  And Congress was free to and it did preempt
 4    more than what it decided the federal government was going to
 5    do.  All the federal government does, under this section of
 6    EPCA, is sets standards for appliances.  I think Congress
 7    preempted more than that, and it told us so because it says:
 8    No state regulation concerning the energy use of a covered
 9    appliance.
10         And so, I don't any there's any way to read
11    "concerning," given the backdrop of that term from the "related
12    to" cases from the many similar preemption provisions to just
13    reach regulations that are effectively the same thing as an
14    energy conservation standard or that require recalculation of
15    the energy use value for a particular appliance.  I think it
16    also sweeps in regulations that effectively require that gas
17    appliances with energy use greater than zero can't be used.
18    You couldn't impose that regulation on the manufacturer.  You
19    can't impose it on the consumer.  And I think the provision
20    that --
21         THE COURT:  Wasn't the purpose of EPCA to avoid these
22    conflicting state standards?
23         MR. BARAN:  Yes, that was.  One of the core things
24    that Congress wanted to accomplish was one of the core purposes
25    of this preemption provision.  It's --
```

P3DRASSo

1          THE COURT:  That's because it would be difficult for

2    manufacturers to have different standards that comply with all

3    these different state laws.  That's not really what's happening

4    here, right?  This isn't going to burden manufacturers in the

5    way that it was intended by EPCA.

6          MR. BARAN:  I disagree.

7          So I agree that once a manufacturer decides, okay, I'm

8    building a gas appliance, the city's law has nothing more to

9    say about how that gas appliance is built, but manufacturers

10   have to make decisions about before that; what appliances are

11   we going to offer with what fuel sources.  And if you have a

12   patchwork of cities where one city is all electric, one city is

13   all gas, manufacturers are absolutely going to have to account

14   for that, especially with populous cities and states, a

15   national patchwork of which fuels, which appliances within

16   their lines can be marketed and sold in which jurisdictions,

17   that's going to affect how you allocate your space in the

18   factory, how you tool your factory floor.

19         So I think even on the view that preemption stops at

20   the end of the factory floor, which I don't think is consistent

21   with the statute and particularly is inconsistent with the

22   statutory exceptions, I think we still win under that view

23   because this does affect manufacturers decisions.  It just

24   affects them one step earlier when they're choosing the fuel

25   that the appliance is going to use, rather than, okay, I've

P3DRASSo

1   made that initial choice, and then designing the rest of the

2   appliance.

3         THE COURT:  Can you address counsel's position about

4   the language regarding testing?

5         MR. BARAN:  I think the language regarding testing

6   actually favors our view because the point of the test and the

7   way the tests are required to be designed is to measure a

8   representative use cycle.  So I think that reflects that

9   Congress was concerned with the real-world impact of what it

10  was doing rather than just how things work and allowed.  And

11  so, I don't think there's any way to read the preemption

12  provision such that it only preempts things that require you to

13  retest the statute -- I'm sorry -- to retest an appliance.

14        So, yes, we don't repeat it every time we say the

15  definition, but I don't think that's because we're trying to

16  hide from the test procedures.  I think that's because it

17  explains how to calculate energy use, but this case isn't

18  really about how to calculate energy use.  We accept everything

19  the city says about how to calculate energy use, and it's still

20  preempted because it's still a regulation concerning energy

21  use.

22        I think the exceptions really help expose that the

23  city's interpretation is too narrow.  The very thing that

24  enables you to satisfy the building code exception disqualifies

25  a regulation from preemption on the city's version of the

P3DRASSo

1   statute.  What I haven't seen either in the city's brief or any

2   of the amicus briefs, or frankly any of the briefing in the

3   Ninth Circuit, is an example of the regulation that could

4   satisfy all seven of the requirements of the building code

5   exception, but would otherwise be preempted on an

6   interpretation of the provision that doesn't preempt laws like

7   New York City's.  And if the things that --

8            THE COURT:  Say that one more time.  I have a

9   transcript here, but just say that one more time.

10           MR. BARAN:  My point is that Congress put in this

11   seven-part exception, so it must have thought that a law that

12   meets all these requirements should be exempt from preemption.

13   But if it didn't put in this exception, it would otherwise be

14   covered by the scope of preemption provision.  So if what it

15   takes to satisfy the exception means that there's just no

16   preemption in the first place under your interpretation, then

17   that interpretation of the general preemption provision must be

18   wrong.  Congress wouldn't have written this whole exception to

19   be surplusage.

20           THE COURT:  All right.  I have a couple questions.  So

21   in your complaint, you're urging that the Court adopt the

22   rationale set forth by the Ninth Circuit, which focused on the

23   term "point of use," to conclude that EPCA preempts regulations

24   that interfere with consumer's ability to use the covered

25   products.  But if I read your opposition brief correctly, you

P3DRASSo

 1   don't seem to be still making that argument but are arguing

 2   instead that Local Law 154 essentially sets the maximum energy

 3   use for gas appliance at zero, so I just want to make sure I'm

 4   clear on what your position is.

 5          MR. BARAN:  I think you can take any of the views that

 6   have been offered of what "point of use" does in the definition

 7   and still get to where we are because I think our argument is

 8   really about concerning.  It's not about point of use.  And I

 9   think the Ninth Circuit understood that to reinforce among the

10   other things in the statute that Congress cared about more than

11   what happens on the factory floor.  But even if you read it the

12   way Judge Friedland's dissent does, and you understand it to

13   mean all it is is site versus source energy, which you measure,

14   I think we'd get to the same place.  Because what is preempted

15   is more than just things that affect the energy use number or

16   an energy efficiency number for the appliance.  I think here,

17   this is just -- what the City has done is just a roundabout way

18   of imposing a zero-energy use standard on all the affected

19   appliances, which are gas and fuel oil appliances.

20          I think one of the disputes in the Ninth Circuit

21   between the panel and the dissent from the denial, and I think

22   what we also heard a little bit today is this idea that there's

23   some unconstrained consumer right to use.  I don't think that's

24   what the Ninth Circuit panel did.  I think it was making a much

25   narrower point that when preemption kicks in, of course

P3DRASSo

1      consumers are going to be able to use the products as a result

2      of bans on those products being preempted, but I don't think

3      that means that it's a totally constrained right to use, free

4      of all regulations, free of fire codes, free of electrical

5      codes and all of that.

6            I think these things that incidentally affect how you

7      might be able to use a particular appliance in a particular

8      building are fundamentally different from what the City has

9      done here, which is a categorical ban on whole swaths of

10     covered appliances, and just not do it in the terms that I

11     think we all agree would be expressly preempted, which is gas

12     appliances maximum energy use is zero.

13            THE COURT:  All right.  So when Section 6297 refers to

14     a covered product, does that mean the broad categories of

15     products listed in Section 6292, which makes no mention of fuel

16     source?  For example, that section covers kitchen ranges and

17     ovens but does not differentiate between gas and electric.  And

18     so, my question is:  Would a gas kitchen range and an electric

19     kitchen range be two different covered products or are they the

20     same covered products?

21            MR. BARAN:  I think they are types or classes of

22     covered products.  The way it works is that there's this list

23     of kinds of appliances that are covered.  The Department of

24     Energy can also and has designated a whole bunch more

25     appliances that are on the statutory list as covered

P3DRASSo

appliances.  There's a process in the statute by which it can

do so.  And then, when it actually sets the standards, it is

required to set them by fuel type, and that's 6295(q)(1).  It

sets different standards for each fuel type.

        Actually, Congress did that in the statute as well

where it was setting standards.  For example, I believe

6295(e)(1).  You can see that in the statute there are separate

standards for water heaters by fuel type.  So a gas water

heater and electric water heater are both types of covered

products.

        THE COURT:  Could New York City limit the amount of

hours per day, for example, that individuals could use gas

stoves?

        MR. BARAN:  I think it's unlikely.  Assuming that

we're talking about otherwise available gas, I think it is

unlikely that New York City would be able to impose that kind

of limit partly because, Where do you draw the line?  Can you

use it for a minute a day?  That starts to look like a ban.  I

think it would depend on the particular circumstances of the

case.  Like, what are the things we see, especially in the

ERISA cases.  That's gone up to the Supreme Court how many

times, and it's because preemption provisions like these are

really hard to draw right lines especially when you are sort of

in the heartland of preemption versus on a case that is

actually preventing the boundary.  But I think in general, it

P3DRASSo

1    sounds like it would likely be preempted as just another way of

2    getting to the same thing it's doing here.

3         THE COURT:  All right.  Anything else?

4         MR. BARAN:  I guess I think I would just leave you

5    with I don't think there's any reason to create a split with

6    the Ninth Circuit, and I don't think the City's reading or any

7    of the amicus readings fully account for all of the statutory

8    context and especially the building code exception.  I really

9    think that if there is no regulation that would be preempted

10   but for the exception, then that just can't be the right

11   interpretation of the statute.  Our interpretation gives

12   meaning to all the parts of the statute.  The City's does not.

13   Thank you, your Honor.

14        THE COURT:  Thanks.  One other question I'm going to

15   ask both of you:  Are there any factual issues you think need

16   to be decided before I can rule?

17        MR. BARAN:  I don't think so.

18        THE COURT:  All right.  Thank you.  Rebuttal?

19        MR. HARNED:  Thank you, your Honor.  I'd like to

20   address three points that my adversary raised.  First and

21   briefly, Local Law 154 is not an appliance ban.  Plainly, by

22   its text, it does not ban appliances.  Natural gas appliances

23   are being bought and sold in the city today.  That will

24   continue to be true in perpetuity under Local Law 154.

25        What Local Law 154 does is limit where you might use a

P3DRASSo

1    covered product, and what it does is limits their use to older

2    building stock.  You cannot install fossil fuel in new

3    buildings, and as a result of that, you cannot use appliances

4    that rely on fossil fuel.  It's plainly not an appliance ban.

5         Second, your Honor, Local Law 154 only concerns the

6    energy use of covered products if you adopt their rewritten

7    definition of energy use.  Under their definition, a regulation

8    concerns energy use if it prevents you from using energy, but

9    that's not the definition that Congress wrote.  And the

10   definition that Congress wrote -- excuse me -- that the

11   plaintiffs here have asserted again is fundamentally

12   incompatible with the statute.

13        THE COURT:  So walk me through the definition of

14   "concerning."

15        MR. HARNED:  Your Honor, we can accept as true that

16   concerning has the meaning that my adversary gave it; that it

17   means related to.  In this context what that means is that New

18   York City could not directly or indirectly regulate in the

19   manner that EPCA does by establishing an appliance efficiency

20   standard.  A direct regulation might be one that is imposed

21   directly on manufacturers.  You must produce products that

22   achieve X level of efficiency.  An indirect regulation can come

23   in many forms.  It can be a regulation that is imposed on

24   consumers.  You cannot purchase products unless they comply

25   with this efficiency standard.  It can be a building code.  You

P3DRASSo

1    cannot satisfy our building code unless the building achieves a

2    certain level of efficient use of energy.

3         Local Law 154 plainly does not do either of those

4    things.  It does not require that any manufacturer have their

5    product use energy more efficiently than it did before Local

6    Law 154.  Instead it says you cannot use a given type of fuel.

7    That is not the regulation that concerns energy use if you

8    apply the definition of energy use that Congress wrote.

9         Your Honor, an example here might be helpful to really

10   explain just how far plaintiff's theory of preemption goes.  My

11   colleague mentioned boilers.  Under their theory if a locality

12   were to say you cannot use a boiler of X size in a space that

13   is too small for its safe use, that would be preempted because

14   you are preventing that boiler's use.  You are preventing that

15   boiler from using energy in certain spaces, right.  Plainly

16   though, that standard would not impose an appliance efficiency

17   standard on the boiler that requires it to consume energy more

18   efficiently.  Under Congress's definition of energy use, that

19   safety standard wouldn't be preempted.  Under their theory, of

20   course, it would be.

21        Your Honor, briefly I'd like to address this idea that

22   Congress intended to preserve choice by limiting the federal

23   government's authority to establish standards that would result

24   in the unavailability of products.  All of those provisions

25   arise under 6295, which is the provision governing energy

P3DRASSo

1    conservation standards; the very types of standards that we say

2    Congress sought to preempt states and localities from doing.

3    And Congress, of course, said sure we don't want you to

4    establish a standard that makes certain covered products

5    unavailable in the market.  And then when you look at the

6    preemption provision, if you are seeking a waiver of preemption

7    from the Department of Energy, they cannot grant that if the

8    state or local appliance efficiency standard has the same

9    effect.

10           That Congress does not want standards to result in the

11   unavailability of products says nothing about regulations like

12   Local Law 154 that are not appliance efficiency standards.  You

13   can go back to the boiler example.  We can come up with other

14   examples, but it is plainly the case that states and localities

15   have the authority to regulate where appliances might be used,

16   and that they can do that without regulating the efficiency of

17   that appliance -- without imposing an appliance efficiency

18   standard.

19           THE COURT:  Can you address plaintiff's argument that

20   Local Law 154 sets the energy-use standard to zero?

21           MR. HARNED:  It doesn't.  There's no energy-use

22   standard if you apply energy use as the definition that

23   Congress gave it.  Of course, if you use their definition where

24   the use of energy is effectively the definition of energy use,

25   it would limit the use of energy in some context.  But if you

P3DRASSo

1    apply Congress's definition, we're not requiring that

2    manufacturers redesign their products to consume zero natural

3    gas.  That's not the case.  Again, any natural gas appliance

4    that could be sold before the effective date of Local Law 154

5    may still be sold in the City today.  Of course, they are being

6    sold.  You can still go to PC Richards & Sons and buy whatever

7    gas stove you would like to buy.

8              THE COURT:  But it wouldn't be able to be used in --

9              MR. HARNED:  In new construction, correct.  But the

10   regulation on where appliances are used is not an appliance

11   efficiency standard.  What we're saying is what Local Law 154

12   says is that you cannot use certain fuel types.  Those fuel

13   types are fuel types, which according to the energy information

14   agency, emit above the threshold of emissions that New York

15   City has determined are acceptable.

16         The preemption provision says nothing about

17   regulations.  It does not say you cannot prohibit -- that a

18   state or local jurisdiction can not promulgate a regulation

19   that prohibits certain fuel types.  It is expressly cabined to

20   energy use, which again has a specific meaning under the

21   statute, meaning that plainly pertains to appliance efficiency

22   standards and does not pertain to appliance use as plaintiff's

23   theory requires.

24             THE COURT:  Do you think the purpose of Local Law 154

25   is relevant here?

P3DRASSo

1          MR. HARNED:  No, your Honor.  I think what's relevant

2    is the mechanism.  Though the purpose of Local Law 154 is to

3    improve air quality to address climate change, there's nothing

4    to indicate that in fact we were trying to ensure natural gas

5    appliances more efficiently used their natural gas.  We don't.

6    There's nothing in the law that would require that.

7          THE COURT:  And I asked this of your adversary, but

8    are there any factual issues you think need to be decided?

9          MR. HARNED:  Your Honor, I don't -- I'm sorry, your

10   Honor.

11         THE COURT:  No.  Go ahead.

12         MR. HARNED:  I don't think so, but I would highlight

13   Local Law 154 will limit where you might be able to use certain

14   appliances.  It is plainly not an appliance ban as they assert

15   it to be.

16         THE COURT:  All right.  Thank you for your excellent

17   advocacy.  I will try and rule shortly.  Have a good day.  And

18   please get a copy of the transcript from the court reporter.

19         (Adjourned)

20                             oOo

21

22

23

24

25